**IN THE UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ANNA HOLDINGS, INC., *et al.*,[1] | ) | Case No. 19-_____ (___) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

## DISCLOSURE STATEMENT FOR THE DEBTORS' FIRST AMENDED JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION

Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C.
Christopher T. Greco, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

-and-

Spencer A. Winters
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar 4165)
Sally E. Veghte (DE Bar 4762)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:        (302) 426-1189
Facsimile:        (302) 426-9193

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

Dated:  November 23, 2019

---

[1]    Due to the large number of Debtors in these anticipated chapter 11 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.primeclerk.com/Acosta.  The location of the Debtors' service address for purposes of these chapter 11 cases is:  6600 Corporate Center Parkway, Jacksonville, Florida 32216.

**THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126, 11 U.S.C. §§ 1125, 1126.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.    THE DEBTORS INTEND TO SUBMIT THIS DISCLOSURE STATEMENT TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING COMMENCEMENT OF SOLICITATION AND THE DEBTORS' FILING FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE.    THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

KE 63679933

PHIL1 8521314v.1

**IMPORTANT INFORMATION REGARDING THIS DISCLOSURE STATEMENT**
**DISCLOSURE STATEMENT, DATED NOVEMBER 23, 2019**

**SOLICITATION OF VOTES ON**
**THE DEBTORS' FIRST AMENDED JOINT PREPACKAGED CHAPTER 11 PLAN OF**
**REORGANIZATION FROM THE HOLDERS OF OUTSTANDING:**

| VOTING CLASS | NAME OF CLASS UNDER THE PLAN |
|---|---|
| CLASS 3 | FIRST LIEN CLAIMS |
| CLASS 4 | SENIOR NOTES CLAIMS |

**IF YOU ARE IN CLASS 3 OR CLASS 4 YOU ARE RECEIVING THIS DOCUMENT AND THE ACCOMPANYING MATERIALS BECAUSE YOU ARE ENTITLED TO VOTE ON THE PLAN**

**UNLESS OTHERWISE DETERMINED BY THE DEBTORS, ALL VOTES OF HOLDERS OF CLASS 3-FIRST LIEN CLAIMS AND CLASS 4-SENIOR NOTES CLAIMS THAT WERE SUBMITTED BEFORE THE TRANSMISSION OF THIS AMENDED DISCLOSURE STATEMENT WILL BE DISREGARDED FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE AMENDED PLAN AND ELECTING WHETHER OR NOT TO RECEIVE THE CASH-OUT OPTION. ALL HOLDERS OF CLASS 3-FIRST LIEN CLAIMS AND CLASS 4-SENIOR NOTES CLAIMS SHOULD SUBMIT THE BALLOT THAT ACCOMPANIES THIS AMENDED DISCLOSURE STATEMENT IN ORDER TO HAVE THEIR VOTES AND ELECTIONS COUNTED IN ACCORDANCE WITH THE SOLICITATION PROCEDURES DESCRIBED HEREIN (THE "SOLICITATION PROCEDURES") BEFORE THE CLASS 3 VOTING DEADLINE OR THE CLASS 4 VOTING DEADLINE, AS APPLICABLE.**

**FURTHER, ANY BALLOT EXECUTED BY OR ON BEHALF OF A HOLDER OF A CLASS 3-FIRST LIEN CLAIM OR CLASS 4-SENIOR NOTES CLAIMS THAT INDICATES (I) A REJECTION OF THE PLAN AND (II) AN ELECTION TO RECEIVE THE FIRST LIEN CASH-OUT OPTION OR SENIOR NOTES CASH-OUT OPTION, SUCH ELECTION, AS APPLICABLE, SHALL BE NULL AND VOID.**

---

**DELIVERY OF BALLOTS**

**BALLOTS MUST BE ACTUALLY RECEIVED BY THE SOLICITATION AGENT BY THE**

**THE CLASS 3 VOTING DEADLINE, WHICH IS 11:59 P.M., PREVAILING EASTERN TIME, ON**

**NOVEMBER 29, 2019, AND THE CLASS 4 VOTING DEADLINE, WHICH IS 11:59 P.M.,**

**PREVAILING EASTERN TIME, ON DECEMBER 9, 2019, VIA THE ENCLOSED PRE-PAID,**

**PRE-ADDRESSED RETURN ENVELOPE**

**OR**

**AT THE FOLLOWING ADDRESSES:**

**VIA FIRST-CLASS MAIL, OVERNIGHT COURIER, OR HAND DELIVERY TO:**

**ANNA HOLDINGS, INC. BALLOT PROCESSING**
**C/O PRIME CLERK LLC**
**ONE GRAND CENTRAL PLACE**

---

**60 EAST 42ND STREET, SUITE 1440**
**NEW YORK, NY 10165**

**OR**

**VIA ELECTRONIC SUBMISSION THROUGH THE**
**SOLICITATION AGENT'S E-BALLOT PORTAL:**

**HTTPS://CASES.PRIMECLERK.COM/ACOSTA**
**PLEASE CHOOSE ONLY ONE METHOD TO RETURN YOUR BALLOT**

**BALLOTS RECEIVED VIA FACSIMILE WILL NOT BE COUNTED**

**IF YOU HAVE ANY QUESTIONS ON THE PROCEDURE FOR VOTING ON THE PLAN, PLEASE**
**CALL THE SOLICITATION AGENT AT: 877-433-8808 (toll free) OR 917-994-8388 (international)**

This disclosure statement (as may be amended, supplemented, or otherwise modified from time to time in accordance with its terms, this "**Disclosure Statement**") provides information regarding the *Debtors' First Amended Joint Prepackaged Chapter 11 Plan of Reorganization* for Anna Holdings, Inc. and its Debtor Affiliates (as may be amended, supplemented, or otherwise modified from time to time in accordance with its terms, the "**Plan**"),[2] which the Debtors are seeking to have confirmed by the Bankruptcy Court.  A copy of the Plan is attached hereto as **Exhibit A**.  The Debtors are providing the information in this Disclosure Statement to certain holders of Claims for purposes of soliciting votes to accept or reject the Plan.

This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Plan being proposed by the Debtors. The Debtors reserve the right to modify the Plan consistent with section 1127 of title 11 of the United States Code (as now in effect or hereafter amended, the "**Bankruptcy Code**"), Rule 3019 of the Federal Rules of Bankruptcy Procedure (together with the local rules of the Bankruptcy Court, as now in effect or hereafter amended, the "**Bankruptcy Rules**"), and subject to the Stakeholder Approval Rights.

Pursuant to the Restructuring Support Agreement, the Plan is currently supported by the Debtors, Consenting First Lien Lenders holding approximately 70% of the amount of First Lien Claims, Consenting Noteholders holding approximately 80% of the amount of Senior Notes Claims, and the Sponsor.

The consummation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in **Article IX** of the Plan.  There is no assurance that the Bankruptcy Court will confirm the Plan or, if the Bankruptcy Court does confirm the Plan, that the conditions necessary for the Plan to become effective will be satisfied or in the alternative waived.

The Debtors urge each holder of a Claim to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and each proposed transaction contemplated by the Plan.

The Debtors strongly encourage holders of Claims in Class 3 and Class 4 to read this Disclosure Statement (including the Risk Factors described in **Article VII** hereof) and the Plan in their entirety before voting to accept or reject the Plan.  Assuming the requisite acceptances to the Plan are obtained, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

**RECOMMENDATION BY THE DEBTORS**

**EACH DEBTOR'S BOARD OF DIRECTORS, MEMBER, OR MANAGER, AS APPLICABLE, HAS APPROVED THE TRANSACTIONS CONTEMPLATED BY THE PLAN AND DESCRIBED IN THIS DISCLOSURE STATEMENT, AND EACH DEBTOR BELIEVES THAT THE COMPROMISES**

---

[2]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan.

**CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF EACH OF THE DEBTOR'S ESTATES, AND PROVIDE THE BEST RECOVERY TO CLAIM AND INTEREST HOLDERS.    AT THIS TIME, EACH DEBTOR BELIEVES THAT THE PLAN AND RELATED TRANSACTIONS REPRESENT THE BEST ALTERNATIVE FOR ACCOMPLISHING THE DEBTORS' OVERALL RESTRUCTURING OBJECTIVES.    EACH OF THE DEBTORS THEREFORE STRONGLY RECOMMENDS THAT ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO <u>ACCEPT</u> THE PLAN BY RETURNING THEIR BALLOTS SO AS TO BE <u>ACTUALLY</u> <u>RECEIVED</u> BY THE SOLICITATION AGENT NO LATER THAN <u>NOVEMBER 29, 2019 AT 11:59 P.M. (PREVAILING EASTERN TIME) FOR CLASS 3 AND 11:59 P.M. (PREVAILING EASTERN TIME) ON DECEMBER 9, 2019 FOR CLASS 4</u> PURSUANT TO THE INSTRUCTIONS SET FORTH HEREIN AND ON THE BALLOTS.**

KE 63679933
PHIL1 8521314v.1

**SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS**

The Bankruptcy Court has not reviewed this Disclosure Statement or the Plan, and the securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the United States Securities and Exchange Commission (the "SEC") under the United States Securities Act of 1933 as amended (the "Securities Act") or any securities regulatory authority of any state under any state securities law ("Blue Sky Laws"). The Plan has not been approved or disapproved by the SEC or any state regulatory authority and neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or the Plan. Any representation to the contrary is a criminal offense. The Debtors are relying on section 4(a)(2) and/or Regulation D of the Securities Act, and similar Blue Sky Laws provisions, to exempt from registration under the Securities Act and Blue Sky Laws the offer to certain holders of First Lien Claims, the Senior Notes Claims, and members of the Ad Hoc Group that are "accredited investors" as defined in Rule 501 of the Securities Act ("Accredited Investors"), respectively, of new securities prior to the Petition Date, including in connection with the solicitation of votes to accept or reject the Plan (the "Solicitation").

After the Petition Date, the Debtors will rely on section 1145(a) of the Bankruptcy Code to exempt from registration under the Securities Act and Blue Sky Laws the offer, issuance, and distribution of New Common Stock under the Plan, the New Preferred Stock constituting the Equity Backstop Premium issued to the Backstop Parties as set forth in the Restructuring Support Agreement. Neither the Solicitation nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.

Except to the extent publicly available, this Disclosure Statement, the Plan, and the information set forth herein and therein are confidential. This Disclosure Statement and the Plan contain material non-public information concerning the Debtors, their subsidiaries, and their respective debt and Securities. Each recipient hereby acknowledges that it (a) is aware that the federal securities laws of the United States prohibit any person who has material non-public information about a company, which is obtained from the company or its representatives, from purchasing or selling Securities of such company or from communicating the information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such Securities and (b) is familiar with the United States Securities Exchange Act of 1934, as amended (the "Securities Exchange Act") and the rules and regulations promulgated thereunder, and agrees that it will not use or communicate to any Person or Entity, under circumstances where it is reasonably likely that such Person or Entity is likely to use or cause any Person or Entity to use, any confidential information in contravention of the Securities Exchange Act or any of its rules and regulations, including Rule 10b-5.

KE 63679933
PHIL1 8521314v.1

**DISCLAIMER**

This Disclosure Statement contains summaries of certain provisions of the Plan and certain other documents and financial information. The information included in this Disclosure Statement is provided solely for the purpose of soliciting acceptances of the Plan and should not be relied upon for any purpose other than to determine whether and how to vote on the Plan. All holders of Claims entitled to vote to accept or reject the Plan are advised and encouraged to read this Disclosure Statement and the Plan in their entirety before voting to accept or reject the Plan. The Debtors believe that these summaries are fair and accurate. The summaries of the financial information and the documents that are attached to, or incorporated by reference in, this Disclosure Statement are qualified in their entirety by reference to such information and documents. In the event of any inconsistency or discrepancy between a description in this Disclosure Statement, on the one hand, and the terms and provisions of the Plan or the financial information and documents incorporated in this Disclosure Statement by reference, on the other hand, the Plan or the financial information and documents, as applicable, shall govern for all purposes.

Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement. The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee of the accuracy or completeness of the information contained herein or the Bankruptcy Court's endorsement of the merits of the Plan. The statements and financial information contained in this Disclosure Statement have been made as of the date hereof unless otherwise specified. Holders of Claims or Interests reviewing the Disclosure Statement should not assume at the time of such review that there have been no changes in the facts set forth in this Disclosure Statement since the date of this Disclosure Statement. No holder of a Claim or Interest should rely on any information, representations, or inducements that are not contained in or are inconsistent with the information contained in this Disclosure Statement, the documents attached to this Disclosure Statement, and the Plan. This Disclosure Statement does not constitute legal, business, financial, or tax advice. Any Person or Entity desiring any such advice should consult with their own advisors. Additionally, this Disclosure Statement has not been approved or disapproved by the Bankruptcy Court, the SEC, or any securities regulatory authority of any state under Blue Sky Laws. The Debtors are soliciting acceptances to the Plan prior to commencing any cases under chapter 11 of the Bankruptcy Code.

**FORWARD LOOKING STATEMENTS**

The financial information contained in or incorporated by reference into this Disclosure Statement has not been audited, except as specifically indicated otherwise. The Debtors' management, in consultation with the Debtors' advisors, has prepared the financial projections attached hereto as **Exhibit D** and described in this Disclosure Statement (the "Financial Projections"). The Financial Projections, while presented with numerical specificity, necessarily were based on a variety of estimates and assumptions that are inherently uncertain and may be beyond the control of the Debtors' management. Important factors that may affect actual results and cause the management forecasts not to be achieved include, but are not limited to, risks and uncertainties relating to the Debtors' businesses (including their ability to achieve strategic goals, objectives, and targets over applicable periods), industry performance, the regulatory environment, general business and economic conditions and other factors. The Debtors caution that no representations can be made as to the accuracy of these projections or to their ultimate performance compared to the information contained in the forecasts or that the forecasted results will be achieved. Therefore, the Financial Projections may not be relied upon as a guarantee or other assurance that the actual results will occur.

Regarding contested matters, adversary proceedings, and other pending, threatened, or potential litigation or other actions, this Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver by the Debtors or any other party, but rather as a statement made in the context of settlement negotiations in accordance with Rule 408 of the Federal Rules of Evidence and any analogous state or foreign laws or rules. As such, this Disclosure Statement shall not be admissible in any non-bankruptcy proceeding involving the Debtors or any other party in interest, nor shall it be construed to be conclusive advice on the tax, securities, financial or other effects of the Plan to holders of Claims against the Debtors or any other party in interest. Please refer to Section VIII of this Disclosure Statement, entitled "Risk Factors" for a discussion of certain risk factors that holders of Claims voting on the Plan should consider.

Except as otherwise expressly set forth herein, all information, representations, or statements contained herein have been provided by the Debtors. No person is authorized by the Debtors in connection with this Disclosure Statement, the Plan, or the Solicitation to give any information or to make any representation or statement regarding

- vii -

this Disclosure Statement, the Plan, or the Solicitation, in each case, other than as contained in this Disclosure Statement and the exhibits attached hereto or as otherwise incorporated herein by reference or referred to herein. If any such information, representation, or statement is given or made, it may not be relied upon as having been authorized by the Debtors.

This Disclosure Statement contains certain forward-looking statements, all of which are based on various estimates and assumptions. Such forward-looking statements are subject to inherent uncertainties and to a wide variety of significant business, economic, and competitive risks, including, but not limited to, those summarized herein. When used in this Disclosure Statement, the words "anticipate," "believe," "estimate," "will," "may," "intend," and "expect" and similar expressions generally identify forward-looking statements. Although the Debtors believe that their plans, intentions, and expectations reflected in the forward-looking statements are reasonable, they cannot be sure that they will be achieved. These statements are only predictions and are not guarantees of future performance or results. Forward-looking statements are subject to risks and uncertainties that could cause actual results to differ materially from those contemplated by a forward-looking statement. All forward-looking statements attributable to the Debtors or Persons or Entities acting on their behalf are expressly qualified in their entirety by the cautionary statements set forth in this Disclosure Statement. Forward-looking statements speak only as of the date on which they are made. Except as required by law, the Debtors expressly disclaim any obligation to update any forward-looking statement, whether as a result of new information, future events, or otherwise.

*[Remainder of Page Intentionally Left Blank]*

KE 63679933
PHIL1 8521314v.1

## TABLE OF CONTENTS

Page

I.    Executive Summary ....................................................................................................1
      A.    Purpose of this Disclosure Statement and the Plan ...................................................1
      B.    Overview of the Transactions Contemplated by the Plan ..........................................1
      C.    Summary of Treatment of Claims and Interests and Description of Recoveries under the
            Plan .......................................................................................................................2
      D.    Voting on the Plan...................................................................................................4
      E.    Confirmation and Consummation of the Plan ..........................................................5
            1.    Confirmation Hearing ....................................................................................6
            2.    Effect of Confirmation and Consummation of the Plan .....................................6
      F.    Additional Plan-Related Documents ........................................................................6

II.   The Debtors' Business Operations and Capital Structure........................................7
      A.    The Debtors' Corporate History ...............................................................................7
      B.    The Debtors' Operations .........................................................................................7
      C.    Acosta's Key Acquisitions ......................................................................................8
      D.    The Debtors' Corporate Structure and Prepetition Capital Structure ..........................9
            1.    The Prepetition First Lien Credit Facility .........................................................9
            2.    The Term Loan Facility ..................................................................................9
            3.    The Revolving Credit Facility .......................................................................10
            4.    The A/R Facility ..........................................................................................10
            5.    The Senior Note ...........................................................................................10
            6.    The Junior Notes Obligations ........................................................................11

III.  Events Leading to These Chapter 11 Cases ...........................................................11
      A.    Industry-Wide Headwinds and Acosta-Specific Challenges......................................11
      B.    Capital and Liquidity Constraints...........................................................................11
      C.    Prepetition Transformation Initiative and Engagement with Creditors .......................12
            1.    Cost-Reduction Transformation Initiatives ....................................................12
            2.    Engagement of Advisors and Development of Revised Business Plan ...............12
            3.    Discussion with Creditors and Forbearance Agreement ..................................12
            4.    Appointment of Disinterested Directors. ........................................................13

IV.   The Debtors' Entry into the Restructuring Support Agreement. ...........................13
      A.    The Primary Components of the Amended and Restated Restructuring Support Agreement.
            ..................................................................................................................14
      B.    The Debtors' Proposed Disclosure Statement and Solicitation Process.......................15
      C.    Employee and Equity Considerations in the Plan .....................................................16
      D.    The Debtors' First Day Motions and Certain Related Relief ......................................16
            1.    Operational First Day Pleadings. ...................................................................16
            2.    Post-Petition Financing and Use of Cash Collateral ........................................16
            3.    Motion to Approve Solicitation Procedures and Confirm the Plan ....................17
      E.    Other Requested First-Day Relief and Retention Applications....................................17

V.    Summary of the Plan..............................................................................................17
      A.    Treatment of Unclassified Claims ..........................................................................18
            1.    DIP Claims ..................................................................................................18
            2.    Administrative Claims ..................................................................................18
            3.    Professional Fee Claims................................................................................18
            4.    Priority Tax Claims......................................................................................20
      B.    Classification and Treatment of Claims and Interests ...............................................20
            1.    Classification of Claims and Interests ............................................................20
            2.    Treatment of Classes of Claims and Interests .................................................21

|  |  | 3. | Class 1 — Other Secured Claims | 21 |
|  |  | 4. | Class 2 — Other Priority Claims | 21 |
|  |  | 5. | Class 3 — First Lien Claims | 21 |
|  |  | 6. | Class 4 — Senior Notes Claims | 22 |
|  |  | 7. | Class 5 — Stock Repurchase Notes Claims | 23 |
|  |  | 8. | Class 6 — Acquisition Notes Claims | 23 |
|  |  | 9. | Class 7 — General Unsecured Claims | 23 |
|  |  | 10. | Class 8 — Debtor Intercompany Claims | 24 |
|  |  | 11. | Class 9 — Non-Debtor Intercompany Claims | 24 |
|  |  | 12. | Class 10 — Intercompany Interests | 25 |
|  |  | 13. | Class 11 — Interests in Anna Holdings | 25 |
|  | C. | | Waiver of Claims Held by the Consenting Sponsor or CIM | 25 |
|  | D. | | Means for Implementation of the Plan | 25 |
|  |  | 1. | General Settlement of Claims and Interests | 25 |
|  |  | 2. | Restructuring Transactions | 26 |
|  |  | 3. | Sources of Consideration for Plan Distributions | 26 |
|  |  | 4. | Early Transaction Agreement Consideration. | 28 |
|  |  | 5. | New Shareholders Agreement. | 29 |
|  |  | 6. | Exemption from Registration Requirements | 29 |
|  |  | 7. | Corporate Existence | 30 |
|  |  | 8. | Corporate Action | 30 |
|  |  | 9. | Vesting of Assets in the Reorganized Debtors | 31 |
|  |  | 10. | Cancellation of Notes, Instruments, Certificates, and Other Documents | 31 |
|  |  | 11. | Effectuating Documents; Further Transactions | 31 |
|  |  | 12. | Exemptions from Certain Taxes and Fees | 32 |
|  |  | 13. | New Corporate Governance Documents | 32 |
|  |  | 14. | Directors and Officers | 32 |
|  |  | 15. | Employee Incentive Plan | 33 |
|  |  | 16. | Preservation of Causes of Action | 33 |
|  |  | 17. | Executory Contracts and Expired Leases | 33 |
|  | E. | | Conditions to Confirmation and Consummation of the Plan | 37 |
|  |  | 1. | Conditions Precedent to Confirmation | 37 |
|  |  | 2. | Conditions Precedent to the Effective Date | 37 |
|  |  | 3. | Waiver of Conditions Precedent to Confirmation or the Effective Date | 38 |
|  |  | 4. | Substantial Consummation | 38 |
|  |  | 5. | Effect of Non-Occurrence of Conditions to Consummation | 38 |
|  | F. | | Settlement, Release, Injunction, and Related Provisions | 38 |
|  |  | 1. | Compromise and Settlement of Claims, Interests, and Controversies | 38 |
|  |  | 2. | Discharge of Claims | 39 |
|  |  | 3. | Release of Liens | 39 |
|  |  | 4. | Debtor Release | 39 |
|  |  | 5. | Third-Party Release | 40 |
|  |  | 6. | Exculpation | 41 |
|  |  | 7. | Injunction | 41 |
| **VI.** | | | **Confirmation of the Plan** | **41** |
|  | A. | | The Confirmation Hearing | 41 |
|  | B. | | Deadline to Object to Approval of the Disclosure Statement and Confirmation of the Plan | 42 |
|  | C. | | Requirements for Approval of the Disclosure Statement | 42 |
|  | D. | | Requirements for Confirmation of the Plan. | 42 |
|  |  | 1. | Requirements of Section 1129(a) of the Bankruptcy Code | 42 |
|  |  | 2. | The Debtor Release, Third-Party Release, Exculpation, and Injunction Provisions | 43 |
|  |  | 3. | Best Interests of Creditors—Liquidation Analysis | 44 |
|  |  | 4. | Feasibility/Financial Projections | 44 |
|  |  | 5. | Acceptance by Impaired Classes | 45 |

- ii -

6. Confirmation Without Acceptance by All Impaired Classes ...................................45
7. The Structure of the Equity Rights Offering and the Direct Investment Preferred Equity Raise Is Consistent with the Bankruptcy Code. ...................................46
8. Valuation of the Debtors ...................................47

**VII. Voting Instructions** ...................................**47**
A. Overview ...................................47
B. Solicitation Procedures ...................................47
    1. Solicitation Agent ...................................47
    2. Solicitation Package ...................................47
    3. Voting Deadlines ...................................48
    4. Distribution of the Solicitation Package and Plan Supplement ...................................48
C. Voting Procedures ...................................48
D. Voting Tabulation ...................................49

**VIII. Risk Factors** ...................................**50**
A. Risks Related to the Restructuring ...................................50
    1. The Debtors Will Consider All Available Restructuring Alternatives if the Restructuring Transactions are not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against the Debtors ...................................50
    2. Even if the Restructuring Transactions are Successful, the Debtors Will Continue to Face Risks ...................................51
    3. Risks Related to the New Common Stock ...................................51
    4. A Decline in the Reorganized Debtors' Credit Ratings Could Negatively Affect the Debtors' Ability to Access the Capital Markets in the Future ...................................53
    5. Risks Related to Confirmation and Consummation of the Plan ...................................53
B. Risks Related to Recoveries Under the Plan ...................................55
    1. The Debtors May Not Be Able to Achieve Their Projected Financial Results or Meet Their Post-Restructuring Debt Obligations ...................................55
    2. Estimated Valuations of the Debtors and the New Common Stock and the New Preferred Stock and Estimated Recoveries to Holders of Allowed Claims and Interests Are Not Intended to Represent Potential Market Values ...................................55
    3. Certain Tax Implications of the Debtors' Bankruptcy and Reorganization May Increase the Tax Liability of the Reorganized Debtors ...................................55
C. Risks Related to the Offer and Issuance of Securities Under the Plan ...................................56
    1. The Debtors Do Not Intend to Offer to Register or to Exchange the New Common Stock or the New Preferred Stock in a Registered Exchange Offer ...................................56
    2. There Is No Established Market for the New Common Stock ...................................56
    3. The Debtors Could Modify the Equity Rights Offering Procedures ...................................57
    4. The Restructuring Support Agreement May Be Terminated and Thus Terminate the Equity Rights Offering ...................................57
D. Risk Factors Related to the Business Operations of the Debtors and Reorganized Debtors ...................................57
    1. The Debtors Will File Voluntary Petitions for Relief Under Chapter 11 of the Bankruptcy Code and Will Be Subject to the Risks and Uncertainties Associated with Any Chapter 11 Restructuring ...................................57
    2. Potential for the Loss of Key Members of the Executive Management Team ...................................58
    3. The Debtors May Not Be Able to Achieve Their Projected Financial Results ...................................58
    4. If the Debtors Do Not Obtain Additional Capital to Fund Their Operations and Obligations, the Debtors' Growth May Be Limited ...................................58
    5. Employee and Labor Risks ...................................59
E. Miscellaneous Risk Factors and Disclaimers ...................................59
    1. The Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed ...................................59
    2. No Legal or Tax Advice Is Provided By This Disclosure Statement ...................................59
    3. No Admissions Made ...................................59
    4. Failure to Identify Litigation Claims or Projected Objections ...................................59

KE 63679933
PHIL1 8521314v.1

|  |  |  |  |
|---|---|---|---|
| | 5. | Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors | 59 |
| | 6. | No Representations Outside This Disclosure Statement Are Authorized | 59 |
| **IX.** | **Important Securities Laws Disclosures** | | **60** |
| A. | Plan Consideration | | 60 |
| B. | Exemption from Registration Requirements; Issuance and Resale of New Common Stock; Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code | | 60 |
| | 1. | Exemption from Registration Requirements; Issuance and Resale of New Common Stock | 60 |
| | 2. | Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code; Implications for Resale of New Common Stock | 61 |
| C. | Private Placement Exemptions | | 62 |
| **X.** | **Certain United States Federal Tax Consequences of the Plan** | | **64** |
| A. | Introduction | | 64 |
| B. | Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the Reorganized Debtors | | 65 |
| C. | Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Class 3 and Class 4 Claims | | 65 |
| | 1. | Tax Consequences of the Consummation of the Plan | 65 |
| | 2. | Tax Consequences of Owning and Disposing of Consideration Received Under the Plan | 67 |
| D. | Certain United States Federal Income Tax Consequences to Non-U.S. Holders of Certain Allowed Claims | | 69 |
| | 1. | U.S. Federal Income Tax Consequences to Non-U.S. Holders of Allowed Claims | 69 |
| | 2. | U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Common Stock and New Preferred Stock | 71 |
| | 3. | FATCA | 72 |
| E. | Information Reporting and Backup Withholding | | 72 |
| **XI.** | **Recommendation of the Debtors** | | **74** |

- iv -

## **<u>EXHIBITS</u>**

Exhibit A        Plan of Reorganization

Exhibit B        Corporate Structure of the Debtors

Exhibit C        Restructuring Support Agreement

Exhibit D        Financial Projections

Exhibit E        Valuation Analysis

Exhibit F        Liquidation Analysis

KE 63679933

PHIL1 8521314v.1

## I.    Executive Summary

### A.    Purpose of this Disclosure Statement and the Plan.

Anna Holdings, Inc. and certain of its direct and indirect subsidiaries, as debtors and debtors in possession (each, a "<u>Debtor</u>," collectively, the "<u>Debtors</u>," and, together with Acosta's non-Debtor affiliates, the "<u>Company</u>" or "<u>Acosta</u>"), submit this disclosure statement (including all exhibits hereto and as may be amended or modified from time to time and including all exhibits and supplements thereto, in accordance with its terms, the "<u>Disclosure Statement</u>") pursuant to sections 1125 and 1126 of the Bankruptcy Code to Holders of Class 3 First Lien Claims and Class 4 Senior Notes Claims against the Debtors in connection with the solicitation of acceptances with respect to the *Debtors' First Amended Joint Prepackaged Chapter 11 Plan of Reorganization* (as may be amended or modified from time to time and including all exhibits and supplements thereto, in accordance with its terms, the "<u>Plan</u>"). A copy of the Plan is attached hereto as **<u>Exhibit A</u>** and incorporated herein by reference.[1]  The Plan constitutes a separate chapter 11 plan for each of the Debtors.

**THE DEBTORS BELIEVE THAT THE COMPROMISES AND SETTLEMENTS CONTEMPLATED BY THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND MAXIMIZE RECOVERIES TO HOLDERS OF CLAIMS.  THE DEBTORS BELIEVE THE PLAN IS THE BEST AVAILABLE ALTERNATIVE FOR IMPLEMENTING A RESTRUCTURING OF THE DEBTORS' BALANCE SHEET.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO <u>ACCEPT</u> THE PLAN.**

### B.    Overview of the Transactions Contemplated by the Plan.

The Company is a privately-owned, multinational full-service sales, marketing, and retail merchandising agency headquartered in Jacksonville, Florida.  Since its founding in 1927, the company has steadily grown from a family-run single-market food broker to a leading full-service sales and marketing agency, operating in the United States, Canada, and Europe.

The Company employs approximately 30,000 full-time, part-time, and temporary personnel.  As of the Petition Date, the Debtors have approximately $3 billion in total funded debt obligations, consisting of approximately $114.9 million in aggregate principal amount outstanding under the A/R Facility (as defined herein);  approximately $146.1 million aggregate principal amount outstanding under a multicurrency revolving credit facility (the "<u>Revolving Credit Facility</u>");  approximately $1,967.4 million in aggregate principal amount outstanding under a secured term loan credit facility (the "<u>Term Loan Facility</u>");  approximately $800.0 million in aggregate principal amount outstanding of unsecured notes (the "<u>Senior Notes</u>");  and approximately $21.6 million of other unsecured note obligations (collectively, the "<u>Other Unsecured Notes</u>").

To implement a comprehensive financial restructuring of their funded debt, the Debtors will commence chapter 11 cases (the "<u>Chapter 11 Cases</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") after commencement of the solicitation process.  The Debtors will seek joint administration of the Chapter 11 Cases for procedural purposes and, upon commencement of the Chapter 11 Cases, will file the Plan, this Disclosure Statement, and a motion seeking to approve the Disclosure Statement and proposed solicitation process.  On November 8, 2019, the Consenting Stakeholders and the Debtors entered into a restructuring support agreement (together with all exhibits thereto, and as amended, restated, and supplemented from time to time, the "<u>Restructuring Support Agreement</u>") that sets forth the principal terms of the Restructuring Transactions and requires the signing parties to support the Plan.

---

[1]    Capitalized terms used but not defined in this Disclosure Statement have the meaning ascribed to such terms in the Plan or in the Restructuring Support Agreement (as defined herein), as applicable.  Additionally, this Disclosure Statement incorporates the rules of interpretation located in Article I of the Plan.  **Any summary provided in this Disclosure Statement of any documents attached to this Disclosure Statement, including the Plan, is qualified in its entirety by reference to the Plan, the exhibits, and other materials referenced in the Plan, the Plan Supplement, and the documents being summarized.  In the event of any inconsistencies between the terms of this Disclosure Statement and the Plan, the Plan shall govern.**

As set forth in the Plan, the Restructuring Transactions provide for a comprehensive restructuring of Claims against and Interests in the Debtors, de-leverage the Company's capital structure and preserve the going-concern value of the Debtors' businesses, maximize recoveries available to all constituents, provide for an equitable distribution to the Debtors' stakeholders, and protect the jobs of the Debtors' approximately 30,000 employees.  More specifically, the Restructuring Transactions provide, among other things, that:

- All Holders of First Lien Claims will have the opportunity to provide the Debtors with their pro-rata portion of a $150.0 million of new money debtor-in-possession financing through the DIP Facility, backstopped by the Ad Hoc Group, pursuant to the terms and conditions set forth in the DIP Credit Agreement, which, among other things, will be used to satisfy all outstanding amounts due under the A/R Facility and fund the Chapter 11 Cases.

- All Administrative Claims, Priority Tax Claims, Other Priority Claims, and Other Secured Claims will be paid in full in Cash or receive such other treatment that renders such Claims unimpaired under the Bankruptcy Code.

- Each eligible Holder of an Allowed Class 3-First Lien Claim shall receive its Pro Rata share (as determined as a percentage of all First Lien Claims) of: (a) 85% of the total New Common Stock, subject to dilution by the Employee Incentive Plan, the Equity Rights Offering, the Direct Investment Preferred Equity Raise, and the Equity Backstop Premium and (b) the First Lien Subscription Rights; *unless*, such Holder of an Allowed First Lien Claim elects, but only if such Holder accepts the Plan and thereby agrees, to instead receive (or cause its affiliated designee to receive) the First Lien Cash-Out Option.

- Each eligible Holder of an Allowed Class 4-Senior Notes Claim shall receive its Pro Rata share (as determined as a percentage of all Senior Notes Claims) of: (a) 15% of the total New Common Stock, subject to dilution by the Employee Incentive Plan, the Equity Rights Offering, the Direct Investment Preferred Equity Raise, and the Equity Backstop Premium and (b) the Senior Notes Subscription Rights; *unless*, such Holder of an Allowed Senior Notes Claim elects, but only if such Holder accepts the Plan, and thereby agrees, to instead receive (or cause its affiliated designee to receive) the Senior Notes Cash-Out Option.

- The Reorganized Debtors shall issue $65.0 million of New Preferred Stock through the Direct Investment Preferred Equity Raise, and such New Preferred Stock shall be purchased by the Backstop Parties.

- The Reorganized Debtors shall also issue $260.0 million of New Preferred Stock through the Equity Rights Offering, which will be backstopped by the Backstop Parties in accordance with the terms of the Backstop and Direct Investment Agreement, and under which each eligible Holder of an Allowed Claim in Class 3-First Lien Claims and Class 4-Senior Notes Claims as of the Record Date, including the Backstop Parties, shall have the opportunity to purchase their Pro Rata share of the First Lien Equity Rights Offering Shares and the Senior Notes Equity Rights Offering Shares (*i.e.*, the First Lien Subscription Rights, including the First Lien Oversubscription Rights, and the Senior Notes Subscription Rights, including the Senior Notes Oversubscription Rights) respectively.

- All outstanding and undisputed General Unsecured Claims, Stock Repurchase Notes Claims, and Acquisition Notes Claims against the Debtors will be unimpaired by the restructuring, unless otherwise agreed to by Holders of such Claims.

As described below, you are receiving this Disclosure Statement because you are a Holder of a Claim entitled to vote to accept or reject the Plan.  **Prior to voting on the Plan, you are encouraged to read this Disclosure Statement and all documents attached to this Disclosure Statement in their entirety.  As reflected in this Disclosure Statement, there are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project, and the Debtors undertake no obligation to update any such statement.  Certain of these risks, uncertainties, and factors are described in Section VIII of this Disclosure Statement, entitled "Risk Factors."**

**C.      Summary of Treatment of Claims and Interests and Description of Recoveries under the Plan.**

The Plan organizes the Debtors' creditor and equity constituencies into groups called "Classes."  For each Class, the Plan describes:  (1) the underlying Claim or Interest; (2) the recovery available to the Holders of Claims in

that Class under the Plan; (3) whether the Class is Impaired or Unimpaired under the Plan; (4) the form of consideration, if any, that Holders in such Class will receive on account of their respective Claims or Interests; and (5) whether the Holders of Claims in such Class are entitled to vote to accept or reject the Plan.

The proposed distributions and classifications under the Plan are based upon a number of factors, including the Debtors' valuation and liquidation analyses.  The valuation of the Reorganized Debtors as a going concern is based upon the value of the Debtors' assets and liabilities as of an assumed Effective Date of December 31, 2019 and incorporates various assumptions and estimates, as discussed in detail in the Valuation Analysis prepared by the Debtors, together with their proposed financial advisor and investment banker, PJT Partners, Inc. ("PJT").

The table below provides a summary of the classification, description, treatment, and anticipated recovery of Claims and Interests under the Plan.  This information is provided in summary form below for illustrative purposes only and is qualified in its entirety by reference to the provisions of the Plan.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.  The recoveries available to holders of Claims are estimates and actual recoveries may materially differ based on, among other things, whether the amount of Claims actually Allowed exceeds the estimates provided below. In such an instance, the recoveries available to holders of Allowed Claims could be materially lower when compared to the estimates provided below. To the extent that any inconsistency exists between the summaries contained in this Disclosure Statement and the Plan, the terms of the Plan shall govern.

3

For a more detailed description of the treatment of Claims and Interests under the Plan and the sources of satisfaction for Claims and Interests, see Section V of this Disclosure Statement, entitled "Summary of the Plan."

| SUMMARY OF ESTIMATED RECOVERIES[2] | | | | | |
|---|---|---|---|---|---|
| Class | Claim/Interest | Plan Treatment | Voting Rights | Projected[3] Amount of Allowed Claims or Interests | Projected Plan Recovery |
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | N/A | 100% |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | N/A | 100% |
| 3 | First Lien Claims | Impaired | Entitled to Vote | $2,137,413,091 | 23–24% |
| 4 | Senior Notes Claims | Impaired | Entitled to Vote | $840,257,534 | 10–11% |
| 5 | Stock Repurchase Notes Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | $376,489 | 100% |
| 6 | Acquisition Notes Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | $21,217,034 | 100% |
| 7 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | $119,358,182 | 100% |
| 8 | Debtor Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) | N/A | N/A |
| 9 | Non-Debtor Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) | N/A | N/A |
| 10 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) | N/A | N/A |
| 11 | Interests in Anna Holdings | Impaired | Not Entitled to Vote (Deemed to Reject) | N/A | N/A |

**D.      Voting on the Plan.**

Certain procedures will be used to collect and tabulate votes on the Plan, as summarized in Section VII of this Disclosure Statement, entitled "Voting Instructions."  Readers should carefully read the voting instructions in Section VII herein.

Only Holders of First Lien Claims and Senior Notes Claims, which are classified in Classes 3 and 4 of the Plan, respectively, are entitled to vote on the Plan (the "Voting Classes").  Holders of Claims in Classes 1, 2, 5, 6, and 7 are conclusively presumed to accept the Plan because they are Unimpaired by the Plan.  Holders of Interests in Class 11 are deemed to reject the Plan because they are Impaired by the Plan and entitled to no recovery under the Plan.

---

[2]     The estimated recoveries presented for First Lien Claims and Senior Notes Claims are estimated recoveries to Holders of Claims on account of their Claims and do not reflect consideration for Backstop Parties on account of their commitments.  Any additional distributions made to Backstop Parties are made solely on account of new capital and consideration provided to the Debtors.  The high end of recovery range assumes that the New Preferred Stock is valued at its face value; the low end of the recovery range assumes that the New Preferred Stock is valued at a premium to face value.  First Lien Claims and Senior Notes Claims recovery calculations do not include the impact on recoveries of the make-whole provisions of the New Preferred Stock.  To the extent certain liquidation events occur, recoveries to First Lien Claims and Senior Notes Claims will be materially less.

[3]     Unless otherwise indicated, all Claim amounts in this Disclosure Statement and accompanying exhibits are estimates as of November 24, 2019.

Holders of Claims or Interests in Classes 8, 9, and 10 are deemed to reject or presumed to accept the Plan because they are (1) Unimpaired under the Plan and presumed to accept the Plan, or (2) Impaired and entitled to no recovery under the Plan and deemed to reject the Plan.

**The Class 3 Voting Deadline is 11:59 p.m., prevailing Eastern Time, on November 29, 2019, and the Class 4 Voting Deadline is 11:59 p.m., prevailing Eastern Time, on December 9, 2019.** To be counted as votes to accept or reject the Plan, each ballot (a "Ballot") must be properly executed, completed, and delivered (either by using the return envelope provided, by first class mail, overnight courier, personal delivery, or electronic submission) such that it is **actually received** before the Voting Deadlines by Prime Clerk, LLC (the "Solicitation Agent") as follows:

| **DELIVERY OF BALLOTS** |
|---|
| 1.  Ballots must be actually received by the Solicitation Agent before the Voting Deadlines. |
| 2.  Ballots may be returned by the following methods: (a) in the enclosed pre-paid, pre-addressed return envelope; (b) via first class mail, overnight courier, or hand delivery to the address set forth below; or (c) via electronic submission through the Solicitation Agent's online voting portal at **https://cases.primeclerk.com/Acosta**. |
| **ANNA HOLDINGS, INC. BALLOT PROCESSING**<br>**C/O PRIME CLERK LLC**<br>**ONE GRAND CENTRAL PLACE**<br>**60 EAST 42ND STREET, SUITE 1440**<br>**NEW YORK, NY 10165** |
| If you have any questions on the procedures for voting on the Plan, please contact the Solicitation Agent by emailing **ACOSTABALLOTS@PRIMECLERK.COM** and reference "Anna Holdings, Inc." in the subject line, or by calling **877-433-8808 (domestic toll-free) or 917-994-8388 (international toll)**, and ask for the solicitation group. |

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE SOLICITATION AGENT.   ANY BALLOT RECEIVED AFTER THE VOTING DEADLINES OR OTHERWISE NOT IN COMPLIANCE WITH THE VOTING INSTRUCTIONS WILL NOT BE COUNTED EXCEPT AS DETERMINED BY THE DEBTORS.**

E.     **Confirmation and Consummation of the Plan.**

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization.  If the Debtors file the Chapter 11 Cases, they will file a motion on the Petition Date requesting that the Bankruptcy Court set a date and time as soon as practicable after the Petition Date for a hearing (such hearing, the "Confirmation Hearing") for the Bankruptcy Court to determine whether the Disclosure Statement contains adequate information under section 1125(a) of the Bankruptcy Code, whether the Debtors' prepetition solicitation of acceptances in support of the Plan complied with section 1126(b) of the Bankruptcy Code, and whether the Plan should be confirmed in light of both the affirmative requirements of the Bankruptcy Code and objections, if any, that are timely filed, as permitted by section 105(d)(2)(B)(2)(v) of the Bankruptcy Code.  The Confirmation Hearing, once set, may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on those parties who have requested notice under Bankruptcy Rule 2002 and the Entities who have filed an objection to the Plan, if any, without further notice to parties in interest.  The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing,

may put in place additional procedures governing the Confirmation Hearing.  Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation.  The Debtors, in the same motion requesting a date for Confirmation of the Plan, will request that the Bankruptcy Court set a date and time for parties in interest to file objections to the adequacy of the Disclosure Statement, the Debtors' prepetition solicitation of acceptances in support of the Plan, and Confirmation of the Plan.  All such objections must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that they are received before the deadline to file such objections.

### 1. Confirmation Hearing.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Disclosure Statement contains adequate information under section 1125(a) of the Bankruptcy Code, the Debtors' prepetition solicitation of acceptances in support of the Plan complied with section 1126(b) of the Bankruptcy Code, and the Plan should be confirmed in light of both the affirmative requirements of the Bankruptcy Code and objections, if any, that are timely filed, and subject to satisfaction or waiver of each condition precedent in Article IX of the Plan.  For a more detailed discussion of the Confirmation Hearing, see Section VI of this Disclosure Statement, entitled "Confirmation of the Plan."

### 2. Effect of Confirmation and Consummation of the Plan.

Following Confirmation, and subject to satisfaction or waiver of each condition precedent in Article IX of the Plan, the Plan will be consummated on the Effective Date.  Among other things, on the Effective Date, certain release, injunction, exculpation, and discharge provisions set forth in Article VIII of the Plan will become effective.  Accordingly, it is important to read the provisions contained in Article VIII of the Plan very carefully so that you understand how Confirmation and Consummation—which effectuates such release, injunction, exculpation, and discharge provisions—will affect you and any Claim or Interest you may hold with respect to the Debtors so that you may cast your vote accordingly.  These provisions are described in Section V of this Disclosure Statement.

### F. Additional Plan-Related Documents.

The Debtors will file certain documents that provide more details about implementation of the Plan in the Plan Supplement, which will be filed with the Bankruptcy Court no later than seven (7) calendar days before the Confirmation Objection Deadline and otherwise in accordance with the Restructuring Support Agreement.  The Debtors will serve a notice that will inform all parties that the initial Plan Supplement was filed, list the information included therein, and explain how copies of the Plan Supplement may be obtained.  Eligible Holders of Claims entitled to vote to accept or reject the Plan shall not be entitled to change their vote based on the contents of the Plan Supplement after the Voting Deadlines.  The Plan Supplement will include:

- the New Shareholders Agreement;

- the New Corporate Governance Documents;

- the Restructuring Steps Memorandum;

- the identity of the members of the Reorganized Acosta Board and the officers of Reorganized Acosta;

- the Rejected Executory Contract and Unexpired Lease List, if any;

- the Retained Causes of Action Schedule;

KE 63679933
PHIL1 8521314v.1

- the Equity Rights Offering Documents; and

- any other necessary documentation related to the Restructuring Transactions.

Each of the foregoing Plan Supplement documents and/or forms of documents, agreements, schedules, and exhibits to the Plan are subject to the Stakeholder Approval Right

> *THE FOREGOING EXECUTIVE SUMMARY IS ONLY A GENERAL OVERVIEW OF THIS DISCLOSURE STATEMENT AND THE MATERIAL TERMS OF, AND TRANSACTIONS PROPOSED BY, THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO, AND SHOULD BE READ IN CONJUNCTION WITH, THE MORE DETAILED DISCUSSIONS APPEARING ELSEWHERE IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED TO THIS DISCLOSURE STATEMENT, INCLUDING THE PLAN.*

## II.    The Debtors' Business Operations and Capital Structure

**A.    The Debtors' Corporate History.**

Acosta is a multinational sales and marketing agency ("SMA") that provides a wide array of sales, marketing, and retail merchandising services to consumer packaged goods ("CPG") companies and retailers across the United States, Canada, and Europe.

Acosta was founded in 1927 by Louis Acosta as L.T. Acosta Company, Inc., a family-run business based in Jacksonville, Florida. During the next several decades, Acosta expanded to become one of the first companies to offer product manufacturer representation across several geographic areas and opened offices throughout the southern United States, including Alabama, Georgia, Louisiana, North Carolina, South Carolina, Tennessee, and Virginia. Acosta received its first national representation from Minute Maid in 1999. Over the next several years, Acosta grew throughout the mid-West, West, Southwest, and Canada and expanded its coverage to include natural and specialty sales, fresh foods, drug, military, and marketing and promotions.

In September of 2014, certain investment funds affiliated with The Carlyle Group, L.P. and certain other institutional investors and employees of the Company acquired the Company for approximately $4.75 billion in cash and equity rollover contributions (the "2014 Acquisition"), which ranked it among the largest private-equity purchases of that year. Anna Holdings, Inc. ("Anna Holdings") and Anna Acquisition Company, Inc. ("Anna Acquisition") were formed to facilitate the 2014 Acquisition. As a result of the 2014 Acquisition, Acosta, Inc. became a wholly owned subsidiary of Anna Acquisition, which is a wholly owned subsidiary of Anna Holdings.

**B.    The Debtors' Operations.**

*Sales Services.* Approximately eighty percent of Acosta's revenue originates from its headquarter services and retail merchandizing services (collectively, the "Sales Services") for its approximately 1,200 blue-chip and midsize clients. Through its Sales Services solutions, Acosta helps drive sales performance at retailer headquarters and enhance store-level sales conditions for its clients across multiple retail channels, including grocery, convenience, and natural stores, chain and club stores, and others. Through headquarter selling, Acosta assists CPG companies in selling new and existing products to retailers, providing business insights, securing optimal shelf placement, executing promotion programs, and managing back-office order-to-cash and claims deduction management solutions. Acosta also works with clients in negotiations with retailers and managing promotional events.

In addition to headquarter selling, Acosta implements store-level merchandising services. Specifically, Acosta's employees routinely visit the retail stores in which clients' products are sold to ensure proper stocking and shelf placement of products, display execution, compliance with brand merchandising activity, and incremental selling activities. The retail services business also offers special projects and custom solutions, which include seasonal coverage, stocking solutions, resets, and audits. Acosta has leading positions across all retail channels, including grocery, club, mass, natural/specialty, convenience, value, pet, drug, eCommerce, electronics, home improvement, and telecommunications.

*Marketing Services.*  In addition to its sales services, Acosta, through its Mosaic business, offers a suite of specialized offerings to assist its clients' marketing efforts (the "Marketing Services"), comprising approximately twenty percent of the Company's revenue.  Acosta provides four primary Marketing Services offerings: (i) experiential marketing; (ii) assisted selling and training; (iii) content marketing; and (iv) shopper marketing. Acosta offers clients event-based marketing services such as brand launch events, pop-up retail experiences, mobile tours, large events, and trial/demo campaigns.  Acosta also provides Marketing Services such as assisted selling, staffing, associate training, in-store demonstrations, and more.  Under its shopping marketing business, Acosta advises clients on consumer promotions, package designs, digital shopping, and other shopper marketing channels.  Additionally, Acosta provides creative content development and tools for managing social communities.  Acosta offers Marketing Services to a diverse, blue-chip client base, including traditional CPGs and a wide-array of technology, liquor, and home goods companies.

*Revenue Models.*  While Acosta historically has generated revenue through commission-based contracts, the Company's revenue mix is shifting to other methods of revenue generation including bonus-based activities, fixed fee charges, hourly billing, and cost-plus arrangements.  Under the bonus-based activities model, Acosta generates incremental revenue based on its ability to over-deliver against certain key performance indicators.  Fixed fee charges are generated for a given arrangement of services, while the hourly payment structure is based solely on the number of hours logged to complete a given arrangement of tasks.  The cost-plus structure requires clients to pay for the cost to complete a given arrangement of tasks plus agreed-upon profit margins.  Part of Acosta's go-forward business plan emphasizes shifts towards higher margin revenue generation models that allow the Company to focus on aligning cost-to-serve with revenue generation to better serve clients and maximize growth.

## C.      Acosta's Key Acquisitions.

A key part of Acosta's growth strategy has hinged on strategic acquisitions to expand Acosta's client offerings and market reach.  These acquisitions have provided Acosta with a diverse suite of solutions for its clients across multiple channels.

*Foodservice Acquisitions*.  Acosta entered the foodservice channel in 2012 and expanded in that area through several strategic acquisitions across the country.  The growth of Acosta's foodservice coverage has focused on foodservice distributors and food operators, such as restaurants, colleges and universities, healthcare facilities, K-12 schools, lodging and other similar entities that are buying products for sale to their consumers.  As of the Petition Date, Acosta's foodservice coverage spans multiple states throughout the United States.

*Mosaic Acquisition*.  Acosta expanded its integrated marketing service offerings through the formation of Acosta Marketing Group in 2011.  In July 2012, in an effort to expand its Marketing Services offerings, Acosta acquired Mosaic Sales Solutions ("Mosaic" and the "Mosaic Acquisition"), one of the fastest growing full-service sales and marketing agencies in North America at the time.  Mosaic specializes in connecting brands with consumers in non-traditional ways, such as retail events, community experiences, and online social media extensions.  Mosaic operates as a stand-alone brand of Acosta.  Through the Mosaic Acquisition, the Marketing Services business has grown industry-leading offerings in retail assisted selling, experiential marketing, and shopper marketing.  The acquisition of Mosaic has expanded and strengthened Acosta's client base through an array of integrated sales and marketing solutions, further enhancing the Company's interdisciplinary capabilities as a result of complementary service offerings.

*Reach Acquisition.*  Most recently, in February 2017, Acosta acquired Reach Holdings Limited ("Reach", and the "Reach Acquisition").  Operating primarily in the United Kingdom, Reach is an outsourced international contract sales organization that specializes in technical sales for a variety of clients across multiple market segments.  The Reach Acquisition bolstered Acosta's global presence and enabled the Company to significantly enhance its service offerings.

KE 63679933
PHIL1 8521314v.1

**D.      The Debtors' Corporate Structure and Prepetition Capital Structure.**

As of the Petition Date, the Debtors have approximately $3 billion of funded debt obligations.  The following table depicts the Debtors' prepetition capital structure, exclusive of accrued but unpaid interest and fees, as of the Petition Date:

| Type of Debt | Description | Maturity | Amount Outstanding |
|---|---|---|---|
| **A/R Facility** | Revolver and term loan, $150 million A/R facility, secured by certain Debtors' U.S. A/R | June 2021 | $114.9 million |
| **Revolving Credit Facility** | Revolving credit facility, *pari passu* with Term Loan Facility | Sept. 2019 / June 2021 | $146.1 million drawn |
| **Term Loan Facility** | Secured term loan facility, originally issued in the amount of $2,065.0 million, amortizing 0.25% quarterly, *pari passu* with the Revolving Credit Facility | Sept. 2021 | $1,967.4 million |
| **Senior Notes** | Unsecured notes guaranteed by each of the Company's subsidiaries that is a borrower or guarantor under the First Lien Facility | Oct. 2022 | $800.0 million |

**1.      The Prepetition First Lien Credit Facility.**

On September 26, 2014, in connection with the 2014 Acquisition, the Debtors entered into that certain credit agreement (as amended, restated, or otherwise modified from time to time, the "Credit Agreement") by and among Acosta, Inc. as Borrower, Anna Acquisition as Holdings, and the lenders party thereto, with JPMorgan Chase Bank, N.A. ("JPM") as administrative agent and collateral agent.[4]  The Credit Agreement governs both a senior secured term loan facility (the "Term Loan Facility") and a multicurrency revolving credit facility (the "Revolving Credit Facility," and together with the Term Loan Facility, the "First Lien Facility").  The Term Loan Facility and the Revolving Credit Facility are *pari passu*, and are guaranteed by each of the Debtors.  The Credit Agreement was amended twice, most recently on January 29, 2019 (the "2019 Amendment").

**2.      The Term Loan Facility**

At the time of the 2014 Acquisition, the Term Loan Facility was issued in the amount of $2.065 billion, amortizing at 0.25 percent quarterly.  As of the Petition Date, approximately $1.967 billion principal amount remains outstanding on the Term Loan Facility.  Interest on the Term Loan Facility accrues at LIBOR plus 3.25 percent.  The Term Loan Facility matures on September 26, 2021.

---

[4]    At the time of the 2014 Acquisition, the Credit Agreement was entered into by Anna Merger Sub, Inc. as Initial Borrower and Acosta Holdco, Inc. as Surviving Borrower.  On the date of the 2014 Acquisition, Anna Merger Sub, Inc. was merged with and into Acosta Holdco, Inc. (with Acosta Holdco, Inc. surviving), then Acosta Holdco, Inc. was merged with and into its wholly owned subsidiary, Acosta Intermediate Holdings, Inc. (with Acosta Intermediate Holdings, Inc. surviving), and then Acosta Intermediate Holdings, Inc. was merged with and into its wholly owned subsidiary, Acosta, Inc. (with Acosta, Inc. surviving).

9

3.       **The Revolving Credit Facility**

At the time of the 2014 Acquisition, the Revolving Credit Facility was issued in the amount of $225 million. The Revolving Credit Facility was set to mature on September 26, 2019.  Pursuant to the 2019 Amendment, certain participating lenders (the "Extending Revolver Lenders") agreed to extend the maturity date of the Revolving Credit Facility to March 26, 2020, with the possibility to be extended further to June 25, 2021 upon satisfaction of certain requirements.  Thereafter, the requirements were satisfied.  Accordingly, the maturity date of the Revolving Credit Facility with respect to the Extending Revolver Lenders is June 25, 2021 (the "Extended Revolver").  In connection with this extension, the commitments of the Extending Revolver Lenders were reduced to $181.8 million from $225.0 million.  Following the closing of the A/R Facility, the commitments of the Extending Revolving Lenders were further reduced to $143.4 million.

On August 19, 2019 and August 27, 2019, following discussions and the recommendation of their advisors, the Debtors borrowed the remaining approximately $78 million availability outstanding under the Revolving Credit Facility.  Access to this additional liquidity, which in the Debtors' view was the least expensive funded source of liquidity available, proved critical to the Debtors' ability to fund operations during negotiations with all major creditor constituencies regarding the terms of a consensual balance sheet restructuring.  Following these borrowings, the Revolving Credit Facility was fully utilized in the amount of $176.8 million (including approximately $31 million of outstanding letters of credit).[5]

Lenders under the Revolving Credit Facility holding approximately $33.5 million of commitments did not consent to an extension of the maturity of the Revolving Credit Facility (the "Non-Extending Revolver Lenders," and such commitments, the "Non-Extended Revolver").  Commitments under the Non-Extended Revolver matured September 26, 2019.  Following collaborative discussions with key stakeholders, Acosta and the majority of lenders under the Credit Agreement agreed that the Company should defer payment under the Non-Extended Revolver and that the lenders would forbear from exercising their rights in connection therewith, while the parties continued their discussions with the common objective of strengthening the Company's financial position.

4.       **The A/R Facility**.

On May 10, 2019, the Debtors entered into that certain credit and security agreement (the "A/R Facility "), among Acosta ARC II, LLC ("ARC"), as borrower thereunder, Acosta, Inc., as master services, the lenders from time to time party thereto, and Wells Fargo Bank, N.A., as administrative agent.  ARC is a wholly-owned subsidiary of Acosta ARC Holdings, LLC ("ARC Holdings"), each of which was created as an Unrestricted Subsidiary (as defined in the Credit Agreement) in connection with the Company's entry into the A/R Facility.  Sound Point Capital Management LP ("Sound Point") holds 100% of the outstanding commitments under the A/R Facility.  Under the A/R Facility Agreement and ancillary documents related thereto, certain of the Debtors (the "Originators") contribute their accounts receivable into the A/R Facility to secure the obligations thereunder.  ARC Holdings is proportionately owned by each of the Originators, and such ownership is subject to adjustment based on the receivable contributions made by each of the Originators from time to time.  As of the Petition Date, there is no availability under the A/R Facility.

5.       **The Senior Notes**.

At the time of the 2014 Acquisition, on September 26, 2014, the Debtors entered into that certain indenture by and among Acosta, Inc., as issuer, and Wilmington Trust, National Association, as indenture trustee, governing $800.0 million of aggregate principal amount of 7.750 percent senior notes due 2022 (the "Senior Notes").  The Senior Notes mature on October 1, 2022 and bear interest at 7.75 percent.  The obligations under the Senior Notes are guaranteed by each of the Debtor subsidiaries that is a borrower or guarantor under the First Lien Facility.

---

[5]    Approximately $100,000 remains undrawn.

6. **The Junior Notes Obligations**.

In addition to their funded debt obligations, certain Debtor and non-Debtor affiliates are obligors on approximately $23.1 million of other unsecured note obligations (collectively, the "Other Unsecured Notes"). Approximately $22.8 million of Other Unsecured Notes are obligations associated with long-term service contracts and other related agreements associated with acquired businesses (the "Acquisition Notes"), including approximately $1.6 million associated with non-Debtor affiliates.    In addition, Anna Holdings is an obligor on approximately $0.4 million of unsecured obligations related to certain stock repurchase promissory notes (the "Stock Repurchase Notes").

## III.    Events Leading to These Chapter 11 Cases.

### A.    Industry-Wide Headwinds and Acosta-Specific Challenges.

Acosta has faced the same pressures affecting the retail industry as a whole, as well as certain Acosta-specific challenges.  In the past five years, Acosta has suffered from the industry headwinds facing CPG manufacturers and the resulting consolidation and downsizing of CPG manufactures' marketing spend.  Acosta's sales and marketing model has also faced pressure as the industry has moved away from Acosta's historical processes.

Acosta's performance was disrupted by changes in consumer behavior and other macroeconomic trends in the retail and CPG industries that had a significant impact on the Company's ability to generate revenue.  Specifically, consumers have shifted away from traditional grocery retailers where Acosta has had a leadership position to discounters, convenience stores, online channels, and organic-focused grocers, where Acosta has not historically focused.  In addition, traffic to center aisles, where a majority of Acosta's CPG clients are traditionally located, has suffered as health-conscious consumers gravitate toward fresh foods typically located on the edges of stores.  Consumers and retailers have also shifted to private label goods over branded goods, impacting Acosta's CPG brand clients.  And consumer purchasing has declined overall as the cost of food continues to increase in the United States.  These consumer trends have exposed CPG manufacturers to significant margin pressure, resulting in a reduction in outsourced sales and marketing spend.  In the years and months leading to the Petition Date, several of Acosta's major clients consolidated, downsized, or otherwise reduced their marketing budgets.

In addition, to these macroeconomic trends, Acosta suffered diminished performance as a result of Acosta-specific operational and strategic challenges.  For instance, the Company has traditionally operated a syndicated model, wherein Acosta associates typically serve multiple CPG clients at the same time.  The sales and marketing industry has moved, however, to a dedicated team model, pursuant to which one SMA team works for one CPG client.  Though Acosta is shifting to a dedicated model, the transition has been slow in achieving significant results.  Acosta has also not traditionally operated in the online sphere, and has focused on CPGs at the expense of developing business in retail services and other marketing solutions.  These factors challenged Acosta's ability to respond to the market pressures from decreased and shifting consumer spending.

Acosta also faced significant pressure as a result of the Company's heavy debt load.  Clients have sought to diversify their SMA providers to decrease perceived risk of Acosta vulnerability.  In fact, certain of Acosta's competitors have pointed to the Company's significant indebtedness, contrasting their own de-levered balance sheets, to entice clients away from Acosta.  Over time, these factors have tightened the Company's liquidity position and constrained the Company from making necessary operational and capital expenditures, further impacting revenue.

### B.    Capital and Liquidity Constraints.

As a result of the significant client contraction over the past several years, the Company's net revenue and consolidated adjusted EBITDA numbers have materially declined.  Since fiscal year 2015, Acosta has experienced a loss of $631 million of revenue and $193 million of EBITDA.  Revenue contributions from the top twenty-five clients in 2015 have declined at approximately 14.6 percent per year since fiscal year 2015.  Furthermore, adjusted EBITDA margins have decreased year-over-year since fiscal year 2015 from over 19 percent to approximately 16 percent as of the end of fiscal year 2018.

The reduction in client revenues and significant debt load have also impacted the Company's liquidity position.  The Debtors' liquidity position materially tightened following the departure of certain key clients in July 2019.  In addition, the Company faced significant debt service payments, including the $33.5 million reduction due to

11

the Non-Extending Revolver Lenders on September 26, 2019, and a $31.0 million interest payment under the Senior Notes on October 1, 2019.  As discussed more fully below, the Debtors and their lenders agreed that the Company should defer making these debt service payments to preserve liquidity during ongoing discussions around a comprehensive restructuring of Acosta's funded debt.

**C.     Prepetition Transformation Initiative and Engagement with Creditors**

**1.     Cost-Reduction Transformation Initiatives**

In response to market pressures and declining revenue, Acosta implemented significant cost reduction programs.  Beginning in 2016, Acosta executed a variety of cost-saving programs aimed at reducing management redundancy, identifying and correcting underutilized activities, and right-sizing employee headcount.  Through these initiatives, Acosta has achieved approximately $265 million of cost savings through fiscal year 2020.  While this had the advantage of reducing operational inefficiencies and redundancies, certain client relationships also suffered, further increasing margin pressure and reducing revenues.

**2.     Engagement of Advisors and Development of Revised Business Plan**

Further, in light of Acosta's significant cash interest obligations and near-term maturities, Acosta viewed a comprehensive debt restructuring as the necessary next step to best position the Company to remain the most competitive sales and marketing agency in the industry.  In July 2019, Acosta's executive management team was restructured to better align business units, improve accountability, and drive profitable growth.  Acosta also engaged restructuring advisors to assist in their restructuring efforts.  Acosta had been working with PJT in connection with its capital raising initiatives since October 2018.  In July 2019, Acosta engaged Alvarez & Marsal Holdings, LLC to assist in liquidity management, and, in August 2019, engaged Kirkland & Ellis LLP to assist in engaging creditors in comprehensive restructuring negotiations.

With the assistance of their advisors, Acosta's management team developed a revised, comprehensive transformation strategy focused on stabilizing the top line, materially reducing debt, and reinforcing the client base by prioritizing client service.  Acosta has begun implementing its growth strategy, focusing on stabilizing client relationships through increased contact and improved service.  Acosta is also investing in its workforce, with an emphasis on increasing engagement and shifting to a performance-based culture.  And, Acosta is working to streamline provision of services through the use of technology and automation to enable high-quality performance and evolve offerings.  Following the past three years of cost-cutting and operational streamlining, Acosta is now focused on growth, both through expansion of SMA offerings, and identifying opportunities for new business.  Consistent with the revised transformation strategy, the Debtors' business plan projects adjusted EBITDA of $141 million in 2020, with projected growth to $194 million by 2024.

**3.     Discussion with Creditors and Forbearance Agreement**

In conjunction with the development of its revised business plan, Acosta worked to engage its creditors around a comprehensive deleveraging transaction. To provide more runway for negotiations, beginning in August 2019, the Company engaged with its lenders regarding the September 26, 2019 maturity of the Non-Extended Revolver and the October 1, 2019 coupon due on the Senior Notes.  Approximately 92 percent of lenders under the Credit Agreement (by amount) agreed to suspend the exercise of their rights through October 30, 2019 in connection with the deferral of these debt service payments (the "First Lien Forbearance").  Holders of over 70 percent of Senior Notes also agreed to suspend exercise of their rights in connection with the deferral of Senior Notes interest (the "Notes Forbearance").  Each of the First Lien Forbearance and Notes Forbearance were extended several times on a short-term basis, and ultimately have been extended co-terminus with the RSA.  The Company also engaged with Sound Point to waive certain reporting requirements and events of default under the A/R Facility through November 8, 2019 (the "Sound Point Waiver") and have agreed for this waiver to extend through December 15, 2019 or termination of the RSA.  These agreements provided the Company and its lenders valuable runway to drive consensus toward a comprehensive restructuring transaction.

4.        **Appointment of Disinterested Directors.**

In September 2019, in connection with its restructuring efforts, Acosta's board of directors (the "Board") appointed two disinterested directors to determine and decide potential conflict matters.  The Board delegated to the disinterested directors the authority to review and act upon any matter arising in or related to a potential restructuring transaction in which a conflict exists between the Company, on the one hand, and its shareholders, affiliates, or directors and officers, on the other hand.  The disinterested directors were given full authority to investigate and determine whether any matter arising in or related to a restructuring transaction constituted a conflict matter.  The disinterested directors engaged Katten Muchin Rosenman LLP, as legal counsel, to lead the investigation regarding interested party issues in connection with the proposed restructuring transactions.

The disinterested directors have commenced an independent investigation (which remains ongoing as of the Petition Date) into interested party issues in connection with the proposed restructuring transactions.  The Debtors expect that the disinterested directors will be in a position to make a final recommendation regarding their investigation in advance of the Debtors' proposed confirmation hearing.

IV.        **The Debtors' Entry into the Restructuring Support Agreement.**

On November 8, 2019, Acosta ultimately agreed to the terms of a comprehensive deleveraging transaction embodied in the Restructuring Support Agreement with a cross-holder group of Term Loan Facility lenders and Senior Notes holders (the "Ad Hoc Group" or the "Consenting Creditors"), consisting of affiliates of each of: Elliott Management Corporation ("Elliott"), Oaktree Capital Management, L.P. ("Oaktree"), Davidson Kempner Capital Management ("DK"), and Nexus Capital Management ("Nexus").  The members of the Ad Hoc Group are members of a larger ad hoc group of First Lien Lenders (the "Lender Group") represented by Davis Polk & Wardwell LLP ("Davis Polk") and Centerview Partners LLC ("Centerview," and together with Davis Polk, the "Lender Group Representatives").  Elliott and Oaktree are represented by White & Case LLP, and DK and Nexus are represented by Sullivan & Cromwell LLP.

The groundwork for this agreement was laid in late August 2019, when the Company and its advisors first met with the Ad Hoc Group's advisors.  In early September 2019, the Company and its advisors met with members of the Ad Hoc Group and JPM.  For the three month period from August to early-November 2019, the Debtors actively engaged in good-faith negotiations with the Ad Hoc Group and each of their respective advisors to negotiate the terms of a restructuring proposal that could form the basis of a reasonable and workable chapter 11 plan.  In order for the Debtors' various competing creditor constituencies to understand the scope and complexity of the Debtors' businesses, including current operations and financial projections, and potential liabilities, certain of the Debtors' creditors, including the Ad Hoc Group members and their advisors, were provided access to certain confidential and non-public information and documentation relating to the Company's operations.

The Company and its advisors had significant engagement with the Ad Hoc Group, other stakeholders and their respective advisors through multiple in-person and telephonic meetings throughout September, October, and November with the aim of driving a consensual, comprehensive restructuring transaction that would materially decrease the Company's leverage and poise the Company for success going forward.

As of early October, the Company and the Ad Hoc Group still could not reach consensus on the terms of a restructuring.  Specifically, members of the Ad Hoc Group disagreed about how much value should be attributed to the Senior Notes and the First Lien Facility.  With these constituents at an impasse, the Company put forth its own proposal to bridge the gap.  After approximately a month of arms'-length, good faith negotiations between the parties, on November 8, 2019, the members of the Ad Hoc Group, the Sponsors and the Debtors entered into the Restructuring Support Agreement, which contemplates the consummation of the "Restructuring Transactions."

On November 8, 2019, following the execution of the Restructuring Support Agreement, the Debtors commenced solicitation of the Plan by delivering a copy of the Plan and the related Disclosure Statement (including Ballots) to Holders of Class 3-First Lien Claims and Class 4-Senior Notes Claims, the only Classes entitled to vote to accept or reject the Plan.

Following solicitation of the Plan and the Disclosure Statement, certain First Lien Lenders represented by Arnold & Porter Kaye Scholer LLP (the "Minority First Lien Group") organized and expressed their concerns regarding certain terms of the Restructuring Support Agreement. The Debtors and the Ad Hoc Group immediately engaged with the Minority First Lien Group in an effort resolve their issues. In an effort to build consensus and provide sufficient time to engage on a solution, the Debtors extended the Class 3 Voting Deadline first to November 19, 2019, at 11:59 p.m., prevailing Eastern Time and again to November 23, 2019, at 11:59 p.m., prevailing Eastern Time. During this period, the Debtors, the Ad Hoc Group, and the Minority First Lien Group engaged in good faith, arm's length negotiations regarding what amendments to the Restructuring Support Agreement would be required to gain the support of the Minority First Lien Group. These negotiations proved fruitful, and the Debtors, the Ad Hoc Group, the Minority First Lien Group, and the other parties thereto signed an amended Restructuring Support Agreement (the "Amended and Restated Restructuring Support Agreement") on November 22, 2019, the terms of which are reflected in this amended Disclosure Statement and the amended Plan.

In light of these developments, the Debtors established November 29, 2019 at 11:59 p.m., prevailing Eastern Time (the "Class 3 Voting Deadline"), as the deadline for the receipt of votes to accept or reject the Plan from Holders of Class 3-First Lien Claims, and December 9, 2019, at 11:59 p.m., prevailing Eastern Time (the "Class 4 Voting Deadline," and, collectively with the Class 3 Voting Deadline, the "Voting Deadlines"), as the deadline for the receipt of votes to accept or reject the Plan from Holders of Class 4-Senior Notes Claims.

A.    **The Primary Components of the Amended and Restated Restructuring Support Agreement.**

The primary components of the Amended Restructuring Transactions, which will be implemented through the Plan, but are comprised of a number of non-severable, interrelated transactions, include:

- all Holders of First Lien Claims will have the opportunity to provide the Debtors with their pro-rata portion of a $150.0 million of new money debtor-in-possession financing through the DIP Facility, backstopped by the Ad Hoc Group, pursuant to the terms and conditions set forth in the DIP Credit Agreement, which, among other things, will be used to satisfy all outstanding amounts due under the A/R Facility and fund the Chapter 11 Cases (as described further below);

- each eligible Holder of an Allowed Class 3-First Lien Claim shall receive its Pro Rata share (as determined as a percentage of all First Lien Claims) of: (a) 85% of the total New Common Stock, subject to dilution by the Employee Incentive Plan, the Equity Rights Offering, the Direct Investment Preferred Equity Raise, and the Equity Backstop Premium and (b) the First Lien Subscription Rights; *unless*, such Holder of an Allowed First Lien Claim elects, but only if such Holder accepts the Plan and thereby agrees, to instead receive (or cause its affiliated designee to receive) the First Lien Cash-Out Option;

- each eligible Holder of an Allowed Class 4-Senior Notes Claim shall receive its Pro Rata share (as determined as a percentage of all Senior Notes Claims) of: (a) 15% of the total New Common Stock, subject to dilution by the Employee Incentive Plan, the Equity Rights Offering, the Direct Investment Preferred Equity Raise, and the Equity Backstop Premium and (b) the Senior Notes Subscription Rights; *unless*, such Holder of an Allowed Senior Notes Claim elects, but only if such Holder accepts the Plan, and thereby agrees, to instead receive (or cause its affiliated designee to receive) the Senior Notes Cash-Out Option;

- the Reorganized Debtors shall issue $65.0 million of New Preferred Stock through the Direct Investment Preferred Equity Raise, and the members of the Ad Hoc Group, as "Backstop Parties," shall be obligated to purchase such New Preferred Stock in accordance with the terms of the Backstop and Direct Investment Agreement;

- the Reorganized Debtors shall also issue $260.0 million of New Preferred Stock through the Equity Rights Offering, 100% of which will be backstopped by the Backstop Parties in accordance with the terms of the Backstop and Direct Investment Agreement, through which each eligible Holder of an Allowed Class 3-First Lien Claim and each Holder of an Allowed Class 4-Senior Notes Claim, including the Backstop Parties, shall have the opportunity to purchase their Pro Rata share of the First Lien Equity Rights Offering Shares and the Senior Notes Equity Rights Offering Shares (*i.e.*, the First Lien

14

Subscription Rights, including the First Lien Oversubscription Rights and the Senior Notes Subscription Rights, including the Senior Notes Oversubscription Rights) respectively; and

- mutual releases among the Debtors and the First Lien Lenders, the A/R Facility Lenders, the DIP Lenders, Holders of the Senior Notes Claims, and the Sponsor, among others.

The Amended and Restated Restructuring Support Agreement and the Plan provide for a completely consensual and deleveraging restructuring supported by Holders of approximately 70% in amount of First Lien Claims and Holders of approximately 80% in amount of Senior Notes Claims. Further, pursuant to the Plan, all Holders of General Unsecured Claims, Acquisition Note Claims, and Stock Repurchase Note Claims will be paid in full in the ordinary course. The Debtors believe the restructuring contemplated by the Restructuring Support Agreement is the best interests of their estates and all stakeholders.

Nonetheless, the Debtors maintain a broad "fiduciary out" under the Restructuring Support Agreement, which provides, in relevant part, "Notwithstanding anything to the contrary in this [Restructuring Support Agreement], nothing in this [Restructuring Support Agreement] shall require a Company Party or the Governing Body of a Company Party to take any action or to refrain from taking any action to the extent such person or persons determines, based on the advice of counsel, that taking or failing to take such action would be inconsistent with applicable Law or its or their fiduciary obligations under applicable Law."

**B.      The Debtors' Proposed Disclosure Statement and Solicitation Process.**

Following the execution of the Restructuring Support Agreement, the Debtors commenced solicitation of the Plan on November 8, 2019 by delivering a copy of the Plan and the Disclosure Statement (including Ballots) to Holders of Class 3-First Lien Claims and Class 4-Senior Notes Claims. Following the commencement of solicitation the Debtors entered into the Amended and Restated Restructuring Support Agreement and amended the Plan and the Disclosure Statement accordingly (as described above). Therefore, on November 19, 2019, the Debtors delivered copies of the amended Plan and this amended Disclosure Statement (including new Ballots) to Holders of Class 3-First Lien Claims and Class 4-Senior Notes Claims so that such Holders could vote on the amended Plan. The Debtors have established November 29, 2019, at 11:59 p.m., prevailing Eastern Time as the revised Class 3 Voting Deadline. For the avoidance of doubt, the Class 4 Voting Deadline remains December 9, 2019, at 11:59 p.m., prevailing Eastern Time. The Debtors expect that the Chapter 11 Cases will have commenced on or about December 1, 2019.

**Unless otherwise determined by the Debtors, all votes of Holders of Class 3-First Lien Claims and Class 4-Senior Notes Claims that were submitted before the transmission of this amended Disclosure Statement will be disregarded for purposes of soliciting votes to accept or reject the amended Plan and electing whether or not to receive the Cash-Out Option. All Holders of Class 3-First Lien Claims and Class 4-Senior Notes Claims should submit the Ballot that accompanies this amended Disclosure Statement in order to have their votes and elections counted in accordance with the Solicitation Procedures before the Class 3 Voting Deadline or the Class 4 Voting Deadline, as applicable.**

The Debtors will seek Bankruptcy Court approval of the Voting Deadlines at the outset of the Chapter 11 Cases. As soon as practicable after the Voting Deadlines, the Solicitation Agent will file with the Bankruptcy Court the Voting Report setting forth the voting results for Class 3-First Lien Claims and Class 4-Senior Notes Claims. Based on the execution of the Restructuring Support Agreement by the Consenting Creditors, the Debtors believe that the Voting Report likely will show that the Holders of Claims entitled to vote on the Plan have overwhelmingly voted to accept the Plan. Accordingly, on the Petition Date, the Debtors intend to file the Plan, this Disclosure Statement, and a motion to approve the Solicitation Procedures and schedule the Confirmation Hearing to consider approval of this Disclosure Statement and Confirmation of the Plan. The following table sets forth the timetable for the solicitation process and the anticipated Chapter 11 Cases.

| Proposed Solicitation and Confirmation Timeline | |
|---|---|
| Commence Solicitation | November 8, 2019 |
| Mail Confirmation Hearing Notice | November 8, 2019 |

15

| Petition Date Milestone | December 1, 2019 (or as extended by RSA parties) |
| Voting Deadline (Class 3) | November 29, 2019, at 11:59 p.m., prevailing Eastern Time |
| Voting Deadline (Class 4) | December 9, 2019, at 11:59 p.m., prevailing Eastern Time |
| Objection Deadline | December 9, 2019, at 5:00 p.m., prevailing Eastern Time, or such other date as the Court may direct |
| Deadline to File Reply Brief | December 11, 2019, at 11:59 p.m., prevailing Eastern Time, or such other date as the Court may direct |
| Anticipated Confirmation Hearing Date | December 13, 2019, or such other date as the Court may direct |

## C.      Employee and Equity Considerations in the Plan.

On the Effective Date, the Reorganized Acosta Board shall be authorized to institute the Employee Incentive Plan, enact and enter into related policies and agreements, and distribute the New Common Stock to participants based on the terms and conditions determined by the Reorganized Acosta Board.

## D.      The Debtors' First Day Motions and Certain Related Relief.

### 1.      Operational First Day Pleadings.

To minimize disruption to the Debtors' operations and effectuate the terms of the Plan, upon the commencement of the Chapter 11 Cases, the Debtors intend to file motions seeking various relief, including authority to: (1) continue utilizing the Debtors' prepetition cash management system, including with respect to intercompany transactions; (2) pay certain prepetition claims in the ordinary course of business; (3) pay prepetition wages and certain administrative costs related to those wages; (4) pay certain taxes and fees that accrued or arose in the ordinary course of business before the Petition Date; and (5) maintain and honor certain obligations related to their customers.  All of the relief requested by the first-day motions and throughout the Chapter 11 Cases will be subject to any orders regarding the Debtors' use of cash collateral.

### 2.      Post-Petition Financing and Use of Cash Collateral

Acosta will be the borrower and all of its subsidiaries who are Debtors will unconditionally guarantee the DIP Facility on a joint and several basis.  Participation in the $150.0 million new money DIP Facility (and the loans thereunder, the "DIP Loans"), on the terms set forth in the DIP Facility Term Sheet attached as Exhibit D to the Restructuring Support Agreement and otherwise acceptable to the Required Consenting Creditors shall be offered on a ratable basis to each First Lien Lender up to its Pro Rata share as of 11:59 p.m. (ET) on November 4, 2019 (the "DIP Participation Record Date"), based on such First Lien Lender's amount of First Lien Loans relative to the aggregate amount of First Lien Loans, pursuant to procedures, terms, conditions and documentation acceptable to the Company, the Ad Hoc Group, and the Required Consenting Creditors.

If any First Lien Lender determines not to participate in the DIP Facility in an amount equal to its Pro Rata share of the First Lien Loans as of the DIP Participation Record Date, any such amounts (the Unfunded Amounts) otherwise allocable to such First Lien Lender shall be available to each of the First Lien Lenders who have committed to participate in the DIP Facility (each such First Lien Lender (including, for the avoidance of doubt, any member of the Ad Hoc Group) which commits to participating in the DIP Facility, a "Participating Lender"), in the proportion that such First Lien Lender's Pro Rata share of the First Lien Loans relative to the Pro Rata shares of all other Participating Lenders bears to the Unfunded Amounts, pursuant to procedures, terms, conditions and documentation acceptable to the Company, the Ad Hoc Group, and Required Consenting Creditors; provided that any amount of the Unfunded Amounts not accepted by Participating Lenders shall be allocated to the Ad Hoc Group, and provided, further, that in no event shall any Participating Lender be required to commit to provide or provide any additional DIP Loans (including pursuant to its initial commitment and any additional funding of the Unfunded Amounts as set forth herein) beyond its initial commitment thereto.

KE 63679933
PHIL1 8521314v.1

The Ad Hoc Group has agreed to the backstop the funding obligation for the DIP Facility on the terms of, and subject to the conditions set forth in, the DIP Credit Agreement and the DIP Facility Term Sheet.

The DIP Facility will have a term of six (6) months (the "Stated Maturity Date"), and the DIP Loans will bear interest at a rate of one-month LIBOR (subject to a 1.50% floor) plus 9.50% per annum. The DIP Lenders will be entitled to (a) in respect of the DIP Lenders' commitments, a commitment premium equal to 3.00%, which will be payable on the closing date and (b) a yield enhancement premium equal to 4.50% of the DIP Loans paid or prepaid and/or commitments terminated, payable upon payment or prepayment of any DIP Loans (whether voluntary or mandatory); *provided*, that the yield enhancement premium shall be automatically waived in the event, and upon the occurrence of, the earlier of the (i) Effective Date and (ii) the Stated Maturity Date.

The proceeds of the DIP Facility will be used to, among other things, (a) pay the costs, fees and expenses associated with the Chapter 11 Cases, (b) make adequate protection payments, (c) pay fees, interest, expenses, and other costs related to the DIP Facility, including fees, costs and expenses incurred by the DIP Agent and/or the DIP Lenders (including, without limitation the reasonable fees and expenses of their legal counsel and financial advisors as provided herein), (d) fund working capital needs, capital improvements and expenditures of the Debtors during the Chapter 11 Cases, in accordance with an approved budget (subject to certain variations permitted under the DIP Credit Agreement), (e) repay all obligations outstanding under the A/R Facility in the aggregate amount of $117 million, and (f) cash collateralize any outstanding undrawn letters of credit issues under the Prepetition First Lien Credit Facility.

     **3.**     **Motion to Approve Solicitation Procedures and Confirm the Plan**

Additionally, the Debtors intend to file a motion seeking (1) entry of an order scheduling the Confirmation Hearing and approving the form of notices and procedures related thereto, (2) approval of the Disclosure Statement as containing adequate information under section 1125(a) of the Bankruptcy Code, and (3) approval of the Solicitation Procedures, which shall include procedures in respect of Holders of Class 3-First Lien Claims and Holders of Class 4-Senior Notes Claims to participate in the Equity Rights Offering.

**E.**     **Other Requested First-Day Relief and Retention Applications.**

The Debtors also plan to file motions and/or applications seeking certain customary relief, including the entry of an order directing the joint administration of the Debtors' Chapter 11 Cases under a single docket and the entry of orders approving the retention of the Debtors' bankruptcy advisors, including Kirkland & Ellis LLP and Kirkland & Ellis International LLP as legal counsel, PJT as financial advisor and investment banker, Alvarez & Marsal Holdings as restructuring advisor, and Prime Clerk, LLC as Solicitation Agent.

**V.**     **Summary of the Plan**

SECTION V OF THIS DISCLOSURE STATEMENT IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE KEY TERMS, STRUCTURE, CLASSIFICATION, TREATMENT, AND IMPLEMENTATION OF THE PLAN, AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE ENTIRE PLAN AND EXHIBITS TO THE PLAN. ALTHOUGH THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN, THIS DISCLOSURE STATEMENT DOES NOT PURPORT TO BE A PRECISE OR COMPLETE STATEMENT OF ALL RELATED TERMS AND PROVISIONS, AND SHOULD NOT BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN. INSTEAD, REFERENCE IS MADE TO THE PLAN AND ALL SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS. THE PLAN ITSELF (INCLUDING ATTACHMENTS) AND THE PLAN SUPPLEMENT WILL CONTROL THE TREATMENT OF HOLDERS OF CLAIMS UNDER THE PLAN. TO THE EXTENT THERE ARE ANY INCONSISTENCIES BETWEEN THIS SECTION V AND THE PLAN (INCLUDING ANY ATTACHMENTS TO THE PLAN) AND THE PLAN SUPPLEMENT, THE PLAN AND PLAN SUPPLEMENT, AS APPLICABLE, SHALL GOVERN.

KE 63679933
PHIL1 8521314v.1

**A.      Treatment of Unclassified Claims.**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

**1.      DIP Claims.**

All DIP Claims shall be deemed Allowed as of the Effective Date in an amount equal to (i) the principal amount outstanding under the DIP Facility on such date, (ii) all interest accrued and unpaid thereon to the date of payment, (iii) all accrued and unpaid fees, expenses, and non-contingent indemnification obligations payable under the DIP Credit Agreement and the DIP Orders, and (iv) all other DIP Obligations as defined in the DIP Credit Agreement other than Contingent DIP Obligations, which shall otherwise survive the Effective Date and shall be paid in full in Cash as soon as reasonably practicable after they become due and payable under the DIP Documents. Except to the extent that a Holder of an Allowed DIP Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim, each such Allowed DIP Claim shall receive on the Effective Date payment in full in Cash of such Holder's Allowed DIP Claim. All reasonable and documented unpaid fees and expenses of the DIP Agent, including reasonable and documented fees, expenses, and costs of its advisors, shall be paid in Cash on the Effective Date. Contemporaneously with the foregoing receipt of payment in full in Cash of the Allowed DIP Claims, except with respect to Contingent DIP Obligations under the DIP Credit Agreement (which contingent obligations shall survive the Effective Date and shall continue to be governed by the DIP Credit Agreement), the DIP Facility, the DIP Credit Agreement, and all related loan documents, shall be deemed cancelled, all Liens on property of the Debtors and the Reorganized Debtors arising out of or related to the DIP Facility shall automatically terminate, and all collateral subject to such Liens shall be automatically released, in each case without further action by the DIP Agent or the DIP Lenders and all guarantees of the Debtors and Reorganized Debtors arising out of or related to the DIP Claims shall be automatically discharged and released, in each case without further action by the DIP Agent or the DIP Lenders. The DIP Agent and the DIP Lenders shall take all actions to effectuate and confirm such termination, release, and discharge as reasonably requested by the Debtors or the Reorganized Debtors, as applicable.

**2.      Administrative Claims.**

Unless otherwise agreed to by the Holders of an Allowed Administrative Claim and the Debtors, or the Reorganized Debtors, or as otherwise set forth in an order of the Bankruptcy Court (including pursuant to the procedures specified therein), as applicable, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim in accordance with the following: (a) if an Administrative Claim is Allowed as of the Effective Date, on or as soon as reasonably practicable after the Effective Date (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than sixty days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claim without any further action by the Holders of such Allowed Administrative Claim; or (d) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

**3.      Professional Fee Claims.**

**(c)      Professional Fee Escrow Account**.

As soon as reasonably practicable after the Confirmation Date, and no later than one Business Day prior to the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and for no other Entities until all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow

Account in any way.  Such funds shall not be considered property of the Estates, the Debtors, or the Reorganized Debtors.

The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from the funds held in the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by an order of the Bankruptcy Court; *provided* that obligations with respect to Allowed Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow Account.  When all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

(d)      **Final Fee Applications and Payment of Accrued Professional Compensation Claims**.

All final requests for payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be filed no later than 45 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders.  The amount of the Allowed Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals, including from funds held in the Professional Fee Escrow Account when such Professional Fee Claims are Allowed by entry of an order of the Bankruptcy Court.

(e)      **Professional Fee Escrow Amount**.

The Professionals shall provide a reasonable and good-faith estimate of their fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date projected to be outstanding as of the Effective Date, and shall deliver such estimate to the Debtors no later than five days before the anticipated Effective Date; *provided*, *however*, that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the estimates.  If a Professional does not provide an estimate, the Debtors may estimate a reasonable amount of unbilled fees and expenses of such Professional, taking into account any prior payments; *provided*, *however*, that such estimate shall not be binding or considered an admission with respect to the fees and expenses of such Professional.  The total aggregate amount so estimated as of the Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow Account, *provided* that the Reorganized Debtors shall use Cash on hand to increase the amount of the Professional Fee Escrow Account to the extent fee applications are filed after the Effective Date in excess of the amount held in the Professional Fee Escrow Account based on such estimates.

(f)      **Post-Confirmation Date Fees and Expenses**.

From and after the Confirmation Date, the Debtors or Reorganized Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors or the Reorganized Debtors, as applicable.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

The Debtors and Reorganized Debtors, as applicable, shall pay, within ten business days after submission of a detailed invoice to the Debtors or Reorganized Debtors, as applicable, such reasonable claims for compensation or reimbursement of expenses incurred by the retained Professionals of the Debtors or the Reorganized Debtors, as applicable.  If the Debtors or Reorganized Debtors, as applicable, dispute the reasonableness of any such invoice, the Debtors or Reorganized Debtors, as applicable, or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.

KE 63679933
PHIL1 8521314v.1

4.      **Priority Tax Claims.**

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the Holder of an Allowed Priority Tax Claim and the applicable Debtor or Reorganized Debtor, each holder of an Allowed Priority Tax Claim will receive, at the option of the applicable Debtor or Reorganized Debtor, in full satisfaction of its Allowed Priority Tax Claim that is due and payable on or before the Effective Date, either (i) Cash equal to the amount of such Allowed Priority Tax Claim on the Effective Date or (ii) otherwise treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.  For the avoidance of doubt, Holders of Allowed Priority Tax Claims will receive interest on such Allowed Priority Tax Claims after the Effective Date in accordance with sections 511 and 1129(a)(9)(C) of the Bankruptcy Code.

**B.      Classification and Treatment of Claims and Interests.**

1.      **Classification of Claims and Interests.**

The Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with section 1122 of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The following chart represents the classification of Claims and Interests for each Debtor pursuant to the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 3 | First Lien Claims | Impaired | Entitled to Vote |
| 4 | Senior Notes Claims | Impaired | Entitled to Vote |
| 5 | Stock Repurchase Notes Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 6 | Acquisition Notes Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 7 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 8 | Debtor Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| 9 | Non-Debtor Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| 10 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| 11 | Interests in Anna Holdings | Impaired | Not Entitled to Vote (Deemed to Reject) |

20

2.      **Treatment of Classes of Claims and Interests.**

To the extent a Class contains Allowed Claims or Allowed Interests with respect to any Debtor, the classification of Allowed Claims and Allowed Interests is specified below.

3.      **Class 1 — Other Secured Claims**

(a)      *Classification*:  Class 1 consists of any Other Secured Claims.

(b)      *Treatment*:  Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each such Holder shall receive, at the option of the applicable Debtor(s), either:

(i)      payment in full in Cash;

(ii)     delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code;

(iii)    Reinstatement of such Allowed Other Secured Claim; or

(iv)     such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)      *Voting*:  Class 1 is Unimpaired under the Plan.  Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan.

4.      **Class 2 — Other Priority Claims**

(a)      *Classification*:  Class 2 consists of any Other Priority Claims.

(b)      *Treatment*:  Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such Holder shall receive, at the option of the applicable Debtor(s), either:

(i)      payment in full in Cash; or

(ii)     such other treatment rendering its Allowed Other Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(c)      *Voting*:  Class 2 is Unimpaired under the Plan.  Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

5.      **Class 3 — First Lien Claims**

(a)      *Classification:*  Class 3 consists of any First Lien Claims against any Debtor.

(b)      *Allowance:*  On the Effective Date, First Lien Claims shall be Allowed in their entirety for all purposes of the Plan in the aggregate principal amount of $2,113,406,091, plus any accrued but unpaid interest, fees, and other expenses arising under or in connection with the First Lien Credit Agreement and LC Obligations Claims (other than LC Obligations

21

Claims that are contingent Claims on the Effective Date because the relevant letter of credit is undrawn as of the Effective Date), which shall not be subject to any avoidance, reductions, setoff, offset, recharacterization, subordination, counterclaims, cross-claims, defenses, disallowance, impairments or any other challenges under applicable law or regulation by any entity.

(c)    *Treatment:*  Except to the extent that a Holder of an Allowed First Lien Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed First Lien Claim, each Holder of an Allowed First Lien Claim shall receive its Pro Rata share (as determined as a percentage of all First Lien Claims) of:

(i)    85% of the total New Common Stock, subject to dilution by the Employee Incentive Plan, the Equity Rights Offering, the Direct Investment Preferred Equity Raise, and the Equity Backstop Premium; and

(ii)    the First Lien Subscription Rights;

*unless*, such Holder of an Allowed First Lien Claim elects, but only if such Holder accepts the Plan and thereby agrees, to instead receive (or cause its affiliated designee to receive) the First Lien Cash-Out Option.

(d)    *Voting*:  Class 3 is Impaired under the Plan.  Holders of Allowed First Lien Claims are entitled to vote to accept or reject the Plan.

**6.    Class 4 — Senior Notes Claims**

(a)    *Classification:* Class 4 consists of any Senior Notes Claims against any Debtor.

(b)    *Allowance*: On the Effective Date, Senior Notes Claims shall be Allowed in their entirety for all purposes of the Plan in the aggregate principal amount of $800,000,000, plus any accrued but unpaid interest, fees, and other expenses arising under or in connection with the Senior Notes Indenture, which shall not be subject to any avoidance, reductions, setoff, offset, recharacterization, subordination, counterclaims, cross-claims, defenses, disallowance, impairments or any other challenges under applicable law or regulation by any entity.

(c)    *Treatment:*  Except to the extent that a Holder of an Allowed Senior Notes Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Senior Notes Claim, each Holder of an

22

Allowed Senior Notes Claim shall receive its Pro Rata share (as determined as a percentage of all Senior Notes Claims) of:

(i)        15% of the total New Common Stock, subject to dilution by the Employee Incentive Plan, the Equity Rights Offering, the Direct Investment Preferred Equity Raise, and the Equity Backstop Premium; and

(ii)       the Senior Notes Subscription Rights;

*unless*, such Holder of an Allowed Senior Notes Claim elects, but only if such holder accepts the Plan, and thereby agrees, to instead receive (or cause its affiliated designee to receive) the Senior Notes Claims Cash-Out Option.

(d)       *Voting*: Class 4 is Impaired under the Plan. Holders of Allowed Senior Notes Claims are entitled to vote to accept or reject the Plan.

**7.        Class 5 — Stock Repurchase Notes Claims**

(a)       *Classification*: Class 5 consists of any Stock Repurchase Notes Claims against Anna Holdings.

(b)       *Treatment*: Except to the extent that a Holder of an Allowed Stock Repurchase Notes Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Stock Repurchase Notes Claim, each Allowed Stock Repurchase Notes Claims shall be Reinstated and paid in the ordinary course of business in accordance with the terms and conditions of each Stock Repurchase Note giving rise to such Allowed Stock Repurchase Notes Claim; *provided*, *however*, that such Stock Repurchase Notes shall be assumed by Acosta in partial satisfaction of the Debtor Intercompany Claim owed by Acosta to Anna Holdings and thereafter assumed by Reorganized Acosta, or a subsidiary thereof, all as provided in the Restructuring Steps Memorandum.

(c)       *Voting*: Class 5 is Unimpaired and Holders of Allowed Stock Repurchase Notes Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 6 Stock Repurchase Notes Claims are not entitled to vote to accept or reject the Plan.

**8.        Class 6 — Acquisition Notes Claims**

(a)       *Classification*: Class 6 consists of any Acquisition Notes Claims against any Debtor.

(b)       *Treatment*: Except to the extent that a Holder of an Allowed Acquisition Notes Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Acquisition Notes Claim, each Allowed Acquisition Notes Claim shall be Reinstated and paid in the ordinary course of business in accordance with the terms and conditions of each Acquisition Note giving rise to such Allowed Acquisition Notes Claim.

(c)       *Voting*: Class 6 is Unimpaired and Holders of Allowed Acquisition Notes Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 6 Acquisition Notes Claims are not entitled to vote to accept or reject the Plan.

**9.        Class 7 — General Unsecured Claims**

(a)       *Classification*: Class 7 consists of any General Unsecured Claims against any Debtor.

(b)      *Treatment*:  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment of its Allowed Claim, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall be Reinstated and paid in the ordinary course of business in accordance with the terms and conditions of the particular transaction or agreement giving rise to such Allowed General Unsecured Claim.

(c)      *Voting*:  Class 7 is Unimpaired and Holders of Class 7 General Unsecured Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 7 General Unsecured Claims are not entitled to vote to accept or reject the Plan.

**10.      Class 8 — Debtor Intercompany Claims**

(a)      *Classification*:  Class 8 consists of any Debtor Intercompany Claims.

(b)      *Treatment*:  Except to the extent otherwise provided in the Restructuring Steps Memorandum, each Allowed Debtor Intercompany Claim shall, at the option of the applicable Debtors, either on or after the Effective Date, be:

(i)      Reinstated;

(ii)      converted to equity; or

(iii)      extinguished, compromised, addressed, setoff, cancelled, or settled, potentially without any distribution on account of such Claims; provided, however, that with respect to the Debtor Intercompany Claim owed by Acosta to Anna Holdings, such Debtor Intercompany Claim shall be partially satisfied on the Effective Date by the assumption by Acosta of Other Unsecured Notes Claims against Anna Holdings.

(c)      *Voting*:  Holders of Allowed Debtor Intercompany Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Allowed Debtor Intercompany Claims are not entitled to vote to accept or reject the Plan.

**11.      Class 9 — Non-Debtor Intercompany Claims**

(a)      *Classification*:  Class 9 consists of any Non-Debtor Intercompany Claims.

(b)      *Treatment*:  Except to the extent otherwise provided in the Restructuring Steps Memorandum, each Allowed Non Debtor Intercompany Claim shall, at the option of the applicable Debtors, be:

(i)      Reinstated;

(ii)      converted to equity; or

(iii)      extinguished, compromised, addressed, cancelled, or settled, without any distribution on account of such Claims.

(c)      *Voting*:  Holders of Allowed Non-Debtor Intercompany Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to

24

section 1126(g) of the Bankruptcy Code.  Holders of Allowed Non-Debtor Intercompany Claims are not entitled to vote to accept or reject the Plan.

12.     **Class 10 — Intercompany Interests**

(a)     *Classification*:  Class 10 consists of all Interests in the Debtors other than Anna Holdings.

(b)     *Treatment*:   Except to the extent otherwise provided in the Restructuring Steps Memorandum, on the Effective Date, Intercompany Interests shall be, at the option of the Debtors, either:

(i)     Reinstated in exchange for the Debtors' and the Reorganized Debtors' agreement under the Plan to make certain distributions to the Holders of Allowed Claims; or

(ii)     discharged, cancelled, released, and extinguished and of no further force or effect without any distribution on account of such Interests.

For the avoidance of doubt, any Interest in non-Debtor subsidiaries owned by a Debtor shall continue to be owned by the applicable Reorganized Debtor unless otherwise provided in the Restructuring Steps Memorandum.

(c)     *Voting*:  Holders of Intercompany Interests are conclusively deemed to have accepted the Plan pursuant to section 1126(f) or rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

13.     **Class 11 — Interests in Anna Holdings**

(a)     *Classification*:  Class 11 consists of all Interests in Anna Holdings.

(b)     *Treatment*:  Following the transactions described in clause (h) of Article IV.B of the Plan, all Interests in Anna Holdings will be cancelled, released, and extinguished, and will be of no further force or effect.

(c)     *Voting*:   Class 11 is Impaired under the Plan.  Holders of Anna Holdings Interests are conclusively presumed to have rejected the Plan.  Therefore, Holders of Allowed Class 11 Interests are not entitled to vote to accept or reject the.

C.      **Waiver of Claims Held by the Consenting Sponsor or CIM.**

Subject to, and upon the occurrence of, the Effective Date, the Consenting Sponsor and CIM shall be deemed to have waived all General Unsecured Claims (including claims for accrued and unpaid management fees payable by the Debtors); *provided, however* that the foregoing (a) shall not limit, reduce, modify or impair the Debtors' or the Reorganized Debtors' Indemnification Provisions with respect to the Consenting Sponsor, CIM, or their affiliates or the Consenting Sponsor's, CIM's, or their affiliates' rights under any D&O Liability Insurance Policies, which shall each be assumed pursuant to Articles V.E and V.F of the Plan, respectively, and (b) shall not waive any Claim held by the Consenting Sponsor, CIM, or their affiliates on account of existing arms'-length commercial contracts and vendor, customer, and landlord relationships.

D.      **Means for Implementation of the Plan.**

1.     **General Settlement of Claims and Interests.**

Unless otherwise set forth in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of

25

all Claims and Interests and controversies resolved pursuant to the Plan, including with respect to issues related to the value of the Debtors' unencumbered property.

2.      **Restructuring Transactions.**

On and after the Confirmation Date, the Debtors or Reorganized Debtors, as applicable, shall take all actions set forth in the Restructuring Steps Memorandum and may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan that are consistent with and pursuant to the terms and conditions of the Plan, which transactions may include, as applicable: (a) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, reorganization, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution or other certificates or documentation for other transactions as described in clause (a), pursuant to applicable state law; (d) the execution and delivery of the Equity Rights Offering Documents, (e) the execution and delivery of the New Shareholders Agreement and the New Corporate Governance Documents, and any certificates or articles of incorporation, bylaws, or such other applicable formation documents (if any) of each Reorganized Debtor (including all actions to be taken, undertakings to be made, and obligations to be incurred and fees and expenses to be paid by the Debtors and/or the Reorganized Debtors, as applicable); and the issuance, distribution, reservation, or dilution, as applicable, of the New Preferred Stock and the New Common Stock, as set forth herein; (f) the adoption of the Employee Incentive Plan and the issuance and reservation of the New Common Stock to the participants in the Employee Incentive Plan on the terms and conditions set by the Reorganized Acosta Board after the Effective Date; (g) all transactions necessary to provide for the purchase of substantially all of the assets or Interests of any of the Debtors by one or more Entities to be wholly owned by Reorganized Acosta, which purchase shall be structured as a taxable transaction for United States federal income tax purposes; and (h) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Restructuring Transactions.

3.      **Sources of Consideration for Plan Distributions.**

The Debtors shall fund distributions under the Plan, as applicable, with: (1) the New Common Stock and the New Preferred Stock; (2) the proceeds of the Equity Rights Offering; (3) the proceeds of the Direct Investment Preferred Equity Raise; and (4) the Debtors' Cash on hand. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments or other documents evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. The issuance, distribution, or authorization, as applicable, of certain securities in connection with the Plan, including the New Common Stock and the New Preferred Stock will be exempt from SEC registration, as described more fully in Article IV.F of the Plan.

(c)      **Issuance and Distribution of the New Common Stock and the New Preferred Stock**

On the Effective Date, the New Common Stock and the New Preferred Stock shall be issued and distributed as provided for in the Restructuring Steps Memorandum to the Entities entitled to receive the New Common Stock and New Preferred Stock pursuant to, and in accordance with, the Plan, the Equity Rights Offering Documents, and the Restructuring Support Agreement. On the Effective Date, the issuance of New Common Stock and the New Preferred Stock shall be authorized without the need for any further corporate action and without any action by the Holders of Claims or other parties in interest. All of the New Common Stock and New Preferred Stock issued under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable consistent with the terms of the New Shareholders Agreement.

Each distribution and issuance of the New Common Stock and the New Preferred Stock on the Effective Date shall be governed by the terms and conditions set forth in the Plan applicable to such distribution, issuance, and/or dilution, as applicable, and by the terms and conditions of the instruments evidencing or relating to such distribution, issuance, and/or dilution, as applicable, including the New Corporate Governance Documents and New

26

Shareholders Agreement, the terms and conditions of which shall bind each Entity receiving such distribution of the New Common Stock and the New Preferred Stock. Any Entity's acceptance of New Common Stock and New Preferred Stock shall be deemed as its agreement to the New Corporate Governance Documents and the New Shareholders Agreement, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms. The New Common Stock and the New Preferred Stock will not be registered on any exchange as of the Effective Date and shall not meet the eligibility requirements of DTC. Notwithstanding anything set forth herein, in the Disclosure Statement, or in the Confirmation Order, the Indenture Trustee shall not be required or otherwise obligated to distribute any New Common Stock, New Preferred Stock, or any other securities or distributions contemplated by the Plan that do not meet the eligibility requirements of DTC.

(d)    **The Direct Investment Preferred Equity Raise and the Equity Rights Offering**

The Debtors shall raise an aggregate of $325.0 million of equity capital through the Equity Rights Offering and the Direct Investment Preferred Equity Raise. In connection with the consummation of the Plan, the Equity Rights Offering and the Direct Investment Preferred Equity Raise shall be consummated in accordance with the terms of the Plan, the Restructuring Support Agreement, and the Equity Rights Offering Documents. All New Common Stock shall be initially subject to dilution by the New Preferred Stock.

(e)    **The Direct Investment Preferred Equity Raise and the Direct Investment Commitments**

On the Effective Date, the Debtors shall consummate the Direct Investment Preferred Equity Raise, through which Reorganized Acosta shall issue $65.0 million of New Preferred Stock. The New Preferred Stock issued pursuant to the Direct Investment Preferred Equity Raise shall be purchased by the Backstop Parties on the terms and conditions set forth in the Backstop and Direct Investment Agreement, such that 85% of the Direct Investment Preferred Equity Raise shall be purchased on a Pro Rata basis by the Backstop Parties based on each Backstop Party's holdings of First Lien Claims relative to the aggregate amount of First Lien Claims held by the Backstop Parties, and 15% of the Direct Investment Preferred Equity Raise shall be purchased based on each Backstop Party's holdings of Senior Notes Claims relative to the aggregate amount of Senior Notes Claims held by the Backstop Parties.

Subject to, and in accordance with the Backstop and Direct Investment Agreement, as consideration for the Direct Investment Commitments, the Backstop Parties shall receive the Direct Investment Commitment Premium, which will be payable on, and as a condition to, the Effective Date, equal to $2.925 million, payable in Cash, and shall have been fully earned as of the effective date of the Restructuring Support Agreement.

(i)    **The Equity Rights Offering and the Backstop Commitments**

On the Effective Date, the Debtors shall consummate the $221.0 million First Lien Equity Rights Offering and the $39.0 million Senior Notes Equity Rights Offering, subject to the terms and conditions set forth in the Plan, and the Equity Rights Offering Documents, through which each eligible Holder of a Claim in Class 3-First Lien Claims and Class 4-Senior Notes Claims as of the Record Date, including the Backstop Parties, shall have the opportunity to purchase their Pro Rata share of the First Lien Equity Rights Offering Shares and the Senior Notes Equity Rights Offering Shares (*i.e.*, the First Lien Subscription Rights, including the First Lien Oversubscription Rights, and the Senior Notes Subscription Rights, including the Senior Notes Oversubscription Rights), respectively.

More specifically, Holders of First Lien Claims that have duly subscribed for 100% of their Pro Rata share of the First Lien Equity Rights Offering Amount are entitled to First Lien Oversubscription Rights, and may elect to receive their respective First Lien Oversubscription Election Amount of First Lien Unsubscribed Equity. Holders of Senior Notes Claims that have duly subscribed for 100% of their Pro Rata share of the Senior Notes Equity Rights Offering Amount are entitled to Senior Notes Oversubscription Rights, and may elect to receive their respective Senior Notes Oversubscription Election Amount of Senior Notes Unsubscribed Equity.

If the First Lien Unsubscribed Equity available is less than the aggregate First Lien Oversubscription Election Amount by all Participating First Lien Claim Holders, then each Participating First Lien Claim Holder's First Lien Oversubscription Rights shall be ratably reduced based on the amount such Holder's First Lien Claims held as of the Record Date, with adjustments, in accordance with the Backstop and Direct Investment Agreement.

27

If the Senior Notes Unsubscribed Equity available is less than the aggregate Senior Notes Oversubscription Election Amount by all Participating Senior Notes Claim Holders, then each Participating Senior Notes Claim Holder's Senior Notes Oversubscription Rights shall be ratably reduced based on the amount of such Holder's Senior Notes Claims held as of the Record Date, with adjustments, in accordance with the Backstop and Direct Investment Agreement.

The Equity Rights Offering Amount will be 100% backstopped by the Backstop Parties, and the Backstop Parties shall be obligated to subscribe to purchase the Final Unsubscribed Equity in accordance with the terms and conditions of the Backstop and Direct Investment Agreement.  The purchase price for the New Preferred Stock issued through the Equity Rights Offering will be equal to $35.00 per share.

Subject to, and in accordance with the Backstop and Direct Investment Agreement, as consideration for the Backstop Commitments, the Backstop Parties shall receive an Equity Backstop Premium, which will be payable on, and as a condition to, the Effective Date in New Preferred Stock in amount equal to 4.5% of the Equity Rights Offering Amount, and shall have been fully earned as of the Agreement Effective Date.

For the avoidance of doubt, any New Preferred Stock purchased by the Backstop Parties in the Direct Investment Preferred Equity Raise and the Equity Rights Offering pursuant to the Backstop Commitments shall be solely on account of the new money provided in the Direct Investment Preferred Equity Raise and the Backstop Commitments and not on account of any Holder's First Lien Claims or Senior Notes Claims.

(f)     **Cash on Hand**

The Debtors or Reorganized Debtors, as applicable, shall use Cash on hand to fund distributions, including the First Lien Cash-Out Option and the Senior Notes Cash-Out Option, to certain Holders of Allowed Claims, consistent with the terms of the Plan.

4.     **Early Transaction Agreement Consideration.**

Pursuant to the Plan, any Holder of First Lien Claims or Holder of Senior Notes Claims that either was (a) not a Consenting Creditor as of November 8, 2019 or (b) a Consenting Creditor as of November 8, 2019 that thereafter acquired First Lien Claims or Senior Notes Claims, the amounts of which are not set forth on the respective counterpart signature pages to the Original RSA, but only to the extent of such newly acquired First Lien Claims or Senior Notes Claims; in each case, only if such Holder executes and delivers, or has executed and delivered, to counsel to Acosta at the notice address set forth in Section 15.10 of the Restructuring Support Agreement, a signature page or joinder to the Restructuring Support Agreement on or before the Petition Date and thereby becomes an Early Consenting First Lien Lender or an Early Consenting Noteholder, as the case may be, shall receive on the Plan Effective Date: (i) in the case of an Early Consenting First Lien Lender, the Early Consenting First Lien Lender Consideration and (ii) in the case of an Early Consenting Noteholder, the Early Consenting Noteholder Consideration (unless the Bankruptcy Court requires the Early Consenting First Lien Lender Consideration, or the Early Consenting Noteholder Consideration, in the aggregate, to be paid by the Reorganized Debtors Pro Rata to all holders of allowed First Lien Claims and allowed Senior Notes Claims, respectively (other than in respect of Original Consenting Creditor RSA Claims), in which case, the Early Transaction Agreement Consideration shall be determined accordingly); *provided, however,* that any party that validly became an Early Consenting First Lien Lender or Early Consenting Noteholder under the Original RSA shall be deemed to become an Early Consenting First Lien Lender or Early Consenting Noteholder under the Restructuring Support Agreement; *provided further, however*, that Consenting Creditors shall not receive Early Transaction Agreement Consideration on account of Original Consenting Creditor RSA Claims.

To the extent an Early Consenting First Lien Lender or Early Consenting Noteholder transfers any First Lien Claims or Senior Notes Claims to a Permitted Transferee (as defined in the Restructuring Support Agreement) in accordance with Section 10.01 of the Restructuring Support Agreement prior to consummation of the Restructuring Transactions, such Permitted Transferee shall be entitled to such Early Consenting First Lien Lender's or Early Consenting Noteholder's Early Transaction Agreement Consideration in respect of such transferred First Lien Claims or Senior Notes Claims but not any other First Lien Claims or Senior Notes Claims held by such Permitted Transferee (unless such Permitted Transferee was an Early Consenting First Lien Lender or Early Consenting Noteholder, as the case may be).

28

For the avoidance of doubt, the Early Transaction Agreement Consideration shall not be earned, and shall not be payable, unless and until the Effective Date occurs. It shall not be payable in the event a plan other than the Plan is consummated.

For U.S. federal income tax purposes, each party shall treat the Early Transaction Agreement Consideration as additional consideration received by a recipient in exchange for their Claim pursuant to the Plan (in a manner consistent with typical market treatment of an early tender premium), unless otherwise required by a decision of a U.S. federal tax court, court of claims, or district court.

**5.        New Shareholders Agreement.**

On the Effective Date, Reorganized Acosta shall enter into and deliver the New Shareholders Agreement, in substantially the form included in the Plan Supplement, to each Holder of New Common Stock and each Holder of New Preferred Stock, and such parties shall be bound thereby, in each case without the need for execution by any party thereto other than Reorganized Acosta.

**6.        Exemption from Registration Requirements.**

All shares of New Common Stock, issued and distributed pursuant to the Plan, will be issued and distributed without registration under the Securities Act or any similar federal, state, or local law in reliance upon section 1145 of the Bankruptcy Code. All shares of New Preferred Stock offered, issued and distributed pursuant to the Plan, including the Equity Rights Offering, will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon either (a) section 1145 of the Bankruptcy Code or (b) section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.

The offering, issuance, and distribution of all shares of New Common Stock and New Preferred Stock pursuant to the Plan in reliance upon section 1145 of the Bankruptcy Code is exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of securities. Such shares of New Common Stock and New Preferred Stock to be issued under the Plan (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) subject to the terms of the New Shareholders Agreement, are freely tradable and transferable by any initial recipient thereof that (i) is not an "affiliate" of the Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, and (iii) is not an entity that is an "underwriter" as defined in subsection (b) of Section 1145 of the Bankruptcy Code.

All shares of New Preferred Stock issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom.

Persons who purchase the New Preferred Stock pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will hold "restricted securities." Resales of such restricted securities would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Holders of restricted securities would, however, be permitted to resell New Preferred Stock without registration if they are able to comply with the applicable provisions of Rule 144 or Rule 144A or any other registration exemption under the Securities Act, or if such securities are registered with the SEC.

All shares of (a) New Common Stock issued to Holders of Allowed First Lien Claims and to Holders of Allowed Senior Notes Claims on account of their Claims, and (b) New Preferred Stock constituting the Equity Backstop Premium issued to any members of the Ad Hoc Group as set forth in the Backstop and Direct Investment Agreement and the Restructuring Support Agreement, will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on Section 1145(a) of the Bankruptcy Code. All shares of New Preferred Stock (x) sold in connection with the Direct Investment Preferred Equity Raise, (y) sold to the Backstop Parties pursuant to the Backstop Commitment as set forth in the Backstop and Direct Investment Agreement and the Restructuring Support Agreement, and (z) sold to the Equity Rights Offering Participants in the Equity Rights Offering upon exercise of their rights will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.

KE 63679933
PHIL1 8521314v.1

The availability of the exemption under section 1145 of the Bankruptcy Code or any other applicable securities laws shall not be a condition to the occurrence of the Effective Date.

Should the Reorganized Debtors elect, on or after the Effective Date, to reflect all or any portion of the ownership of the Reorganized Acosta's New Common Stock or New Preferred Stock through the facilities of DTC, the Reorganized Debtors shall not be required to provide any further evidence other than the Plan or Final Order with respect to the treatment of such applicable portion of the Reorganized Acosta's New Common Stock or New Preferred Stock, and such Plan or Final Order shall be deemed to be legal and binding obligations of the Reorganized Debtors in all respects.

DTC shall be required to accept and conclusively rely upon the Plan and Final Order in lieu of a legal opinion regarding whether the Reorganized Acosta's New Common Stock or New Preferred Stock are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the Reorganized Acosta's New Common Stock or New Preferred Stock are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

## 7.    Corporate Existence.

Except as otherwise provided in the Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under the Plan, the New Corporate Governance Documents, or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

For the avoidance of doubt, after the cancellation of the equity interests described above, (i) the former equityholders of Anna Holdings shall not be deemed to own any interest, directly or indirectly, in Anna Holdings, its Subsidiaries or any asset thereof and (ii) the Reorganized Debtors shall indemnify and hold harmless each such equityholder and its affiliates for any liability for Taxes of Anna Holdings or its Subsidiaries (and related out-of-pocket expenses) imposed on such equityholder or its affiliate as transferee or successor of Anna Holdings or its Subsidiaries, by operation of law, or otherwise, to the extent such liability is attributable to such equityholder's ownership of Anna Holdings immediately prior to the cancellation of its shares under the Plan.

## 8.    Corporate Action.

On or before the Effective Date, as applicable, all actions contemplated under the Plan or the Plan Supplement shall be deemed authorized and approved in all respects, including:  (1) adoption or assumption, as applicable, of the agreements with existing management; (2) selection of the directors, managers, and officers for the Reorganized Debtors; (3) implementation of the Restructuring Transactions; and (4) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, as applicable, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors, as applicable.  On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the Backstop and Direct Investment Agreement, the New Shareholders Agreement, and any and all other agreements, documents, securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by Article IV.I of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

9.        **Vesting of Assets in the Reorganized Debtors.**

Except as otherwise provided in the Plan or the Plan Supplement, or in any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Debtor's Estate, all Causes of Action, and any property acquired by any of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens securing obligations on account of Other Secured Claims that are Reinstated pursuant to the Plan, if any).  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

10.        **Cancellation of Notes, Instruments, Certificates, and Other Documents.**

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, certificates, shares, and other documents evidencing Claims or Interests shall be cancelled, and the obligations of the Debtors or the Reorganized Debtors thereunder or in any way related thereto shall be discharged and deemed satisfied in full, and the First Lien Agent, DIP Agent, and Indenture Trustee shall be released from all duties and obligations thereunder; *provided*, *however*, that notwithstanding Confirmation or the occurrence of the Effective Date, any credit document or agreement that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of (1) allowing Holders of Allowed Claims to receive distributions under the Plan, (2) allowing and preserving the rights of the First Lien Agent, DIP Agent, and Indenture Trustee to make distributions pursuant to the Plan, (3) preserving the First Lien Agent's, the DIP Agent's, and the Indenture Trustee's rights to compensation and indemnification as against any money or property distributable to the Holders of First Lien Claims,  Holders of Senior Notes Claims, DIP Claims, including permitting the First Lien Agent, the DIP Agent, and the Indenture Trustee to maintain, enforce, and exercise its charging liens, if any, against such distributions, (4) preserving all rights, including rights of enforcement, of the First Lien Agent, the DIP Agent, and the Indenture Trustee against any person other than a Released Party (including the Debtors), including with respect to indemnification or contribution from the Holders of First Lien Claims, Senior Notes Claims, and DIP Claims, pursuant and subject to the terms of the First Lien Credit Agreement, the Senior Notes Indenture, and the DIP Credit Agreement as in effect on the Effective Date, (5) permitting the First Lien Agent, the Indenture Trustee, and the DIP Agent to enforce any obligation (if any) owed to the First Lien Agent, the Indenture Trustee, or DIP Agent under the Plan, (6) permitting the First Lien Agent, the Indenture Trustee, and the DIP Agent to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court, (7) permitting the DIP Agent, the DIP Lenders, the First Lien Agent, the First Lien Lenders, the Senior Noteholders, and the Indenture Trustee to assert any rights with respect to the Contingent DIP Obligations, the Contingent First Lien Obligations, or the Contingent Senior Notes Obligations, as applicable, and (8) permitting the First Lien Agent, the Indenture Trustee, and the DIP Agent to perform any functions that are necessary to effectuate the foregoing; *provided*, *further*, *however*, that (a) the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Debtors or Reorganized Debtors, as applicable, except as expressly provided for in the Plan and (b) except as otherwise provided in the Plan, the terms and provisions of the Plan shall not modify any existing contract or agreement that would in any way be inconsistent with distributions under the Plan.  The First Lien Agent, the Indenture Trustee, and the DIP Agent shall be discharged and shall have no further obligation or liability except as provided in the Plan and Confirmation Order, and after the performance by the First Lien Agent, the Indenture Trustee, and the DIP Agent and their representatives and professionals of any obligations and duties required under or related to the Plan or Confirmation Order, the First Lien Agent, the Indenture Trustee, and the DIP Agent shall be relieved of and released from any obligations and duties arising thereunder.  The fees, expenses, and costs of the First Lien Agent, the Indenture Trustee, and the DIP Agent, including fees, expenses, and costs of its professionals incurred after the Effective Date in connection with the First Lien Credit Agreement, the Senior Notes Indenture, and the DIP Credit Agreement, as applicable, and reasonable and documented costs and expenses associated with effectuating distributions pursuant to the Plan will be paid by the Reorganized Debtors in the ordinary course.

11.        **Effectuating Documents; Further Transactions.**

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors and managers thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or

31

appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the New Shareholders Agreement, the New Corporate Governance Documents, and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required under the Plan.

### 12. Exemptions from Certain Taxes and Fees.

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under the Plan or pursuant to: (a) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors or the Reorganized Debtors, including the New Common Stock and New Preferred Stock; (b) the Restructuring Transactions; (c) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (d) the making, assignment, or recording of any lease or sublease; or (e) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 13. New Corporate Governance Documents.

The New Corporate Governance Documents shall, among other things:  (1) contain the terms consistent with the documentation set forth in the Plan Supplement; (2) authorize the issuance, distribution, and reservation of the New Common Stock and New Preferred Stock to the Entities entitled to receive such issuances, distributions and reservations under the Plan; and (3) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, and limited as necessary to facilitate compliance with non-bankruptcy federal laws, prohibit the issuance of non-voting equity Securities.

On or immediately before the Effective Date, Acosta or Reorganized Acosta, as applicable, will file its New Corporate Governance Documents with the applicable Secretary of State and/or other applicable authorities in its state of incorporation or formation in accordance with the applicable laws of their respective state of incorporation or formation, to the extent required for such New Corporate Governance Documents to become effective.  After the Effective Date, Reorganized Acosta may amend and restate its formation, organizational, and constituent documents as permitted by the laws of its respective jurisdiction of formation and the terms of such documents.

### 14. Directors and Officers.

On the Effective Date, the Reorganized Acosta Board shall be determined and selected as agreed to among the members of the Ad Hoc Group, but which will include the CEO.

On the Effective Date, the terms of the current members of the Acosta board of directors shall expire, and the Reorganized Acosta Board will include those directors set forth in the list of directors of the Reorganized Debtors included in the Plan Supplement.  On the Effective Date, the officers and overall management structure of Reorganized Acosta, and all officers and management decisions with respect to Reorganized Acosta (and/or any of its direct or indirect subsidiaries), compensation arrangements, and affiliate transactions shall only be subject to the approval of the Reorganized Acosta Board.

From and after the Effective Date, each director, officer, or manager of the Reorganized Debtors shall be appointed and serve pursuant to the terms of their respective charters and bylaws or other formation and constituent documents, the New Shareholders Agreement, and the New Corporate Governance Documents, and applicable laws of the respective Reorganized Debtor's jurisdiction of formation.  To the extent that any such director or officer of the Reorganized Debtors is an "insider" pursuant to section 101(31) of the Bankruptcy Code, the Debtors will disclose the nature of any compensation to be paid to such director or officer.

15.     **Employee Incentive Plan.**

On the Effective Date, the Reorganized Acosta Board shall be authorized to institute the Employee Incentive Plan, enact and enter into related policies and agreements, and distribute the New Common Stock (and/or New Preferred Stock or other equity securities) to participants based on the terms and conditions (including, if applicable, anti-dilution protections) determined by the Reorganized Acosta Board.

16.     **Preservation of Causes of Action.**

In accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan, which shall be deemed released and waived by the Debtors and Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity.**  Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order of the Bankruptcy Court, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

17.     **Executory Contracts and Expired Leases.**

(c)     **Assumption of Executory Contracts and Unexpired Leases.**

On the Effective Date, except as otherwise provided in the Plan or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, all Executory Contracts and Unexpired Leases shall be deemed assumed, including the Restructuring Support Agreement, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code, unless such Executory Contract and Unexpired Lease:  (1) was assumed or rejected previously by the Debtors; (2) previously expired or terminated pursuant to its own terms; (3) is the subject of a motion to reject filed on or before the Effective Date; or (4) is identified on the Rejected Executory Contract and Unexpired Lease List.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or assumption and assignment, as applicable, of such Executory Contracts or Unexpired Leases as provided for in the Plan, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.  Any motions to assume Executory

33

Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order.

To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

### (d)    Claims Based on Rejection of Executory Contracts or Unexpired Leases.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the rejections, if any, of any Executory Contracts or Unexpired Leases as provided for in the Plan or the Rejected Executory Contract and Unexpired Leases List, as applicable. Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Solicitation Agent and served on the Reorganized Debtors no later than thirty days after the effective date of such rejection.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Solicitation Agent within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Reorganized Debtors, the Estates, or their property, without the need for any objection by the Debtors or Reorganized Debtors, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Article VIII.G of the Plan, notwithstanding anything in a Proof of Claim to the contrary.**

All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as a General Unsecured Claim pursuant to Article III.B of the Plan and may be objected to in accordance with the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

Notwithstanding anything to the contrary in the Plan, the Debtors, or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease List at any time through and including thirty days after the Effective Date.

### (e)    Cure of Defaults and Objections to Cure and Assumption.

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount (if any) in Cash on the Effective Date or in the ordinary course of business or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be filed, served, and actually received by the counsel to the Debtors and the U.S. Trustee on the Confirmation Objection Deadline or other deadline that may be set by the Court. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount.

The cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption in the event of a dispute regarding: (1) the amount of any payments to cure such a default; (2) the ability of the Reorganized Debtors or any assignee to provide adequate assurance of future performance under the Executory Contract or Unexpired Lease to be assumed; or (3) any other matter pertaining to assumption.

KE 63679933

PHIL1 8521314v.1

The Debtor or the Reorganized Debtor, as applicable, shall be authorized to reject any executory contract or unexpired lease to the extent the Debtor or the Reorganized Debtor, as applicable, in the exercise of its sound business judgment, concludes that the amount of the cure obligation as determined by Final Order or as otherwise finally resolved, renders assumption of such contract or lease unfavorable to the applicable Debtor's Estate or the Reorganized Debtor.  Such rejected contracts, if any, shall be deemed as listed on the Rejected Executory Contract and Unexpired Lease List, if any.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  **Any Proof of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.**

      **(f)**      **Insurance Policies.**

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan.  On the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims.  Except as set forth in Article V.F of the Plan, nothing in the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, or any other order of the Bankruptcy Court (including any other provision that purports to be preemptory or supervening), (1) alters, modifies, or otherwise amends the terms and conditions of (or the coverage provided by) any of such insurance policies or (2) alters or modifies the duty, if any, that the insurers or third party administrators pay claims covered by such insurance policies and their right to seek payment or reimbursement from the Debtors (or after the Effective Date, the Reorganized Debtors) or draw on any collateral or security therefor.  For the avoidance of doubt, insurers and third party administrators shall not need to nor be required to file or serve a cure objection or a request, application, claim, Proof of Claim, or motion for payment and shall not be subject to any claims bar date or similar deadline governing cure amounts or Claims.

      **(g)**      **Indemnification Provisions.**

On and as of the Effective Date, the Indemnification Provisions will be assumed and irrevocable and will survive the effectiveness of the Plan, and the Reorganized Debtors' New Corporate Governance Documents will provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to the Debtors' and the Reorganized Debtors' current and former directors, officers, employees, equityholders, and agents to the fullest extent permitted by law and at least to the same extent as the organizational documents of each of the respective Debtors on the Petition Date, against any claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted.  None of the Debtors, or the Reorganized Debtors, as applicable, will amend and/or restate their respective governance documents before or after the Effective Date to amend, augment, terminate, or adversely affect any of the Debtors' or the Reorganized Debtors' obligations to provide such indemnification rights or such directors', officers', employees', equityholders' or agents' indemnification rights.

On and as of the Effective Date, any of the Debtors' indemnification obligations with respect to any contract or agreement that is the subject of or related to any litigation against the Debtors or Reorganized Debtors, as applicable, shall be assumed by the Reorganized Debtors and otherwise remain unaffected by the Chapter 11 Cases.

      **(h)**      **Director, Officer, Manager, and Employee Liability Insurance.**

After the Effective Date, pursuant to section 365(a) of the Bankruptcy Code, the Debtors shall be deemed to have assumed all of the D&O Liability Insurance Policies (including, if applicable, any "tail policy") and any agreements, documents, or instruments relating thereto.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of all such policies (including, if applicable, any "tail policy").

35

After the Effective Date, none of the Debtors or the Reorganized Debtors shall terminate or otherwise reduce the coverage under any such policies (including, if applicable, any "tail policy") with respect to conduct occurring as of the Effective Date, and all officers, directors, managers, and employees of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such policies regardless of whether such officers, directors, managers, or employees remain in such positions after the Effective Date.

On and after the Effective Date, each of the Reorganized Debtors shall be authorized to purchase a directors' and officers' liability insurance policy for the benefit of their respective directors, members, trustees, officers, and managers in the ordinary course of business.

### (i)      Employee and Retiree Benefits.

Except as otherwise provided in the Plan, on and after the Effective Date, subject to any Final Order and, without limiting any authority provided to the Reorganized Acosta Board under the Debtors' respective formation and constituent documents, the Reorganized Debtors shall:  (1) amend, adopt, assume, and/or honor in the ordinary course of business any contracts, agreements, policies, programs, and plans, in accordance with their respective terms, for, among other things, compensation, including any incentive plans, retention plans, health care benefits, disability benefits, deferred compensation benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity from and after the Petition Date; and (2) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time arising prior to the Petition Date and not otherwise paid pursuant to a Bankruptcy Court order.  Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as such term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

### (j)      Modifications, Amendments, Supplements, or Other Agreements.

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### (k)      Reservation of Rights.

Neither the assumption of any Executory Contract or Unexpired Lease pursuant to the Plan nor exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejected Executory Contract and Unexpired Lease List, nor anything contained in the Plan or Plan Supplement, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.

If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or the Reorganized Debtors, as applicable, shall have thirty calendar days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease *nunc pro tunc* to the Confirmation Date.  The deemed assumption provided for herein shall not apply to any such contract or lease, and any such contract or lease shall be assumed or rejected only upon motion of the Debtor following the Bankruptcy Court's determination that the contract is executory or the lease is unexpired.

KE 63679933
PHIL1 8521314v.1

(l)    **Nonoccurence of Effective Date.**

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

(m)    **Contracts and Leases Entered Into After the Petition Date.**

Contracts and leases entered into after the Petition Date by any Debtor and any Executory Contracts and Unexpired Leases assumed by any Debtor may be performed by the applicable Reorganized Debtor in the ordinary course of business.

**E.    Conditions to Confirmation and Consummation of the Plan.**

**1.    Conditions Precedent to Confirmation.**

The following are conditions to the entry of the Confirmation Order unless such conditions, or any of them, have been satisfied or waived pursuant to Article IX.C of the Plan:

- the Consenting Sponsor and CIM shall have agreed to waive all General Unsecured Claims in accordance with Article III.C of the Plan;

- neither the Backstop and Direct Investment Agreement, nor the Restructuring Support Agreement shall have been terminated; and

- subject to Stakeholder Approval Rights, the Plan Supplement and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements and exhibits to the Plan, shall have been filed, and shall be in form and substance consistent with the DIP Facility Documents, and the Equity Rights Offering Documents.

**2.    Conditions Precedent to the Effective Date.**

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Article IX.C of the Plan:

- the Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Debtors, subject to Stakeholder Approval Rights, and which shall have included a finding that the Backstop Parties are deemed to be good faith purchasers for the purposes of section 363(m) of the Bankruptcy Code;

- the Confirmation Order shall have become a Final Order;

- the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

- all Definitive Documents shall, where applicable, have been executed and remain in full force and effect in form and substance consistent with and subject to Stakeholder Approval Rights;

- the conditions to closing the Backstop and Direct Investment Agreement shall have been satisfied or waived in accordance with its terms and the Backstop and Direct Investment Agreement shall not have been terminated;

- all conditions and milestones in the Restructuring Support Agreement shall have been satisfied or waived in accordance with its terms and the Restructuring Support Agreement shall not have been terminated;

- the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements and exhibits to the Plan, shall have been filed, and shall be in form subject to Stakeholder Approval Right;

- the Plan shall not have been materially amended, altered or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with Section X.A of the Plan;

- all fees provided for in the Restructuring Support Agreement and the Final DIP Order, including the reasonable and documented fees and expenses of the legal and financial advisors of the First Lien Lenders (subject to and in accordance with the terms of the First Lien Credit Agreement), and the Indenture Trustee Expenses, incurred in connection with the Chapter 11 Cases prior to the Effective Date and for which the Debtors have received invoices, shall have been paid in full by the Debtors;

- the New Corporate Governance Documents and the New Shareholders Agreement shall be in full force and effect (with all conditions precedent thereto having been satisfied or waived), subject to any applicable post-closing execution and delivery requirements;

- to the extent invoiced and not already paid and/or provided for in Article IX.B.9 of the Plan, the payment in Cash of all Restructuring Expenses; and

- all Professional Fee Claims and expenses of retained professionals required to be approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date have been placed in the Professional Fee Escrow Account pending approval by the Bankruptcy Court.

### 3.    Waiver of Conditions Precedent to Confirmation or the Effective Date.

Each condition to Confirmation set forth in Article IX.A and each condition to the Effective Date set forth in Section IX.B may be waived in whole or in part at any time by the Debtors, subject to Stakeholder Approval Rights, without an order of the Bankruptcy Court.

### 4.    Substantial Consummation.

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, with respect to any of the Debtors, shall be deemed to occur on the Effective Date with respect to such Debtor.

### 5.    Effect of Non-Occurrence of Conditions to Consummation.

If the Effective Date does not occur with respect to any of the Debtors, the Plan shall be null and void in all respects with respect to such Debtor, and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by or Claims against or Interests in such Debtors; (2) prejudice in any manner the rights of such Debtors, any Holders of a Claim or Interest, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by such Debtors, any Holders, or any other Entity in any respect.

## F.    Settlement, Release, Injunction, and Related Provisions.

### 1.    Compromise and Settlement of Claims, Interests, and Controversies.

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance

38

with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

2.      **Discharge of Claims.**

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan  (including, with respect to the Contingent DIP Obligations, Contingent First Lien Obligations, and the Contingent Senior Notes Obligations, in each case which are not discharged hereunder), or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Debtor Intercompany Claims or Non-Debtor Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan or voted to reject the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date, except as otherwise specifically provided in the Plan (including, with respect to the Contingent DIP Obligations, the Contingent First Lien Obligations, and the Contingent Senior Notes Obligations, in each case which are not discharged hereunder).

3.      **Release of Liens.**

**Except (1) with respect to the Liens securing Other Secured Claims that are Reinstated pursuant to the Plan, or (2) as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates and, subject to the consummation of the applicable distributions contemplated in the Plan, shall be fully released and discharged, at the sole cost and expense of the Reorganized Debtors, and the Holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall execute such documents as may be reasonably requested by the Debtors or the Reorganized Debtors, as applicable, to reflect or effectuate such releases, and all of the right, title, and interest of any Holders of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the applicable Reorganized Debtor and its successors and assigns.**

4.      **Debtor Release.**

**Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor**

39

and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the A/R Facility, the DIP Credit Facility, the DIP Orders, the First Lien Credit Facilities, the Senior Notes, the Chapter 11 Cases, the Restructuring Support Agreement, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the New Corporate Governance Documents, the Plan, the Equity Rights Offering Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, Disclosure Statement, the New Corporate Governance Documents, the New Shareholders Agreement, the Equity Rights Offering, the Direct Investment Preferred Equity Raise, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act, or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than, in respect of the First Lien Agent, Claims or liabilities arising out of or relating to any action taken or omitted to be taken by the First Lien Agent that is determined by the final, non-appealable judgment of a court of competent jurisdiction to have constituted gross negligence or willful misconduct.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (1) any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the assumption of the Indemnification Provisions as set forth in the Plan or (2) any retained Causes of Action.

      5.        Third-Party Release.

      Effective as of the Effective Date, each Releasing Party, in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of any of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the A/R Facility, the DIP Credit Facility, the DIP Orders, the First Lien Credit Facilities, the Senior Notes, the Chapter 11 Cases, the Restructuring Support Agreement, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the New Corporate Governance Documents, the Plan, the Equity Rights Offering Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the New Corporate Governance Documents, the New Shareholders Agreement, the Plan, the Equity Rights Offering (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), the Direct Investment Preferred Equity Raise, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act, or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than, in respect of the First Lien Agent, Claims or liabilities arising out of or relating to any action taken or omitted to be taken by the First Lien Agent that is determined by the final, non-appealable judgment of a court of competent jurisdiction to have constituted gross negligence or willful misconduct.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the assumption of the Indemnification Provisions as set forth in the Plan.

KE 63679933
PHIL1 8521314v.1

6.    **Exculpation.**

**Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the Restructuring Support Agreement and related prepetition transactions, the Chapter 11 Cases, the Disclosure Statement, the Plan, the Equity Rights Offering Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the Equity Rights Offering Documents, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for claims related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

7.    **Injunction.**

**Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold claims or interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Holder has filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a claim or interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.**

**VI.    <u>Confirmation of the Plan</u>**

A.    **The Confirmation Hearing.**

At the Confirmation Hearing, the Bankruptcy Court will determine whether to approve the Disclosure Statement and whether the Plan should be confirmed in light of both the affirmative requirements of the Bankruptcy Code and objections, if any, that are timely filed.  **Subject to Stakeholder Approval Rights, the Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the**

41

adjourned date made at the Confirmation Hearing or the filing of a notice of such adjournment served in accordance with the order approving the Solicitation Procedures.

**B.      Deadline to Object to Approval of the Disclosure Statement and Confirmation of the Plan.**

Upon commencement of the Chapter 11 Cases and scheduling of the Confirmation Hearing, the Debtors will provide notice of the Confirmation Hearing, and, if approved by the Bankruptcy Court, the notice will provide that objections to the Disclosure Statement and Confirmation of the Plan must be filed and served at or before 5:00 p.m., prevailing Eastern Time, on December 9, 2019.  Unless objections to the Disclosure Statement or Confirmation of the Plan are timely served and filed, they may not be considered by the Bankruptcy Court.

**C.      Requirements for Approval of the Disclosure Statement.**

Pursuant to sections 1125(g) and 1126(b) of the Bankruptcy Code, prepetition solicitation of votes to accept or reject a chapter 11 plan must comply with applicable federal or state securities laws and regulations (including the registration and disclosure requirements thereof) or, if such laws and regulations do not apply, provide "adequate information" under section 1125 of the Bankruptcy Code.  At the Confirmation Hearing the Debtors will seek a determination from the Bankruptcy Court that the Disclosure Statement satisfies sections 1125(g) and 1126(b) of the Bankruptcy Code.

**D.      Requirements for Confirmation of the Plan.**

**1.      Requirements of Section 1129(a) of the Bankruptcy Code.**

Among the requirements for Confirmation are the following:  (a) the Plan is accepted by all impaired Classes of Claims and Interests or, if the Plan is rejected by an Impaired Class, at least one Impaired Class of Claims or Interests has voted to accept the Plan and a determination that the Plan "does not discriminate unfairly" and is "fair and equitable" as to Holders of Claims in all rejecting Impaired Classes; (b) the Plan is feasible; and (c) the Plan is in the "best interests" of Holders of Impaired Claims and Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that the Plan satisfies or will satisfy all of the necessary requirements of chapter 11 of the Bankruptcy Code.  Specifically, in addition to other applicable requirements, the Debtors believe that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtors, as the Plan proponents, have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, will be disclosed to the Bankruptcy Court, and any such payment:  (a) made before Confirmation will be reasonable or (b) will be subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation.

- Either each Holder of an Impaired Claim against or Interest in the Debtors will accept the Plan, or each non-accepting Holder will receive or retain under the Plan on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that the Holder would receive or retain if the Debtors were liquidated on that date under chapter 7 of the Bankruptcy Code.

- Except to the extent that the Holder of a particular Claim agrees to a different treatment of its Claim, the Plan provides that, to the extent an Allowed Administrative Claim has not already been paid in full or

otherwise satisfied during the Chapter 11 Cases, Allowed Administrative Claims and Other Priority Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successors thereto under the Plan.

- All fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid as of the Effective Date.

Section 1126(c) of the Bankruptcy Code provides that a class of claims has accepted a plan of reorganization if such plan has been accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class. Section 1126(d) of the Bankruptcy Code provides that a class of interests has accepted a plan of reorganization if such plan has been accepted by holders of such interests that hold at least two-thirds in amount of the allowed interests of such class.

### 2.    The Debtor Release, Third-Party Release, Exculpation, and Injunction Provisions.

Article VIII of the Plan provides for releases of certain claims and Causes of Action the Debtors may hold against the Released Parties. The Released Parties are: (a) each of the Debtors; (b) the Reorganized Debtors; (c) each of the First Lien Lenders; (d) each of the A/R Facility Lenders; (e) the First Lien Agent; (f) the A/R Facility Agent; (g) the DIP Agent; (h) each of the DIP Lenders; (i) each of the Backstop Parties; (j) each member of the Ad Hoc Group; (k) the Ad Hoc Group; (l) the Lender Group; (m) each member of the Minority First Lien Group; (n) the Minority First Lien Group; (o) each Holder of a Senior Notes Claim; (p) the Indenture Trustee; (q) the Sponsors; (r) each current and former Affiliate of each Entity in clause (a) through the following clause (s); and (s) each Related Party of each Entity in clause (a) through this clause (s); *provided*, *however*, that in each case, an Entity shall not be a Released Party if it timely files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in Article VIII.D of the Plan that is not resolved before Confirmation; *provided*, *further*, that any such Entity shall be identified by name as a non-Released Party in the Confirmation Order.

Article VIII of the Plan provides for releases of certain claims and Causes of Action that Holders of Claims may hold against the Released Parties in exchange for the good and valuable consideration and the valuable compromises made by the Released Parties (the "<u>Third-Party Release</u>"). The Holders of Claims who are releasing certain claims and Causes of Action against non-Debtors under the Third-Party Release include: (a) each of the Debtors; (b) the Reorganized Debtors; (c) each of the First Lien Lenders; (d) the First Lien Agent; (e) each of the A/R Facility Lenders; (f) the A/R Facility Agent; (g) the DIP Agent; (h) each of the DIP Lenders; (i) each of the Backstop Parties; (j) each member of the Ad Hoc Group; (k) the Ad Hoc Group; (l) the Lender Group; (m) each member of the Minority First Lien Group; (n) the Minority First Lien Group; (o) each Holder of a Senior Notes Claim; (p) the Indenture Trustee; (q) the Sponsors; (r) all Holders of Claims or Interests; (s) each current and former Affiliate of each Entity in clause (a) through the following clause (t); and (t) each Related Party of each Entity in clause (a) through this clause (t); *provided*, *however*, that in each case, an Entity shall not be a Releasing Party if it timely files with the Bankruptcy Court on the docket of the Chapter 11 Cases an objection to the releases contained in Article VIII.E of the Plan that is not resolved before Confirmation; *provided*, *further*, that any such Entity shall be identified by name as a non-Releasing Party in the Confirmation Order.

Article VIII of the Plan provides for the exculpation of each Exculpated Party for certain acts or omissions taken in connection with the Chapter 11 Cases. The released and exculpated claims are limited to those claims or Causes of Action that may have arisen in connection with, related to, or arising out of the Plan, this Disclosure Statement, or the Chapter 11 Cases. The Exculpated Parties are: (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) any statutory committees appointed in the Chapter 11 Cases and each of their respective members; (d) each current and former Affiliate of each Entity in clause (a) through the following clause (e); and (e) each Related Party of each Entity in clause (a) through this clause (e).

Article VIII of the Plan permanently enjoins Entities who have held, hold, or may hold Claims, Interests, or Liens that have been discharged or released pursuant to the Plan or are subject to exculpation pursuant to the Plan from asserting such Claims, Interests, or Liens against each Debtor, the Reorganized Debtors, and the Released Parties.

Under applicable law, a debtor release of the Released Parties is appropriate where: (a) there is an identity of interest between the debtor and the third party, such that a suit against the released non-debtor party is, at core, a suit against the debtor or will deplete assets of the estate; (b) there is a substantial contribution by the non-debtor of assets to the reorganization; (c) the injunction is essential to the reorganization; (d) there is overwhelming creditor support for the injunction; and (e) the chapter 11 plan will pay all or substantially all of the claims affected by the injunction. *In re Indianapolis Downs, LLC*, 486 B.R. 286, 303 (Bankr. D. Del. 2013). Importantly, these factors are "neither exclusive nor are they a list of conjunctive requirements," but "[i]nstead, they are helpful in weighing the equities of the particular case after a fact-specific review." *Id.* Further, a chapter 11 plan may provide for a release of third party claims against non-debtors, such as the Third-Party Release, where such releases are consensual. *Id.* at 304–06. In addition, exculpation is appropriate where it applies to estate fiduciaries. *Id.* at 306. Finally, an injunction is appropriate where it is necessary to the reorganization and fair pursuant to section 105(a) of the Bankruptcy Code. *In re W.R. Grace & Co.*, 475 B.R. 34, 107 (D. Del. 2012). In addition, approval of the releases, exculpations, and injunctions for each of the Released Parties and each Exculpated Party as part of Confirmation of the Plan will be limited to the extent such releases, exculpations, and injunctions are permitted by applicable law.

The Debtors believe that the releases, exculpations, and injunctions set forth in the Plan are appropriate because, among other things, the releases are narrowly tailored to the Debtors' restructuring proceedings, and each of the Released Parties has contributed value to the Debtors and aided in the reorganization process, which facilitated the Debtors' ability to propose and pursue confirmation of the Plan. The Debtors believe that each of the Released Parties has played an integral role in formulating the Plan and has expended significant time and resources analyzing and negotiating the issues presented by the Debtors' prepetition capital structure. The Debtors further believe that such releases, exculpations, and injunctions are a necessary part of the Plan. In addition, the Debtors believe the Third-Party Release is entirely consensual under the established case law in the United States Bankruptcy Court for the District of Delaware. *See In re Indianapolis Downs, LLC*, 486 B.R. at 304–06. The Debtors will be prepared to meet their burden to establish the basis for the releases, exculpations, and injunctions for each of the Released Parties and each Exculpated Party as part of Confirmation of the Plan.

### 3.    Best Interests of Creditors—Liquidation Analysis.

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an interest in such class either (a) has accepted the plan, or (b) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate compliance with the "best interests" test, the Debtors, with the assistance of their advisors, prepared the Liquidation Analysis, attached hereto as **Exhibit F**, showing that the value of the distributions provided to Holders of Allowed Claims and Interests under the Plan would be the same or greater than under a hypothetical chapter 7 liquidation. Accordingly, the Debtors believe that the Plan is in the best interests of creditors.

### 4.    Feasibility/Financial Projections.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a chapter 11 plan of reorganization is not likely to be followed by the liquidation of the reorganized debtor or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in the chapter 11 plan). For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors have prepared certain unaudited pro forma financial statements with regard to the Reorganized Debtors (the "Financial Projections"), which projections and the assumptions upon which they are based are attached hereto as **Exhibit D**. Based on these Financial Projections, the Debtors believe the deleveraging contemplated by the Plan meets the financial feasibility requirement. Moreover, the Debtors believe that sufficient funds will exist to make all payments required by the Plan. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

5.      **Acceptance by Impaired Classes.**

The Bankruptcy Code requires that, except as described in the following section, each impaired class of claims or interests must accept a plan in order for it to be confirmed.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to the class is not required.  A class is "impaired" unless the plan:  (a) leaves unaltered the legal, equitable, and contractual rights to which the claim or the interest entitles the holder of the claim or interest; (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest; or (c) provides that, on the consummation date, the holder of such claim receives cash equal to the allowed amount of that claim or, with respect to any equity interest, the holder of such interest receives value equal to the greater of (i) any fixed liquidation preference to which the holder of such equity interest is entitled, (ii) the fixed redemption price to which such holder is entitled, or (iii) the value of the interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number of creditors actually voting cast their ballots in favor of acceptance.  For a class of impaired interests to accept a plan, section 1126(d) of the Bankruptcy Code requires acceptance by interest holders that hold at least two-thirds in amount of the allowed interests of such class, counting only those interests that actually voted to accept or reject the plan.  Thus, a class of interests will have voted to accept the plan only if two-thirds in amount actually voting cast their ballots in favor of acceptance.

6.      **Confirmation Without Acceptance by All Impaired Classes.**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted the plan, *provided* that the plan has been accepted by at least one impaired class of claims.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminately unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

If any Impaired Class of Claims or Interests rejects the Plan, including Classes of Claims or Interests deemed to reject the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, utilizing the "cramdown" provision under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or to withdraw the Plan as to such Debtor.

The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the requirements for cramdown and the Debtors will be prepared to meet their burden to establish that the Plan can be Confirmed pursuant to section 1129(b) of the Bankruptcy Code as part of Confirmation of the Plan.

(c)      **No Unfair Discrimination**.

The "unfair discrimination" test applies with respect to classes of claim or interests that are of equal priority but are receiving different treatment under a proposed plan.  The test does not require that the treatment be the same or equivalent, but that the treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  Under certain circumstances, a proposed plan may treat two classes of unsecured creditors differently without unfairly discriminating against either class.

With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  Accordingly, the Debtors believe that the Plan meets the standard to demonstrate that the Plan does not unfairly discriminate and the

45

Debtors will be prepared to meet their burden to establish that there is no unfair discrimination as part of Confirmation of the Plan.

        **(d)**        **Fair and Equitable Test**.

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to each non-accepting class and as set forth below, the test sets different standards depending on the type of claims or interests in such class. The Debtors believe that the Plan satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Plan. There is no Class receiving more than a 100% recovery and no junior Class is receiving a distribution under the Plan until all senior Classes have received a 100% recovery or agreed to receive a different treatment under the Plan.

        **(i)**        **Secured Claims**.

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (A) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (B) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a value, as of the effective date, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the claimant's liens.

        **(ii)**        **Unsecured Claims**.

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (A) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date, equal to the allowed amount of such claim; or (B) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or junior interest, subject to certain exceptions.

        **(iii)**        **Interests**.

The condition that a plan be "fair and equitable" to a non-accepting class of interests, includes the requirements that either: (A) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date, equal to the greater of: (1) the allowed amount of any fixed liquidation preference to which such holder is entitled; (2) any fixed redemption price to which such holder is entitled; or (3) the value of such interest; or (B) the holder of any interest that is junior to the interests of such class will not receive or retain any property under the plan on account of such junior interest.

        **7.**        **The Structure of the Equity Rights Offering and the Direct Investment Preferred Equity Raise Is Consistent with the Bankruptcy Code.**

The Bankruptcy Code does not require the right to participate in a new investment to be extended to all members of a particular class if certain members of the class are participants. Creditors may receive separate consideration on account of a commitment to provide new money, assuming such consideration is provided in good faith and on terms generally consistent with the market.

Section 1123(a)(4) of the Bankruptcy Code requires that a plan provide the same treatment for each claim or interest in a particular class unless a holder of a particular claim or interest agrees to less favorable treatment. *See* 11 U.S.C. § 1123(a)(4). Courts agree that section 1123(a)(4) of the Bankruptcy Code does not require identical treatment for all members of a class. *See In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013) ("[T]he 'same treatment' standard of section 1123(a)(4) does not require that all claimants within a class receive the same amount of money."); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 249–50 (Bankr. S.D.N.Y. 2007) ("The requirements of section 1123(a)(4) apply only to a plan's treatment on account of particular claims or interests in a specific class—not the treatment that members of the class may separately receive under a plan on account of the class members' other rights or contributions.").

Several courts have applied section 1123(a)(4) in the context of a new money investment and held that it was permissible for a stakeholder to receive additional consideration on account of a new-money investment. *See e.g.*, *In re Peabody Energy Corp.*, 933 F.3d 918, 925 (8th Cir. 2019) (holding that the right to participate in the private capital raise was not on account of the creditors' claim but rather consideration for valuable new commitments to support the plan and backstop the preferred and common stock offering); *In re CHC Group Ltd.*, No. 16-31854, 2017 Bankr. LEXIS 1016, at *53–54 (Bankr. N.D. Tex. Mar. 3, 2017) (overruling a section 1123(a)(4) plan objection and stating that fees paid to plan sponsors in return for their commitment to backstop a rights offering pursuant to the plan was a commitment fee to the backstop parties as consideration to bear the attendant risks and not a payment on account of the backstop parties' prepetition claims and therefore did not constitute impermissible disparate treatment in violation of section 1123(a)(4) of the Bankruptcy Code).

Here, all Holders of Claims are receiving the same treatment on account of their claims under the Plan. To the extent that members of the Ad Hoc Group receive additional consideration in the form of the Equity Backstop Premium, or the right to participate in the Direct Investment Preferred Equity Raise, that consideration is not on account of their Claims. Rather, that consideration is on account of the valuable commitments provided by the members of Ad Hoc Group, pursuant to the Restructuring Support Agreement and the Backstop and Direct Investment Agreement, to support and backstop the Equity Rights Offering and to provide the Reorganized Debtors with new equity capital through the Direct Investment Preferred Equity Raise. Therefore, the Plan complies with section 1123(a)(4) of the Bankruptcy Code.

### 8. Valuation of the Debtors.

The Debtors' investment banker, PJT, has prepared an independent valuation analysis, which is attached to this Disclosure Statement as **Exhibit E** (the "Valuation Analysis"). The Valuation Analysis should be considered in conjunction with the Risk Factors discussed in Section VIII of this Disclosure Statement, entitled "Risk Factors," and the Financial Projections. The Valuation Analysis is dated as of November 22, 2019, and is based on data and information as of that date. Holders of Claims should carefully review the information in **Exhibit E** in its entirety. The Debtors believe that the Valuation Analysis demonstrates that the Plan is "fair and equitable" to the non-accepting classes.

## VII. Voting Instructions

### A. Overview.

Holders of Claims entitled to vote should carefully read the below voting instructions.

### B. Solicitation Procedures.

#### 1. Solicitation Agent.

The Debtors have proposed to retain Prime Clerk LLC to act, among other things, as the Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan. The Solicitation Agent will process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan and will file the Voting Report as soon as practicable after the Voting Deadlines.

#### 2. Solicitation Package.

The following materials constitute the solicitation package (the "Solicitation Package") distributed to Holders of Claims in the Voting Classes:

- the Debtors' cover letter in support of the Plan;

- the appropriate Ballot and applicable voting instructions, together with a pre-addressed, postage pre-paid return envelope; and

- this Disclosure Statement and all exhibits hereto, including the Equity Rights Offering Documents, the Plan and all exhibits thereto (which may be distributed in paper or USB-flash drive format).

**3.       Voting Deadlines.**

The period during which Ballots with respect to the Plan will be accepted by the Debtors will terminate at **11:59 p.m. prevailing Eastern Time on November 29, 2019** for Class 3 and **11:59 p.m. prevailing Eastern Time on December 9, 2019** for Class 4 unless the Debtors extend the date until which Ballots will be accepted.  Except to the extent that the Debtors so determine or as permitted by the Bankruptcy Court, Ballots that are received after the Voting Deadlines will not be counted or otherwise used by the Debtors in connection with the Debtors' request for Confirmation of the Plan (or any permitted modification thereof).

Subject to Stakeholder Approval Rights, the Debtors reserve the right, at any time or from time to time, to extend the period of time (on a daily basis, if necessary) during which Ballots will be accepted for any reason, including determining whether or not the requisite number of acceptances have been received, by making a public announcement of such extension no later than the first Business Day next succeeding the previously announced Voting Deadlines.  The Debtors will give notice of any such extension in a manner deemed reasonable to the Debtors in their discretion.  There can be no assurance that the Debtors will exercise its right to extend the Voting Deadlines.

**4.       Distribution of the Solicitation Package and Plan Supplement.**

The Debtors caused the Solicitation Agent to distribute the Solicitation Package to Holders of Claims in the Voting Classes on November 8, 2019, which is twenty-one (21) days before the Class 3 Voting Deadline and thirty-one (31) days before the Class 4 Voting Deadline.

The Package (except the Ballots) may also be obtained from the Solicitation Agent by:  (a) calling the Debtors' restructuring hotline at 877-433-8808 (domestic toll-free) or 917-994-8388 (international toll), and asking for the Solicitation Group; (b) emailing acostaballots@primeclerk.com and referencing "Anna Holdings, Inc." in the subject line; or (c) writing to the following address:  Anna Holdings, Inc. Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165.  When the Debtors file the Chapter 11 Cases, you may also obtain copies of any pleadings filed with the Bankruptcy Court for free by visiting the Debtors' restructuring website, https://cases.primclerk.com/Acosta, or for a fee at https://ecf.deb.uscourts.gov/.

The Debtors will file the Plan Supplement in accordance with the terms of the Plan.  As the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website.  The Debtors will not serve paper or CD-ROM copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement at no cost from the Solicitation Agent by:  (a) calling the Solicitation Agent at one of the telephone numbers set forth above; (b) visiting the Debtors' restructuring website, https://cases.primeclerk.com/Acosta; or (c) emailing the Solicitation Agent at the email address set forth above.

**C.       Voting Procedures.**

November 4, 2019, (the "Voting Record Date"), is the date that was used for determining which Holders of Claims are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the solicitation procedures.  Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

In order for the Holder of a Claim or Interest in the Voting Classes to have such Holder's Ballot counted as a vote to accept or reject the Plan, such Holder's Ballot must be properly completed, executed, and delivered by (a) using the enclosed pre-paid, pre-addressed return envelope; (b) via first class mail, overnight courier, or hand delivery to the Solicitation Agent at Anna Holdings, Inc. Ballot Processing, c/o Prime Clerk LLC, One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, NY 10165; or (c) via electronic submission through the Solicitation Agent's online voting portal at https://cases.primeclerk.com/Acosta, so that such Holder's Ballot is **actually received** by the Solicitation Agent before the Voting Deadlines.

KE 63679933
PHIL1 8521314v.1

**Unless otherwise determined by the Debtors, all votes of Holders of Class 3-First Lien Claims and Class 4-Senior Notes Claims that were submitted before the transmission of this amended Disclosure Statement will be disregarded for purposes of soliciting votes to accept or reject the amended Plan and electing whether or not to receive the Cash-Out Option. All Holders of Class 3-First Lien Claims and Class 4-Senior Notes Claims should submit the Ballot that accompanies this amended Disclosure Statement in order to have their votes and elections counted in accordance with the Solicitation Procedures before the Class 3 Voting Deadline or the Class 4 Voting Deadline, as applicable.**

The Debtors are providing the Solicitation Package to Holders of Class 3 First Lien Claims and Class 4 Senior Notes Claims. If a Holder of a Claim or Interest in a Voting Class transfers all of such Claim or Interest to one or more parties on or after the Voting Record Date and before the Holder has cast its vote on the Plan, such Claim or Interest is automatically deemed to have provided a voting proxy to the purchaser(s) of the Holder's Claim or Interest and such purchaser(s) shall be deemed to be the Holder(s) thereof as of the Voting Record Date for purposes of voting on the Plan, provided that the transfer complies with the applicable requirements under the Restructuring Support Agreement, if applicable.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINES, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM OR INTEREST BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

EACH HOLDER OF A CLAIM OR INTEREST MUST VOTE ALL OF ITS CLAIMS OR INTERESTS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES. BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM OR INTEREST WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM OR INTEREST HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS OR INTERESTS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN. IF A HOLDER CASTS MULTIPLE BALLOTS WITH RESPECT TO THE SAME CLASS OF CLAIMS OR INTERESTS AND THOSE BALLOTS ARE IN CONFLICT WITH EACH OTHER, SUCH BALLOTS WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

IT IS IMPORTANT THAT THE HOLDER OF A CLAIM OR INTEREST IN THE VOTING CLASSES FOLLOWS THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT.

**D.     Voting Tabulation.**

A Ballot does not constitute, and shall not be deemed to be, a Proof of Claim or an assertion or admission of a Claim. Only Holders of Claims in the Voting Classes shall be entitled to vote with regard to such Claims and Interests.

Unless the Debtors decide otherwise, Ballots received after the Voting Deadlines may not be counted. A Ballot will be deemed delivered only when the Solicitation Agent actually receives the executed Ballot as instructed in the applicable voting instructions. No Ballot shall be sent to the Debtors, the Debtors' agents (other than the Solicitation Agent) or the Debtors' financial or legal advisors.

The Bankruptcy Code may require the Debtors to disseminate additional solicitation materials if the Debtors make material changes to the terms of the Plan or if the Debtors waive a material condition to confirmation of the Plan. In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court.

To the extent there are multiple Claims within Voting Classes, the Debtors may, in their discretion, and to the extent possible, aggregate the Claims or Interests of any particular Holder within a Voting Class for the purpose of counting votes.

KE 63679933
PHIL1 8521314v.1

In the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

The following Ballots will not be counted in determining the acceptance or rejection of the Plan: (a) any Ballot that is illegible or contains insufficient information to permit the identification of the Holder; (b) any Ballot cast by a person or entity that does not hold a Claim or Interest that is entitled to vote on the Plan; (c) any unsigned Ballot; (d) any Ballot not marked to accept or reject the Plan, or marked both to accept and reject the Plan; (e) any Ballot received after the Voting Deadlines, unless otherwise determined by the Debtors; (f) any Ballot submitted by a party not entitled to cast a vote with respect to the Plan; and (g) unless otherwise determined by the Debtors, any Ballot submitted before the transmission of this amended Disclosure Statement.

As soon as practicable after the Voting Deadlines, the Solicitation Agent will file the Voting Report with the Bankruptcy Court. The Voting Report shall, among other things, delineate every Ballot that does not conform to the voting instructions or that contains any form of irregularity (each an "Irregular Ballot"), including those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, or damaged. The Solicitation Agent will attempt to reconcile the amount of any Claim reported on a Ballot with the Debtors' records, but in the event such amount cannot be timely reconciled without undue effort on the part of the Solicitation Agent, the amount shown in the Debtors' records shall govern. The Voting Report also shall indicate the Debtors' intentions with regard to such Irregular Ballots. Neither the Debtors nor any other Person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification.

## VIII.   Risk Factors

**BEFORE TAKING ANY ACTION WITH RESPECT TO THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTORS WHO ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE PLAN, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH, REFERRED TO, OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT, INCLUDING OTHER DOCUMENTS FILED WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES. THE RISK FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE RESTRUCTURING AND CONSUMMATION OF THE PLAN. EACH OF THE RISK FACTORS DISCUSSED IN THIS DISCLOSURE STATEMENT MAY APPLY EQUALLY TO THE DEBTORS AND THE REORGANIZED DEBTORS, AS APPLICABLE AND AS CONTEXT REQUIRES.**

A.   **Risks Related to the Restructuring.**

1.   **The Debtors Will Consider All Available Restructuring Alternatives if the Restructuring Transactions are not Implemented, and Such Alternatives May Result in Lower Recoveries for Holders of Claims Against the Debtors.**

Subject to the terms of the Restructuring Support Agreement, if the Restructuring Transactions are not consummated, the Debtors thereafter will consider all available restructuring alternatives, including filing an alternative chapter 11 plan, converting to a chapter 7 plan, commencing section 363 sales of the Debtors' assets and any other transaction that would maximize the value of the Debtors' estates. The terms of any alternative restructuring proposal may be less favorable to Holders of Claims against the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in the confirmation of the Plan, the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring would have other adverse effects on the Debtors. For example, it would adversely affect:

- the Debtors' ability to raise additional capital;

- the Debtors' liquidity;

- how the Debtors' business is viewed by investors, lenders, and credit ratings agencies;

- the Debtors' enterprise value; and

- the Debtors' business relationships with clients, customers, and vendors.

**2.      Even if the Restructuring Transactions are Successful, the Debtors Will Continue to Face Risks.**

The Restructuring Transactions are generally designed to reduce the Debtors' cash interest expense, improve the Debtors' liquidity and provide the Debtors' greater flexibility to generate long-term growth.  Even if the Restructuring Transactions are implemented, the Debtors will continue to face a number of risks, including certain risks that are beyond the Debtors' control, such as changes in economic conditions, changes in the Debtors' industry and changes in commodity prices.  As a result of these risks, there is no guarantee that the Restructuring Transactions will achieve the Debtors' stated goals.

**3.      Risks Related to the New Common Stock and the New Preferred Stock.**

The following are some of the risks that apply to Holders of Claims against the Debtors or other parties who become Holders of the New Common Stock and the New Preferred Stock pursuant to the Plan.  There are additional risk factors related to ownership of the New Common Stock and the New Preferred Stock that Holders of Claims against the Debtors should consider before deciding to vote to accept or reject the Plan.

**(c)      The Consideration Under the Plan Does Not Reflect any Independent Valuation of Claims against or Interests in the Debtors**.

The Debtors have not obtained or requested an opinion from any bank or other firm as to the fairness of the consideration under the Plan.

**(c)      The Terms of the New Common Stock and the New Preferred Stock Are Subject to Change Based on Negotiation and the Approval of the Bankruptcy Court**.

The terms of the New Common Stock and the New Preferred Stock are subject to change based on negotiations between the Debtors and the Required Consenting Creditors.[6]  Holders of Claims that are not the Required Consenting Creditors will not participate in these negotiations and the results of such negotiations may alter the terms of the New Common Stock and the New Preferred Stock in a material manner.  As a result, the final terms of the New Common Stock and the New Preferred Stock may be less favorable to Holders of certain Claims.

**(d)      The Terms of the New Shareholders Agreement Are Subject to Change Based on Negotiation and the Approval of the Bankruptcy Court.**

The terms of the New Shareholders Agreement are subject to change based on negotiations between the Debtors and the Required Consenting Creditors.  Holders of Claims that are not the Required Consenting Creditors will not participate in these negotiations and the results of such negotiations may affect the rights of shareholders in Reorganized Acosta following the Effective Date.

**(e)      Holders of the New Common Stock and the New Preferred Stock May Experience Dilution of Their Ownership Interests.**

Holders of the New Common Stock and the New Preferred Stock will be subject to dilution of their ownership interests as a result of the equity issued in connection with (a) the Equity Rights Offering; (b) the Equity Backstop

---

[6]      Required Consenting Creditors has the meaning ascribed to it in the Restructuring Support Agreement.

Premium, (c) the Direct Investment Preferred Equity Raise; (d) any other equity that may be issued post-emergence, including through the Employee Incentive Plan; and (e) the conversion of any options, warrants, convertible securities, exercisable securities, or other securities post-emergence.

> (f) **The Interests of Holders of the New Common Stock and the New Preferred Stock May be Subordinated to Reorganized Acosta's Indebtedness.**

In any subsequent liquidation, dissolution, or winding up of the Reorganized Debtors, the New Common Stock and the New Preferred Stock would rank below all debt claims against the Reorganized Debtors; further, the New Common Stock would rank below the New Preferred Stock. As a result, Holders of the New Common Stock and the New Preferred Stock will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all applicable Holders of debt have been paid in full. Additionally, Holders of the New Common Stock will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all applicable Holders of debt and the liquidation preference of the New Preferred Stock have been paid in full.

> (g) **Reorganized Acosta May Not Pay Dividends on the New Common Stock.**

Reorganized Acosta may not pay any dividends on the New Common Stock. In such circumstances, the success of an investment in the Reorganized Debtors will depend entirely upon any future appreciation in the value of the New Common Stock. There is, however, no guarantee that the New Common Stock will appreciate in value or even maintain its initial implied valuation.

> (h) **Upon the Occurrence of Certain Events, Reorganized Acosta May Have To Pay Redemption Premiums to Holders of the New Preferred Stock.**

Upon the occurrence of certain events, including a change of control, merger, sale of all or substantially all assets, acceleration, default, bankruptcy, insolvency, redemption, or prepayment, whether mandatory or at Reorganized Acosta's option, Holders of the New Preferred Stock will be entitled to the payment of certain premiums. If triggered, the payment of such premiums would adversely affect junior stakeholders of Reorganized Acosta, including holders of the New Common Stock. The potential that Reorganized Acosta may be required to pay such premiums may impact the prices at which the New Common Stock and the New Preferred Stock may trade.

> (i) **The Conversion Rate of the New Preferred Stock Is Subject to Adjustment Only upon the Occurrence of Certain Events.**

The conversion rate of the New Preferred Stock is subject to adjustment only upon certain events, including, among others, stock splits, combinations, or certain other adjustments with respect to the New Common Stock. The conversion rate will not be adjusted otherwise.

> (j) **Interest on the New Preferred Stock Will Be Paid in Kind.**

Pursuant to the terms of the New Preferred Stock, interest on the New Preferred Stock will be paid semi-annually in kind at a rate of fourteen and one-half percent (14.5%). The payment of interest in kind will increase the amount of New Preferred Stock outstanding.

> (k) **Holders of the New Preferred Stock Will Have the Right To Require Reorganized Acosta To Repurchase the New Preferred Stock.**

Pursuant to the terms of the Equity Rights Offering Documents, Holders of the New Preferred Stock will have the right ten years from the issue date to require Reorganized Acosta to repurchase the New Preferred Stock, including any dividends accrued thereon. In the event that Reorganized Acosta does not repurchase any such New Preferred Stock, the Holders thereof will have the right to convert its New Preferred Stock into its Pro Rata share of 99.9% of the Reorganized Acosta's then-outstanding New Common Stock on a fully diluted basis, without taking into account any prior issues of equity in respect of a holder's prior conversion.

KE 63679933
PHIL1 8521314v.1

4.    **A Decline in the Reorganized Debtors' Credit Ratings Could Negatively Affect the Debtors' Ability to Access the Capital Markets in the Future**.

The Debtors' or the Reorganized Debtors' credit ratings could be lowered, suspended, or withdrawn entirely, at any time, by the rating agencies, if, in each rating agency's judgment, circumstances warrant, including as a result of exposure to the credit risk and the business and financial condition of the Debtors or the Reorganized Debtors, as applicable. Downgrades in the Reorganized Debtors' long-term debt ratings may increase the cost of any debt that they may incur in the future.

5.    **Risks Related to Confirmation and Consummation of the Plan**.

(c)    **The Restructuring Support Agreement May Be Terminated**.

As more fully set forth in Section 13 of the Restructuring Support Agreement, the Restructuring Support Agreement may be terminated upon the occurrence of certain events, including, among others, the Debtors' failure to meet specified milestones relating to the filing, confirmation, and consummation of the Plan, and breaches by the Debtors and/or the Consenting Stakeholders of their respective obligations under the Restructuring Support Agreement.

(d)    **Conditions Precedent to Confirmation May Not Occur**.

As more fully set forth in Article IX of the Plan, the occurrence of Confirmation and the Effective Date are each subject to a number of conditions precedent. If each condition precedent to Confirmation is not met or waived, the Plan will not be confirmed, and if each condition precedent to Consummation is not met or waived, the Effective Date will not take place. In the event that the Plan is not confirmed or is not consummated, the Debtors may seek Confirmation of a new plan. Pursuit of a new plan would be subject to limitations in the DIP Order and the DIP Facility, and may require consents or concessions from the DIP Agents and the DIP Lenders. The Debtors can provide no assurances that such consents or concessions would be obtained. If the Debtors do not secure sufficient working capital to continue their operations or if the new plan is not confirmed, however, the Debtors may be forced to liquidate their assets.

(e)    **Parties in Interest May Object to the Plan's Classification of Claims and Interests**.

Section 1122 of the Bankruptcy Code provides that a plan may place a Claim or an Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests in such Class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

(f)    **The Debtors May Not Be Able to Satisfy Vote Requirements**.

Pursuant to section 1126(c) of the Bankruptcy Code, section 1129(a)(7)(A)(i) of the Bankruptcy Code will be satisfied with respect to Class 3 and Class 4 if Holders of at least two-thirds in amount and more than one-half in number of the Allowed Claims in each Class that vote on the Plan cast votes to accept the Plan. There is no guarantee that the Debtors will receive the necessary acceptances from Holders of Claims in the Voting Classes. If the Voting Classes vote to reject the Plan, the Debtors may elect to amend the Plan, commence Chapter 11 Cases notwithstanding rejection of the Plan in accordance with the Restructuring Support Agreement, or continue operating under the current *status quo* outside of chapter 11.

(g)    **The Debtors May Not Be Able to Secure Confirmation**.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the bankruptcy court that: (i) the plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting Classes; (ii) the plan is not likely to be followed by a liquidation or a need for further financial reorganization unless liquidation or reorganization is contemplated by the plan; and (iii) the value of distributions to non-accepting Holders of Claims within a particular Class under the plan

53

will not be less than the value of distributions such Holders would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A dissenting Holder of an Allowed Claim or Interest might challenge either the adequacy of this Disclosure Statement or whether the voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement and the voting results are appropriate, the Bankruptcy Court can decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes.

If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims and Interests will receive with respect to their Allowed Claims and Interests, as applicable.

Subject to the limitations contained in the Plan and the Stakeholder Approval Rights, the Debtors reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Any modifications could result in a less favorable treatment of any Class than the treatment currently provided in the Plan, such as a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan.

(h)    **Parties in Interest May Object to the Releases Contained in the Plan**.

Confirmation is also subject to the Bankruptcy Court's approval of the settlement, release, injunction, and related provisions described in Article VIII of the Plan.  Certain parties in interest may assert that the Debtors cannot demonstrate that they meet the standards for approval of releases, exculpations, and injunctions established by the United States Court of Appeals for the Third Circuit.

(i)    **The Debtors May Not Be Able to Pursue Nonconsensual Confirmation Over Certain Impaired Non-Accepting Classes**.

Generally, a bankruptcy court may confirm a plan under the Bankruptcy Code's "cramdown" provisions over the objection of an impaired non-accepting class of claims or interests if at least one impaired class of claims has accepted the plan (with acceptance being determined without including the vote of any "insider" in that accepting class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the rejecting impaired classes.

As to Classes 3 and 4 (First Lien Claims and Senior Notes Claims, respectively), while the Debtors believe they have secured Plan support from the Holders of Claims well in excess of the requisite two-thirds in amount and more than one-half in number of the Allowed Class 3-First Lien Claims and Allowed Class 4-Senior Notes Claims pursuant to the Restructuring Support Agreement, the amount required for an accepting Class of Claims pursuant to section 1126(c) of the Bankruptcy Code, there is no guarantee that those Holders will vote in those Claims favor of the Plan.  There can be no assurances that the Debtors will confirm a chapter 11 plan and emerge as a reorganized company in that event, and it is unclear what distributions, if any, Holders of Allowed Claims and Interests will receive with respect to their Allowed Claims and Interests in that instance.  In addition, the pursuit of an alternative restructuring proposal may result in, among other things, increased expenses relating to Professional Fee Claims.

Finally, to the extent that a Voting Class votes to reject the Plan, the Debtors may not be able to seek to "cramdown" such Voting Class under section 1129(b) of the Bankruptcy Code because there is no other impaired Class of Claims entitled to vote under the Plan.

(j)    **The Debtors May Object to the Amount or Classification of a Claim or Interest**.

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim or Interest where such Claim or Interest is subject to an objection or dispute.  Any Holder of a

Claim or Interest that is subject to an objection or dispute may not receive its expected share of the estimated distributions described in this Disclosure Statement.

> (k)    **The Debtors' Historical Financial Information May Not Be Comparable to the Financial Information of the Reorganized Debtors**.

As a result of Consummation and the transactions contemplated thereby, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

> (l)    **The Effective Date May Not Occur**.

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

**B.    Risks Related to Recoveries Under the Plan.**

> 1.    **The Debtors May Not Be Able to Achieve Their Projected Financial Results or Meet Their Post-Restructuring Debt Obligations.**

The Financial Projections represent management's best estimate of the future financial performance of the Debtors or the Reorganized Debtors, as applicable, based on currently known facts and assumptions about future operations of the Debtors or the Reorganized Debtors, as applicable, as well as the U.S. and world economy in general and the relevant industries in which the Debtors operate.  There is no guarantee that the Financial Projections will be realized, and actual results may differ significantly from the Financial Projections.  To the extent the Reorganized Debtors do not meet their projected financial results or achieve projected revenues and cash flows, the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date, may be unable to service their debt obligations as they come due, or may not be able to meet their operational needs, all of which may negatively affect the value of the New Common Stock and the New Preferred Stock.  Further, a failure of the Reorganized Debtors to meet their projected financial results could lead to cash flow and working capital constraints, which may require the Debtors to seek additional working capital.  The Reorganized Debtors may be unable to obtain such working capital when required, or may only be able to obtain such capital on unreasonable or cost prohibitive terms.  For example, the Reorganized Debtors may be required to take on additional debt, the interest costs of which could adversely affect the results of the operations and financial condition of the Reorganized Debtors, and also have a negative effect on the value of the New Common Stock and the New Preferred Stock.  In addition, if any such required capital is obtained in the form of equity, the New Common Stock and the New Preferred Stock to be issued to Holders of Allowed Class 3-First Lien Claims and Allowed Class 4-Senior Notes Claims under the Plan could be diluted.

> 2.    **Estimated Valuations of the Debtors and the New Common Stock and the New Preferred Stock and Estimated Recoveries to Holders of Allowed Claims and Interests Are Not Intended to Represent Potential Market Values.**

The Debtors' estimated recoveries to Holders of Allowed Claims and Allowed Interests are not intended to represent the market value of the Debtors' Securities.  The estimated recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Debtors), including:  (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Debtors' ability to achieve the operating and financial results included in the Financial Projections; (d) the Debtors' ability to maintain adequate liquidity to fund operations; (e) the assumption that capital and equity markets remain consistent with current conditions; and (f) the Debtors' ability to maintain critical existing customer and client relationships.

> 3.    **Certain Tax Implications of the Debtors' Bankruptcy and Reorganization May Increase the Tax Liability of the Reorganized Debtors.**

Holders of Allowed Claims should carefully review Section X of this Disclosure Statement, entitled "Certain U.S. Federal Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Debtors.

55

C.      **Risks Related to the Offer and Issuance of Securities Under the Plan.**

1.      **The Debtors Do Not Intend to Offer to Register or to Exchange the New Common Stock or the New Preferred Stock in a Registered Exchange Offer.**

Neither the New Common Stock nor the New Preferred Stock will be registered under the Securities Act or any state securities laws and, subject to the discussion in Section IV.C.5 below, the discussion below and the discussion in Section IX of this Disclosure Statement, entitled "Important Securities Laws Disclosures" unless so registered, may not be re-offered or re-sold except pursuant to an exemption from the registration requirements of the Securities Act and applicable state securities laws.  The Debtors do not intend to register the New Common Stock and the New Preferred Stock under the Securities Act or to offer to exchange the New Common Stock or the New Preferred Stock in an exchange offer registered under the Securities Act.  As a result, the New Common Stock and the New Preferred Stock may be transferred or re-sold only in transactions exempt from the securities registration requirements of federal and applicable state laws.  In addition, the Debtors are not subject to the reporting requirements of the Securities Act, and Holders of the New Common Stock and the New Preferred Stock will not be entitled to any information except as expressly required by the New Shareholders Agreement.

To the extent that any New Common Stock and New Preferred Stock issued under the Plan is covered by section 1145 of the Bankruptcy Code, it may be resold by the Holders thereof without registration under the Securities Act unless the Holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities; provided, however, shares of such securities will not be freely tradable if, at the time of transfer, the Holder is an "affiliate" of the Reorganized Acosta as defined in Rule 144(a)(1) under the Securities Act and has not been such an "affiliate" within ninety days of such transfer. Such affiliate Holders would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.  Resales by Persons who receive New Common Stock or New Preferred Stock pursuant to the Plan that are deemed to be "underwriters" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law. Such Persons would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.

The information which the Debtors are required to provide in order to issue the New Common Stock and the New Preferred Stock may be less than the Debtors would be required to provide if the New Common Stock and the New Preferred Stock were registered.  Among other things, the Debtors may not be required to provide:  (a) separate financial information for any subsidiary; (b) selected historical consolidated financial data of Acosta; (c) selected quarterly financial data of Acosta; (d) certain information about the Debtors' disclosure controls and procedures and their internal controls over financial reporting; and (e) certain information regarding the Debtors' executive compensation policies and practices and historical compensation information for their executive officers.  This lack of information could impair your ability to evaluate your ownership and the marketability of the New Common Stock and the New Preferred Stock.

2.      **There Is No Established Market for the New Common Stock or the New Preferred Stock.**

The New Common Stock and the New Preferred Stock will be a new issuance of Securities, and there is no established trading market for those Securities.  The Debtors do not intend to apply for the New Common Stock or the New Preferred Stock to be listed on any securities exchange or to arrange for quotation on any automated dealer quotation system.  You may not be able to sell your New Common Stock or your New Preferred Stock at a particular time or at favorable prices.  As a result, the Debtors cannot assure you as to the liquidity of any trading market for the New Common Stock or the New Preferred Stock.  Accordingly, you may be required to bear the financial risk of your ownership of the New Common Stock and the New Preferred Stock indefinitely.  If a trading market were to develop, future trading prices of the New Common Stock and/or the New Preferred Stock may be volatile and will depend on many factors, including:  (a) the Debtors' operating performance and financial condition; (b) the interest of securities dealers in making a market for them; and (c) the market for similar Securities.

3.        **The Debtors Could Modify the Equity Rights Offering Procedures.**

Subject to the Stakeholder Approval Rights, the Debtors may modify the Equity Rights Offering Procedures to among other things, include additional procedures, as needed, to administer the Equity Rights Offering and comply with applicable law.  Such modifications may adversely affect the rights of Equity Rights Offering Participants.

4.        **The Restructuring Support Agreement May Be Terminated and Thus Terminate the Equity Rights Offering.**

As stated above, as set forth in Section 13 of the Restructuring Support Agreement, the Restructuring Support Agreement may be terminated upon the occurrence of certain events.  Termination of the Restructuring Support Agreement will result in termination of the Equity Rights Offering, the DIP Credit Agreement and the Backstop and Direct Investment Agreement.  Additionally, the Equity Rights Offering is subject to approval by the Bankruptcy Court, and there is no guarantee that the Bankruptcy Court will grant its approval.

D.        **Risk Factors Related to the Business Operations of the Debtors and Reorganized Debtors.**

1.        **The Debtors Will File Voluntary Petitions for Relief Under Chapter 11 of the Bankruptcy Code and Will Be Subject to the Risks and Uncertainties Associated with Any Chapter 11 Restructuring.**

For the duration of the Chapter 11 Cases, the Debtors' operations and the Debtors' ability to execute their business strategy will be subject to the risks and uncertainties associated with bankruptcy.  These risks include, among other things:

- the Debtors' ability to obtain approval of the Bankruptcy Court with respect to pleadings and motion papers filed in the Chapter 11 Cases from time to time;

- the Debtors' ability to obtain creditor and Bankruptcy Court approval for, and then to Consummate, the Plan to emerge from bankruptcy;

- the occurrence of any event, change, or other circumstance that could give rise to the termination of the Restructuring Support Agreement;

- the Debtors' ability to obtain and maintain normal trade terms with service providers and maintain contracts that are critical to their operations;

- the Debtors' ability to attract, motivate, and retain key employees;

- the Debtors' ability to attract and retain clients and customers; and

- the Debtors' ability to fund and execute their business plan.

The Debtors will also be subject to risks and uncertainties with respect to the actions and decisions of creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Plan.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways.  For example, negative events or publicity associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with their customers, as well as their suppliers and employees, which, in turn, could adversely affect the Debtors' operations and financial condition.  Also, pursuant to the Bankruptcy Code, the Debtors need Bankruptcy Court approval for transactions outside the ordinary course of business, which may limit their ability to respond timely to certain events or take advantage of certain opportunities.  Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot predict or quantify the ultimate effect that events occurring during the Chapter 11 Cases will have on their businesses, financial condition, and results of operations.

As a result of the Chapter 11 Cases, the realization of assets and the satisfaction of liabilities are subject to uncertainty.  While operating as debtors in possession, and subject to approval of the Bankruptcy Court, or otherwise

as permitted in the normal course of business or Bankruptcy Court order, the Debtors may sell or otherwise dispose of assets and liquidate or settle liabilities. Further, the Plan could materially change the amounts and classifications of assets and liabilities reported in the historical consolidated financial statements. The historical consolidated financial statements do not include any adjustments to the reported amounts of assets or liabilities that might be necessary as a result of Confirmation.

2.      **Potential for the Loss of Key Members of the Executive Management Team.**

If the Debtors were to lose key members of their senior management team on account of the Chapter 11 Cases or otherwise, the Debtors' business, financial condition, liquidity, and results of operations could be adversely affected.

3.      **The Debtors May Not Be Able to Achieve Their Projected Financial Results.**

The Financial Projections set forth in this Disclosure Statement represent the best estimate of the future financial performances of the Debtors based on currently known facts and assumptions about future operations as well as the United States and world economies in general and, specifically, the CPG, retail, and marketing industries. The actual financial results may differ significantly from the projections. If the Debtors do not achieve their projected financial results, then the value of the Debtors debt or equity issued pursuant to the Plan may experience a decline and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date. There are numerous factors and assumptions inherent in determining the Debtors financial results, many of which are beyond the Debtors' control, including the following:

(a)      changes in consumer behavior, including a shift away from traditional grocery retail stores where the Debtors have an established presence and an overall decline in consumer purchasing;

(b)      macroeconomic trends in the retail and CPG industries, including a move by retailers toward private label goods; and

(c)      increased competition from competitors as consumers increase spending in markets where the Debtors do not have a historical presence, including discount stores and online channels.

4.      **If the Debtors Do Not Obtain Additional Capital to Fund Their Operations and Obligations, the Debtors' Growth May Be Limited.**

The Debtors may require additional capital to fund their operations and obligations, which will depend on several factors, including:

- the Debtors' ability to enter into new client and customer agreements and to extend the duration of existing agreements;

- the success rate of the Debtors' sales efforts;

- costs of recruiting and retaining qualified personnel;

- expenditures and investments to implement the Debtors' business strategy; and

- the identification and successful completion of acquisitions.

If the Debtors cannot raise additional capital, the Debtors may be required to curtail internal growth initiatives and/or forgo the pursuit of acquisitions. The Debtors do not know whether additional financing will be available on commercially acceptable terms, if at all, when needed. If sufficient funding is not available or is not available on commercially acceptable terms, the Debtors' ability to fund their operations, support the growth of their business, or otherwise respond to competitive pressures could be significantly delayed or limited, which could materially adversely affect the Debtors' business, financial condition, or results of operations.

58

5.      **Employee and Labor Risks.**

As a services company, the Debtors employees are essential to the Debtors' ability to generate revenue. When unemployment rates are low, it can be difficult for the Debtors to find qualified and affordable personnel. The Debtors may be unable to hire and retain a sufficient skilled labor force necessary to support the Debtors' operating requirements and growth strategy. The Debtors' labor expenses may increase as a result of a shortage in the supply of skilled personnel. Additionally, the Debtors may also be forced to incur significant training expenses if they are unable to hire employees with the requisite skills. Accordingly, labor shortages or increased labor or training costs could materially adversely affect the Debtors' business, financial condition, or results of operations.

E.      **Miscellaneous Risk Factors and Disclaimers.**

1.      **The Financial Information Is Based on the Debtors' Books and Records and, Unless Otherwise Stated, No Audit Was Performed.**

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to assure the accuracy of the financial information provided in this Disclosure Statement, and while the Debtors believe that such financial information fairly reflects their financial condition, the Debtors are unable to warrant or represent that the financial information contained in this Disclosure Statement (or any information in any of the exhibits to the Disclosure Statement) is without inaccuracies.

2.      **No Legal or Tax Advice Is Provided By This Disclosure Statement.**

This Disclosure Statement is not legal advice to any person or Entity. The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each reader should consult its own legal counsel and accountant with regard to any legal, tax, and other matters concerning its Claim. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote to accept or reject the Plan or whether to object to Confirmation.

3.      **No Admissions Made.**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, the Reorganized Debtors, Holders of Allowed Claims or Interests, or any other parties in interest.

4.      **Failure to Identify Litigation Claims or Projected Objections.**

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim is, or is not, identified in this Disclosure Statement. The Debtors may seek to investigate, file, and prosecute Claims and may object to Claims after Confirmation and Consummation of the Plan, irrespective of whether this Disclosure Statement identifies such Claims or objections to Claims.

5.      **Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors.**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement and the exhibits to the Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement or the information in the exhibits to the Disclosure Statement.

6.      **No Representations Outside This Disclosure Statement Are Authorized.**

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure voting Holders' acceptance or rejection of the Plan that are other than

59

as contained in, or included with, this Disclosure Statement, should not be relied upon by voting Holders in arriving at their decision.  Voting Holders should promptly report unauthorized representations or inducements to counsel to the Debtors and the Office of the United States Trustee for the District of Delaware.

**IX.     Important Securities Laws Disclosures**

**A.     Plan Consideration.**

In accordance with the Plan, the Restructuring Support Agreement, and the Equity Rights Offering Documents, the Debtors and/or Reorganized Debtors, as applicable, will distribute Cash and 100% of the New Common Stock and the Subscription Rights to Holders of Allowed Class 3-First Lien Claims and Holders of Allowed Class 4-Senior Notes Claims as set forth in the Plan. The Plan also provides for the New Preferred Stock to be issued to the Backstop Parties in consideration for their Backstop Commitments (as defined in the Restructuring Support Agreement) as provided for in the Restructuring Support Agreement and the Backstop and Direct Investment Agreement. The Debtors believe that shares of New Common Stock and the New Preferred Stock may constitute "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and all applicable state Blue Sky Laws.

**B.     Exemption from Registration Requirements; Issuance and Resale of New Common Stock; Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code.**

**1.     Exemption from Registration Requirements; Issuance and Resale of New Common Stock.**

Section 1145 of the Bankruptcy Code provides that the registration requirements of section 5 of the Securities Act (and any applicable state Blue Sky Laws) shall not apply to the offer or sale of stock, options, warrants, or other securities by a debtor if:  (a) the offer or sale occurs under a plan of reorganization; (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor; and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property.  In reliance upon these exemptions, the offer, issuance and distribution of (i) the New Common Stock in respect of Claims as contemplated by the Plan and (ii) the New Preferred Stock constituting the Equity Backstop Premium issued to any Backstop Parties as set forth in the Restructuring Support Agreement will not be registered under the Securities Act or any applicable state Blue Sky Laws.

The Debtors believe that the issuance of (i) the New Common Stock in respect of Claims as contemplated by the Plan, and (ii) the New Preferred Stock constituting the Equity Backstop Premium issued to any Backstop Parties as set forth in the Restructuring Support Agreement is covered by section 1145 of the Bankruptcy Code.  Accordingly, the Debtors believe that such New Common Stock and New Preferred Stock may be resold without registration under the Securities Act or other federal securities laws, unless the Holder is an "underwriter" (as discussed in Section IX.B.2 below) with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code, or an affiliate of the Reorganized Debtors (or has been such an "affiliate" within ninety days of such transfer).  The Debtors will seek to obtain, as part of the Confirmation Order, a provision confirming such exemption.  In addition, such New Common Stock and New Preferred Stock generally may be able to be resold without registration under applicable state Blue Sky Laws by a Holder that is not an underwriter or an affiliate of the Reorganized Debtors pursuant to various exemptions provided by the respective Blue Sky Laws of those states.  However, the availability of such exemptions cannot be known unless individual state Blue Sky Laws are examined.

Recipients of (i) the New Common Stock to be issued in respect of Claims as contemplated by the Plan, and (ii) the New Preferred Stock constituting the Equity Backstop Premium issued to any Backstop Parties as set forth in the Restructuring Support Agreement are advised to consult with their own legal advisors as to the availability and applicability of section 1145 of the Bankruptcy Code to such New Common Stock and New Preferred Stock and any other potential exemption from registration under the Securities Act or applicable state Blue Sky Laws in any given instance and as to any applicable requirements or conditions to such availability.

Notwithstanding anything to the contrary in the Plan, no Entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Stock and the New Preferred Stock is exempt from registration and/or

60

eligible for DTC book-entry delivery, settlement, and depository services.  For the avoidance of doubt, all of the New Common Stock and the New Preferred Stock shall be subject to the terms of the New Shareholders Agreement.

The Debtors do not have any contract, arrangement, or understanding relating to, and will not, directly or indirectly, pay any commission or other remuneration to any broker, dealer, salesperson, agent, or any other person for soliciting votes to accept or reject the Plan.  The Debtors have received assurances that no person will provide any information to Holders of First Lien Claims or Holders of Senior Notes Claims relating to the solicitation of votes on the Plan other than to refer such Holders to the information contained in this Disclosure Statement.  In addition, no broker, dealer, salesperson, agent, or any other person, is engaged or authorized to express any statement, opinion, recommendation, or judgment with respect to the relative merits and risks of the Plan.  Thus, no person will receive any commission or other remuneration, directly or indirectly, for soliciting votes to accept or reject the Plan or in connection with the offer of any Securities that may be the deemed to occur in connection with voting on the Plan.

2.      **Definition of "Underwriter" Under Section 1145(b) of the Bankruptcy Code; Implications for Resale of New Common Stock.**

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions of an entity that is not an issuer":  (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer," for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "controlling persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling Person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities.  In addition, the legislative history of section 1145 of the Bankruptcy Code may suggest that a creditor who owns 10% or more of a class of voting securities of a reorganized debtor may be presumed to be a "controlling Person" and, therefore, an underwriter.

Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling Person") with respect to (i) the New Common Stock to be issued in respect of Claims as contemplated by the Plan, and (ii) the New Preferred Stock constituting the Equity Backstop Premium issued to any Backstop Parties as set forth in the Restructuring Support Agreement would depend upon various facts and circumstances applicable to that Person.  Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to (i) the New Common Stock to be issued in respect of Claims as contemplated by the Plan, and (ii) the New Preferred Stock constituting the Equity Backstop Premium issued to any Backstop Parties as set forth in the Restructuring Support Agreement and, in turn, whether any Person may freely resell such New Common Stock or New Preferred Stock.  The Debtors recommend that potential recipients of such New Common Stock and New Preferred Stock consult their own counsel concerning their ability to freely trade such securities without registration under the federal and applicable state Blue Sky Laws.

Under certain circumstances, Holders of (i) the New Common Stock to be issued in respect of Claims as contemplated by the Plan, and (ii) the New Preferred Stock constituting the Equity Backstop Premium issued to any Backstop Parties as set forth in the Restructuring Support Agreement who are deemed to be "underwriters" may be entitled to resell their New Common Stock and New Preferred Stock, as applicable, pursuant to the limited safe harbor

resale provisions of Rule 144 of the Securities Act.  Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such person after a specified holding period if current information regarding the issuer is publicly available and certain other conditions are met, and, if such seller is an affiliate of the issuer, if volume limitations and manner of sale requirements are met.

## C.     Private Placement Exemptions.

Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving any public offering are exempt from registration under the Securities Act.  Regulation D is a non-exclusive safe harbor from registration promulgated by the SEC under section 4(a)(2) of the Securities Act.

The Debtors believe that all shares of New Preferred Stock issued (x) in connection with the Direct Investment Preferred Equity Raise, (y) to the Backstop Parties pursuant to the Backstop Commitment as set forth in the Restructuring Support Agreement, and (z) to Holders of First Lien Claims and Holders of Senior Notes Claims in the Equity Rights Offering upon exercise of their rights will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance on Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder.  These shares will be subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration, under the Securities Act and other applicable law, as described below.

Unlike the securities that will be issued pursuant to section 1145(a)(1) of the Bankruptcy Code, all shares of New Preferred Stock issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will be considered "restricted securities" and may not be offered, sold, exchanged, assigned or otherwise transferred unless they are registered under the Securities Act, or an exemption from registration under the Securities Act is available.

All persons who purchase such shares will be required to agree that they will not offer, sell or otherwise transfer any such shares except in accordance with the exemption from registration provided by Rule 144 under the Securities Act, if and when available.

Rule 144 provides an exemption for the public resale of "restricted securities" if certain conditions are met. These conditions vary depending on whether the holder of the restricted securities is an affiliate of the issuer.  An affiliate is defined as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the issuer."

A non-affiliate who has not been an affiliate of the issuer during the preceding three months may resell restricted securities after a six-month holding period if at the time of the sale there is available certain current public information regarding the issuer, and may sell the securities after a one-year holding period whether or not there is current public information regarding the issuer.  Adequate current public information is available for a reporting issuer if the issuer has filed all periodic reports required under Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, during the twelve months preceding the sale of the restricted securities.  If the issuer is a non-reporting issuer, adequate current public information is available if certain information about the issuer is made publicly available.

An affiliate may resell restricted securities after the six-month holding period if at the time of the sale certain current public information regarding the issuer is available.  The affiliate must also comply with the volume, manner of sale and notice requirements of Rule 144.  First, the rule limits the number of restricted securities (plus any unrestricted securities) sold for the account of an affiliate (and related persons) in any three-month period to the greater of 1% of the outstanding securities of the same class being sold, or, if the class is listed on a stock exchange, the greater of 1% of the average weekly reported volume of trading in such restricted securities during the four weeks preceding the filing of a notice of proposed sale on Form 144.  Second, the manner of sale requirement provides that the restricted securities must be sold in a broker's transaction, which generally means they must be sold through a broker and handled as a routine trading transaction.  The broker must receive no more than the usual commission and cannot solicit orders for the sale of the restricted securities except in certain situations.  Third, if the sale exceeds 5,000 restricted securities or has an aggregate sale price greater than $50,000, an affiliate must file with the SEC three copies of a notice of proposed sale on Form 144.  The sale must occur within three months of filing the notice unless an amended notice is filed.

62

The Debtors believe that the Rule 144 exemption will not be available with respect to any such shares (whether held by non-affiliates or affiliates) until at least six months after the Effective Date. Accordingly, holders of such shares will be required to hold such shares for at least six months and, thereafter, to sell them only in accordance with the applicable requirements of Rule 144.

****

*Legend*. To the extent certificated or issued by way of direct registration on the records of the issuer's transfer agent, certificates evidencing (i) the New Common Stock or the New Preferred Stock constituting the Equity Backstop Premium held by Holders of 10% or more of the outstanding New Common Stock or the New Preferred Stock, as applicable, or who are otherwise underwriters as defined in section 1145(b) of the Bankruptcy Code, and (ii) all shares of New Preferred Stock issued (x) in connection with the Direct Investment Preferred Equity Raise, (y) to the Backstop Parties pursuant to the Backstop Commitment as set forth in the Backstop and Direct Investment Agreement, and (z) to Holders of First Lien Claims and Holders of Senior Notes Claims in the Equity Rights Offering upon exercise of their rights will bear a legend substantially in the form below:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "<u>ACT</u>"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER.

The Debtors and Reorganized Debtors, as applicable, reserve the right to reasonably require certification, legal opinions or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of the 4(a)(2) Securities. The Debtors and Reorganized Debtors, as applicable, also reserve the right to stop the transfer of any 4(a)(2) Securities if such transfer is not in compliance with Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws. All persons who receive 4(a)(2) Securities will be required to acknowledge and agree that (a) they will not offer, sell or otherwise transfer any 4(a)(2) Securities except in accordance with an exemption from registration, including under Rule 144 under the Securities Act, if and when available, or pursuant to an effective registration statement, and (b) the 4(a)(2) Securities will be subject to the other restrictions described above.

In any case, recipients of securities issued under the Plan are advised to consult with their own legal advisers as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

**BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE DEBTORS OR THE REORGANIZED DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE DISTRIBUTED UNDER THE PLAN. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY RESELL SUCH SECURITIES.**

Notwithstanding anything contained herein to the contrary, each recipient of the New Common Stock and the New Preferred Stock issued pursuant to the Plan will be deemed to be a party to the New Shareholders Agreement, and such New Common Stock and New Preferred Stock will be subject to the New Organizational Documents. Without limiting the forgoing, on the Effective Date, holders of the New Common Stock and the New Preferred Stock will become parties to the New Shareholders Agreement and the New Organizational Documents, which shall govern (among other things) the relative rights of holders of the New Common Stock and the New Preferred Stock.

KE 63679933
PHIL1 8521314v.1

## X.    Certain United States Federal Tax Consequences of the Plan

### A.    Introduction.

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors, and certain Holders (which, solely for purposes of this discussion, means the beneficial owners for U.S. federal income tax purposes) of certain Claims entitled to vote on the Plan. This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law"). Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. The Debtors have not requested, and do not intend to request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, local, gift, or estate tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, pass-through entities, beneficial owners of pass-through entities, trusts, governmental authorities or agencies, dealers and traders in securities, subchapter S corporations, Persons who hold Claims or who will hold consideration received under the Plan as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and Holders of Claims who are themselves in bankruptcy). Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code. This summary does not discuss differences in tax consequences to Holders of Claims that act or receive consideration in a capacity other than any other Holder of a Claim of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below. This summary does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan, or (b) that are deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim that is: (a) an individual citizen or resident of the United States for U.S. federal income tax purposes; (b) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the U.S., any state thereof or the District of Columbia; (c) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (d) a trust (i) if a court within the U.S. is able to exercise primary jurisdiction over the trust's administration and one or more "United States persons" (within the meaning of section 7701(a)(30) of the Tax Code) have authority to control all substantial decisions of the trust, or (ii) that has a valid election in effect under applicable Treasury Regulations to be treated as a "United States person" (within the meaning of section 7701(a)(30) of the Tax Code). For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims should consult their tax advisors regarding the U.S. federal income tax consequences of the Plan.

KE 63679933

PHIL1 8521314v.1

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

B.      **Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors and the Reorganized Debtors.**

The Debtors currently expect that the Restructuring Transactions will be consummated as a taxable sale of the assets and/or stock of any Debtor (a "Taxable Transaction") and that, in connection with that Taxable Transaction, as described in the Restructuring Steps Memorandum, elections will be made to treat all assets held by Acosta, Inc. and its United States subsidiaries as having been sold (rather than treating the stock of any such entities as having been sold) (the "Expected Structure"). The discussion below assumes that the Expected Structure is utilized. If the Debtors (in conjunction with other parties in interest) determine, prior to the Effective Date, that the Restructuring Transactions will be consummated other than pursuant to the Expected Structure, a supplemental disclosure will be filed containing a discussion of certain tax consequences of such alternative structure.

In the Expected Structure, the Debtors would realize gain or loss upon such transfer in an amount equal to the difference between the aggregate fair market value of the assets transferred or deemed transferred by the Debtors and the Debtors' aggregate tax basis in such assets. Gain, if any, would be reduced by the amount of the Debtors' available tax attributes (including an anticipated loss with respect to the stock of Acosta, Inc.). Any remaining gain would be recognized by the Debtors and result in a cash tax obligation. The Debtors currently anticipate that no material federal cash tax liability will result from the Restructuring Transactions. The Reorganized Debtors should take a fair market value basis as of the Effective Date in the assets acquired from the Debtors. The Reorganized Debtors generally will not succeed to any of the Debtors' existing tax attributes.

The foregoing and following discussion generally assumes that, and the Debtors intend to take the position that, the Early Transaction Agreement Consideration (comprising the Early Consenting First Lien Lender Consideration and the Early Consenting Noteholder Consideration) is treated for U.S. federal income tax purposes as additional consideration received by Holders in exchange for their Claims pursuant to the Plan, by analogy to a so-called "early tender premium." There is not, however, authority that directly addresses the U.S. federal income tax treatment of payments of this type (or of "early tender premiums,"). As a result, there can be no assurance that the IRS will not take a contrary position regarding the U.S. federal income tax treatment of the receipt of the Early Transaction Agreement Consideration. The Debtors, Reorganized Debtors, and Holders of Claims could all be subject to potentially adverse U.S. federal income tax consequences in the event the Debtors' intended treatment of the Early Transaction Agreement Consideration is not sustained. Holders of Claims should consult with their own tax advisors as to the tax consequences of the Early Transaction Agreement Consideration.

C.      **Certain U.S. Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Class 3 and Class 4 Claims.**

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan. Holders of Claims are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

1.      **Tax Consequences of the Consummation of the Plan.**

(c)      **Consequences to the Holders of Allowed Class 3--First Lien Claims.**

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of their Claims, each Holder of a Allowed Class 3-First Lien Claim will receive its Pro Rata share (as determined as a percentage of all First Lien Claims) of: (a) 85% of the total New Common Stock, subject to dilution by the Employee Incentive Plan, the Equity Rights Offering, the Direct Investment Preferred Equity Raise, and the Equity Backstop Premium and (b) the First Lien Subscription Rights; *unless*, such Holder of an Allowed First Lien

65

Claim elects, but only if such Holder accepts the Plan and thereby agrees, to instead receive (or cause its affiliated designee to receive) the First Lien Cash-Out Option.

The Holder of the Allowed Class 3-First Lien Claim will be treated as receiving, as applicable, its Pro Rata share of the New Common Stock, First Lien Subscription Rights, and/or cash in a taxable exchange under section 1001 of the Tax Code.  Other than with respect to any amounts received that are attributable to accrued but unpaid interest, each U.S. Holder should recognize gain or loss in an amount equal to the difference between (x) the fair market value of the New Common Stock and First Lien Subscription Rights received and the amount of cash, received, in each case as applicable, in respect of the Allowed Class 3-First Lien Claim and (y) such U.S. Holder's adjusted basis, if any, in such Claim.  The character of such gain or loss will be determined by a number of factors, including, among other things, the tax status of the U.S. Holder, the rules regarding market discount and accrued but unpaid interest, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If recognized gain or loss is capital in nature, it generally would be long-term capital gain or loss if the U.S. Holder held its Claim for more than one year as of the Effective Date.  Such U.S. Holder's tax basis in the New Common Stock and First Lien Subscription Rights received, as applicable, should equal the fair market value of such property as of the Effective Date, and such U.S. Holder's holding period in such consideration should begin on the day after the Effective Date.

(d)    **Consequences to Holders of Allowed Class 4 – Senior Notes Claims.**

Pursuant to the Plan, in exchange for full and final satisfaction, compromise, settlement, release, and discharge of their Claims, each Holder of an Allowed Class 4-Senior Notes Claim will receive its Pro Rata share of (as determined as a percentage of all Senior Notes Claims) of:  (a) 15% of the total New Common Stock, subject to dilution by the Employee Incentive Plan, the Equity Rights Offering, the Direct Investment Preferred Equity Raise, and the Equity Backstop Premium and (b) the Senior Notes Subscription Rights; *unless,* such Holder of an Allowed Senior Notes Claim elects, but only if such Holder accepts the Plan, and thereby agrees, to instead receive (or cause its affiliated designee to receive) the Senior Notes Cash-Out Option.

(e)    **Treatment of Equity Rights Offering**

A U.S. Holder that elects to exercise its First Lien Subscription Rights or its Senior Notes Subscription Rights (together, the "Subscription Rights") should be treated as purchasing, in exchange for its Subscription Right and the amount of cash paid by the U.S. Holder to exercise such Subscription Rights, New Preferred Stock of Reorganized Acosta.  Such a purchase should generally be treated as the exercise of an option under general tax principles, and such U.S. Holder should not recognize income, gain, or loss for U.S. federal income tax purposes when it exercises the Subscription Rights. A U.S. Holder's aggregate tax basis in the New Preferred Stock should equal the sum of (i) the amount of cash paid by the U.S. Holder to exercise the Subscription Rights plus (ii) such U.S. Holder's tax basis in the Subscription Rights immediately before the Subscription Rights are exercised.  A U.S. Holder's holding period for the New Preferred Stock received pursuant to such exercise should begin on the day following the Effective Date.

A U.S. Holder that elects not to exercise the Subscription Rights may be entitled to claim a (likely short-term capital) loss equal to the amount of tax basis allocated to such Subscription Rights, subject to any limitation on such U.S. Holder's ability to utilize capital losses.  U.S. Holders electing not to exercise their Subscription Rights should consult with their own tax advisors as to the tax consequences of such decision.

(f)    **Accrued Interest.**

A portion of the consideration received by U.S. Holders of Claims may be attributable to accrued but unpaid interest on such Claims.  Such amount should be taxable to that U.S. Holder as ordinary interest income if such accrued interest has not been previously included in the Holder's gross income for U.S. federal income tax purposes. Conversely, U.S. Holders of Claims may be able to recognize a deductible loss to the extent that any accrued interest on the Claims was previously included in the Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.

KE 63679933
PHIL1 8521314v.1

If the fair market value of the consideration received by a Holder pursuant to the Plan is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued but unpaid interest is unclear.  Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan. Holders of Claims should consult their respective tax advisors regarding the proper allocation of the consideration received by them under the Plan between principal and accrued but unpaid interest in such event.

(g)     **Market Discount.**

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of a Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, in each case, by at least a *de minimis* amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such Claim was considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).  Holders should consult their own tax advisors concerning the application of the market discount rules to their Claims.

(h)     **Medicare Tax.**

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Plan.

(i)     **Limitation of Use of Capital Losses.**

U.S. Holders who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses.  For non-corporate U.S. Holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. Non-corporate U.S. Holders may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains.  U.S. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in succeeding tax years.  Corporate U.S. Holders may only carry over unused capital losses for the five years following the capital loss year, but are allowed to carry back unused capital losses to the three years preceding the capital loss year.

2.     **Tax Consequences of Owning and Disposing of Consideration Received Under the Plan**

(c)     **Distributions on New Common Stock and New Preferred Stock**

Any distributions made on account of the New Common Stock, and any cash distributions made on account of the New Preferred Stock, will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Acosta as determined under U.S. federal income tax principles.

As discussed further below, the Debtors currently anticipate that the Reorganized Debtors will take the position that, under section 305 of the Tax Code, distributions in kind of additional New Preferred Stock pursuant to the terms of the New Preferred Stock generally will not constitute dividends.  To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares (determined on a share-by-share basis).  Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.  Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for a dividends-received deduction.

(d)        <strong>Potential Constructive Distributions with Respect to New Preferred Stock</strong>

Under section 305 of the Tax Code, holders of New Preferred Stock may be treated as receiving distributions with respect to their New Preferred Stock under section 301 of the Tax Code under a variety of circumstances.

As an initial matter, certain provisions of section 305 of the Tax Code apply only if the New Preferred Stock constitutes "preferred" stock for purposes of section 305 of the Tax Code (as opposed to "common" stock for purposes of section 305 of the Tax Code).  The determination of whether stock constitutes "preferred" or "common" stock for purposes of section 305 of the Tax Code depends in large part upon whether the stock participates significantly in corporate growth (such stock colloquially being referred to as "participating preferred stock").  Participating preferred stock is treated as common stock for purposes of section 305 of the Tax Code and, accordingly, certain of the deemed distribution provisions of section 305 of the Tax Code are generally inapplicable to such stock.

Although the treatment of the New Preferred Stock under section 305 of the Tax Code is subject to uncertainty, the New Preferred Stock will participate with New Common Stock in dividends of Reorganized Acosta on an as-converted basis, and receive upon liquidation or redemption the greater of (i) the liquidation preference, including any dividends accrued to the holder thereof, and (ii) what the holders of the New Preferred Stock would have received had such Holder converted such New Preferred Stock to New Common Stock.  Accordingly, the Debtors currently anticipate that the Reorganized Debtors will take the position that the New Preferred Stock will be treated as "common" stock for purposes of section 305 of the Tax Code.  If such treatment under section 305 of the Tax Code is respected, any ordinary payment-in-kind distributions and preferred original issue discount ("OID") (*i.e.*, the excess of redemption price over issue price), if any, should not be subject to the deemed distribution provisions of section 305 of the Tax Code.  Moreover, although subject to potential uncertainty, the Debtors currently anticipate that the Reorganized Debtors will take the position that dividends made simultaneously to New Common Stock and New Preferred Stock should not result in a deemed distribution under section 305 of the Tax Code.

If the New Preferred Stock is treated as "preferred" stock under section 305 of the Tax Code, any OID on the New Preferred Stock will generally be required to be recognized as a dividend over the term of the New Preferred Stock on a constant-yield-to-maturity basis to the extent of the Reorganized Debtors' earnings and profits (and thereafter first as a return of capital which reduces basis and then, generally, capital gain, under the same rules applicable to distributions in respect of the New Common Stock, though any such amounts treated as a dividend will generally be ineligible for the reduced rate applicable to qualified dividend income or the dividends received deduction available to qualified corporations).

Further, if the New Preferred Stock is treated as "preferred" stock under section 305 of the Tax Code, there is a risk that payment-in-kind distributions and the resulting increases in the liquidation preference of the New Preferred Stock will be treated as a deemed dividend to the extent of Reorganized Acosta's earnings and profits (as described above).

In addition to the above rules, under certain circumstances, the payment-in-kind distributions with respect to the New Preferred Stock could be subject to treatment as a deemed distribution, even if the New Preferred Stock otherwise constitutes "common stock" for purposes of section 305 of the Tax Code.  Such treatment could apply in the event distributions are made with respect to the New Common Stock (and the New Preferred Stock on an as-converted basis), because such distributions on the New Common Stock, in conjunction with the payment-in-kind

68

distributions with respect to the New Preferred Stock, could implicate Treasury Regulation Section 1.305-7 and the disproportionate distribution rule of section 305 of the Tax Code. As described above, however, the Debtors currently anticipate that the Reorganized Debtors will take the position that cash dividends made simultaneously to New Common Stock and New Preferred Stock should not result in a deemed distribution under section 305 of the Tax Code.

Holders of Claims receiving the New Preferred Stock are urged to consult their own tax advisors regarding the treatment of the New Preferred Stock under section 305 of the Tax Code.

(e)   <strong>Conversion of New Preferred Stock to New Common Stock</strong>

Subject to the discussion immediately below, the conversion of New Preferred Stock to New Common Stock should generally be a tax-free exchange pursuant to a recapitalization, with the result that the basis of the New Preferred Stock transfers to the New Common Stock in the hands of the converting U.S. Holder.

If, however, there are dividends in arrears on the New Preferred Stock and the fair market value of the New Common Stock received (determined immediately following the recapitalization) exceeds the issue price of the New Preferred Stock surrendered, then conversion may result in a deemed distribution if (a) the conversion is "pursuant to a plan to periodically increase a shareholder's proportionate interest in the assets or earnings and profits of the corporation" or (b) the New Preferred Stock does not constitute "common" stock for purposes of section 305 of the Tax Code. There is significant uncertainty with respect to whether clause (a) would apply to a conversion of the New Preferred Stock. In the event clause (b) applied to such conversion, a converting holder would be treated as receiving a deemed distribution in an amount equal to the *lesser of* (x) the amount of the dividends in arrears and (y) the excess of (1) the fair market value of the New Common Stock (determined immediately following the recapitalization) over (2) the issue price of the New Preferred Stock surrendered, in each case, to the extent of the current or accumulated earnings and profits of Reorganized Acosta as determined under U.S. federal income tax principles (and, thereafter, first as a return of capital which reduces basis and then, generally, capital gain, under the same rules applicable to distributions in respect of the New Common Stock, though any such amounts treated as a dividend will generally be ineligible for the reduced rate applicable to qualified dividend income or the dividends received deduction available to qualified corporations).

Holders of Claims receiving the New Preferred Stock are urged to consult their own tax advisors regarding the tax consequences of converting the New Preferred Stock.

(f)   <strong>Sale, Redemption, or Repurchase of New Common Stock and New Preferred Stock</strong>

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the New Common Stock or New Preferred Stock. Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder held the New Common Stock or New Preferred Stock for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as described above.

If, however, there are unpaid accrued and declared dividends on the New Preferred Stock at the time of the sale, redemption, or other taxable disposition of the New Preferred Stock, then, generally, the portion of the consideration attributable to those dividends will be treated as a dividend to the extent of the current or accumulated earnings and profits of Reorganized Acosta as determined under U.S. federal income tax principles (and, thereafter, first as a return of capital which reduces basis and then, generally, capital gain, under the same rules applicable to distributions in respect of the New Common Stock).

## D.  Certain United States Federal Income Tax Consequences to Non-U.S. Holders of Certain Allowed Claims

### 1.  U.S. Federal Income Tax Consequences to Non-U.S. Holders of Allowed Claims

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Plan to Non-U.S.

69

Holders.  The discussion does not include any non-U.S. tax considerations.  The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, and local and the non-U.S. tax consequences of the consummation of the Plan to such Non-U.S. Holder and the ownership and disposition of the New Common Stock and the New Preferred Stock, as applicable.

### (c)      Gain Recognition

Any gain realized by a Non-U.S. Holder on the exchange of its claim generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder (except that the Medicare tax would generally not apply).  In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates).  In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### (d)      Accrued but Unpaid Interest

Payments made to a Non-U.S. Holder under the Plan that are attributable to accrued but unpaid interest generally will not be subject to U.S. federal income or withholding tax, provided that (i) such Non-U.S. Holder is not a bank, (ii) such Non-U.S. Holder does not actually or constructively own 10 percent or more of the total combined voting power of all classes of the stock of the Debtors and (iii) the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but unpaid interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to accrued but unpaid interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to accrued but unpaid interest.  For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

KE 63679933

PHIL1 8521314v.1

2.      **U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of New Common Stock and New Preferred Stock**

(c)      **Dividends on New Common Stock and New Preferred Stock**

Any distributions made with respect to New Common Stock or New Preferred Stock (other than certain distributions of stock of Reorganized Acosta) will constitute dividends for U.S. federal income tax purposes to the extent of Reorganized Acosta's current or accumulated earnings and profits as determined under U.S. federal income tax principles (and thereafter first as a return of capital which reduces basis and then, generally, capital gain). Except as described below, dividends paid with respect to New Common Stock or New Preferred Stock held by a Non-U.S. Holder that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or if an income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30 percent (or lower treaty rate or exemption from tax, if applicable). A Non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN (or a successor form) upon which the Non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to New Common Stock or New Preferred Stock held by a Non-U.S. Holder that are effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

(d)      **Potential Constructive Distributions with Respect to New Preferred Stock**

As discussed above, holders of New Preferred Stock may be treated as receiving deemed distributions under a variety of circumstances. To the extent that any such constructive distributions are deemed to occur, they will constitute dividends for U.S. federal income tax purposes to the extent of Reorganized Acosta's current or accumulated earnings and profits as determined under U.S. federal income tax principles (and thereafter first as a return of capital which reduces basis and then, generally, capital gain), and thus subject to the same withholding and information reporting regimes described above with respect to distributions on the New Common Stock.

Under Treasury Regulations issued pursuant to section 871(m) of the Tax Code, withholding at a rate of 30 percent (subject to certain treaty considerations) would apply to certain "dividend equivalent" payments made or deemed made to Non-U.S. Holders in respect of financial instruments that reference U.S. stocks. The Treasury Regulations promulgated under section 871(m) do not apply to a payment to the extent that the payment is already treated as a deemed dividend under the rules described above, and therefore generally would not apply in respect of adjustments to the conversion rate of the New Preferred Stock. However, because the section 871(m) rules are complex, it is possible that they will apply in certain circumstances in which the deemed dividend rules described above do not apply, in which case the section 871(m) rules might require withholding at a different time or amount than the deemed dividend. Importantly, in Notice 2018-72, the IRS extended certain transition relief that makes section 871(m) of the Tax Code inapplicable to instruments that are not so-called "delta one" instruments. The Debtors will make a determination regarding the applicability of section 871(m) of the Tax Code to the New Preferred Stock prior to the Effective Date.

(e)      **Conversion of New Preferred Stock to New Common Stock**

The characterization of the conversion of New Preferred Stock to New Common for a Non-U.S. Holder will generally be the same as for a U.S. Holder, as described above, and any dividend income that a Non-U.S. Holder realizes as a result of the conversion of New Preferred Stock to New Common Stock will be subject to the same withholding and information reporting regimes described above with respect to distributions on the New Common Stock.

KE 63679933
PHIL1 8521314v.1

(f)        Sale, Redemption, or Repurchase of New Common Stock or New Preferred Stock

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of New Common Stock or New Preferred Stock unless:

i.        such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States;

ii.        such gain is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States); or

iii.        Reorganized Acosta is or has been during a specified testing period a "U.S. real property holding corporation" for U.S. federal income tax purposes.

If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New Common Stock or New Preferred Stock.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).  The Debtors consider it unlikely, based on Acosta, Inc.'s current business plans and operations, that Acosta, Inc. is, or that Reorganized Acosta will become in the future, a "U.S. real property holding corporation."

3.        FATCA

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30% on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules were previously scheduled to take effect on January 1, 2019, that would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends. However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future. Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

**BOTH U.S. HOLDERS AND NON-U.S. HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE POSSIBLE IMPACT OF THESE RULES ON SUCH HOLDERS' EXCHANGE OF ANY OF ITS CLAIMS PURSUANT TO THE PLAN AND ON ITS OWNERSHIP OF NEW COMMON STOCK OR NEW PREFERRED STOCK.**

E.        **Information Reporting and Backup Withholding**

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends.  The Debtors will comply with all applicable reporting requirements of the Tax Code.  In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan.  Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless, in the case of a U.S. Holder, such U.S.

72

Holder provides a properly executed IRS Form W-9 and, in the case of Non-U.S. Holder, such Non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption).  The current backup withholding rate is 24 percent.  Backup withholding is not an additional tax but is, instead, an advance payment that may entitle the Holder to a refund from the IRS to the extent it results in an overpayment of tax, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM UNDER THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, NON-US, OR OTHER TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

KE 63679933

PHIL1 8521314v.1

## XI.    Recommendation of the Debtors

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to Holders of Allowed Claims and Interests than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  In addition, any alternative other than Confirmation could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than proposed under the Plan.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote to accept or reject the Plan support Confirmation and vote to accept the Plan.

Anna Holdings, Inc.,
on behalf of itself and each of the other Debtors

By: */s/ Matthew Laurie*

Name: Matthew Laurie
Title:  Interim Chief Financial Officer

Prepared By:

Edward O. Sassower, P.C.
Joshua A. Sussberg, P.C.
Christopher T. Greco, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

-and-

Spencer A. Winters
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar 4165)
Sally E. Veghte (DE Bar 4762)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

Dated:  November 23, 2019

74

**<u>Exhibit A</u>**

**Plan of Reorganization**

**Exhibit B**

**Corporate Structure of the Debtors**

KE 63679933

PHIL1 8521314v.1

**<u>Exhibit C</u>**

**Restructuring Support Agreement**

**Exhibit D**

**Financial Projections**

**<u>Exhibit E</u>**

**Valuation Analysis**

**Exhibit F**

**Liquidation Analysis**