**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| ANNA HOLDINGS, INC., *et al.*,[1] | Case No. 19-12551 (___) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY**
**OF INTERIM AND FINAL ORDERS (A) AUTHORIZING**
**THE DEBTORS TO (I) OBTAIN POSTPETITION FINANCING**
**AND (II) UTILIZE CASH COLLATERAL, (B) GRANTING LIENS AND**
**SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (C) GRANTING**
**ADEQUATE PROTECTION, (D) MODIFYING THE AUTOMATIC STAY,**
**(E) SCHEDULING A FINAL HEARING, AND (F) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully submit this motion for the relief set forth herein.[2]  In support of this motion, the Debtors respectfully submit:  (a) the First Day Declaration and (b) the *Declaration of Paul Sheaffer in Support of the Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Obtain Postpetition Financing and (II) Utilize Cash Collateral, (B) Granting Liens and Superpriority Administrative Expense Claims, (C) Granting Adequate Protection, (D) Modifying the Automatic Stay, (E) Scheduling a Final Hearing, and (F) Granting Related*

---

[1]    Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been requested, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.primeclerk.com/Acosta.  The location of the Debtors' service address is:  6600 Corporate Center Parkway, Jacksonville, Florida 32216.

[2]    The facts and circumstances supporting this motion are set forth in the *Declaration of Matthew Laurie, Interim Chief Financial Officer of the Debtors, in Support of Debtors' Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with this motion and incorporated by reference herein.

*Relief* (the "Sheaffer Declaration"), filed contemporaneously herewith.[3]  In further support of this motion, the Debtors respectfully state the following:

### Introduction

1.      The Debtors' proposed $150 million debtor-in-possession financing facility (the "DIP Facility") will refinance approximately $118 million in outstanding obligations under their prepetition accounts receivables facility (the "Prepetition A/R Facility") and provide additional incremental cash to fund the chapter 11 cases (the "Cases") and working capital needs. The DIP Facility is fully backstopped by the Backstop Group (as defined below) and open to all Prepetition First Lien Lenders.  The Prepetition A/R Facility, which is provided by a third-party financial institution that is not a DIP Lender (as defined below), is a critical source of day-to-day liquidity for the Debtors.  Absent being refinanced by the DIP Facility, the Prepetition A/R Facility would be in default as a result of the chapter 11 filing, shutting off the Debtors' access to the cash proceeds of their accounts receivable.  Access to the proposed DIP Facility will send a clear signal to the market that the Debtors' operations can and will continue on a business-as-usual basis.

2.      The DIP Facility was the result of extensive prepetition negotiations between the Debtors and the DIP Lenders, which consist of an ad hoc group of prepetition term lenders and bondholders (the "Backstop Group") and an ad hoc group of minority Prepetition First Lien Lenders (the "Minority First Lien Group") that are party to the Debtors' restructuring support agreement (the "Restructuring Support Agreement").  No third-party came forward with any proposal for a priming facility to meet the Debtors' liquidity needs and support consummation of a consensual prepackaged plan.  The DIP Facility, together with the Restructuring Support

---

[3]     Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the First Day Declaration, the Sheaffer Declaration, this motion, the DIP Credit Agreement, or in the Interim Order (as defined below), as applicable.

Agreement and the Debtors' proposed chapter 11 plan of reorganization (the "Plan"), provides the Debtors with a path to an expeditious and adequately-capitalized exit from chapter 11, which will best preserve the value of the Debtors' business and operations.

3.     The DIP Facility will provide the Debtors with sufficient liquidity to fund the Debtors' business operations and administrative expenses during the Cases.  If approved, the Debtors will use the proceeds of the DIP Facility to, among other things, refinance the Prepetition A/R Facility, honor employee wages and benefits, procure necessary goods and services, and fund general and corporate operating needs as well as the administration of the Cases, in each case in accordance with a budget agreed to by the Debtors and the DIP Lenders attached hereto as **Schedule 1** to **Exhibit A** (the "Approved Budget").

4.     The Debtors and their estates would suffer immediate and irreparable harm if the Debtors were denied the financing needed to sustain on-going business operations during the critical first weeks of these cases.  Failure to obtain the financing would preclude access to the Debtors' accounts receivable, their principal source of operating liquidity.  The DIP Facility ensures that the Debtors (a) have sufficient funding to consummate the Plan contemplated by the Restructuring Support Agreement and (b) can continue to operate uninterrupted in the Cases. Further, as set forth in the Sheaffer Declaration, the terms of the DIP Facility are reasonable under the circumstances and were the product of good faith, arm's length negotiations.  *See* Sheaffer Decl. ¶ 27.

5.     Thus, for the reasons set forth herein, in the Sheaffer Declaration, and in the First Day Declaration, the Debtors believe that approval of the DIP Facility will maximize the value of the Debtors' estates for the benefit of the Debtors' stakeholders and is an exercise of the Debtors' sound business judgment.  Accordingly, the Debtors respectfully request that the Court approve

3

the relief requested herein and enter an interim order substantially in the form attached hereto as **Exhibit A** (the "Interim Order") and a final order (the "Final Order," and together with the Interim Order, the "DIP Orders").

**Jurisdiction and Venue**

6.    The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and rule 9013-1(f) of the Local Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

7.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

8.    The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Local Rules 2002-1(b), 4001-2, and 9013-1(m).

**Background**

9.    The Debtors (together with their non-Debtor affiliates, the "Company") comprise a multinational enterprise that provides a range of sales, marketing, and retail services to global consumer product good manufacturers, technology companies, and retailers.  The Company is headquartered in Jacksonville, Florida, but its operations are extensive and span across the United States, Canada, and Europe.

10.     On the date hereof (the "<u>Petition Date</u>"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.   Concurrently with the filing of this motion, the Debtors filed a motion requesting procedural consolidation and joint administration of the Cases pursuant to Bankruptcy Rule 1015(b).

## **Relief Requested**

11.     The Debtors request that the Court:

a.     authorize the Debtors to obtain senior secured postpetition financing on a superpriority basis in the form of a single-draw term loan credit facility in the aggregate principal amount of $150,000,000 in the form of the DIP Facility, pursuant to the terms and conditions of that certain *Superpriority Secured Debtor-in-Possession Credit Agreement* (as the same may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "<u>DIP Credit Agreement</u>"), by and among Acosta, Inc., as borrower, (the "<u>DIP Borrower</u>"), the Guarantors party thereto, Ankura Trust Company, LLC, as administrative agent  and collateral agent (in such capacities, the "<u>DIP Agent</u>"), and the Lenders party thereto  (the "<u>DIP Lenders</u>"), substantially in the form attached hereto as **Exhibit B**;

b.     authorize the Debtors to execute and deliver the DIP Credit Agreement, and any other agreements, instruments, pledge agreements, guarantees, control agreements, and other documents related thereto (as each of the foregoing may be amended, restated, supplemented, waived, and/or modified from time to time in accordance with the terms hereof and thereof, and collectively with the DIP Orders, the "<u>DIP Loan Documents</u>") and to perform their respective obligations thereunder and all such other and further acts as may be necessary, appropriate, or desirable in connection with the DIP Loan Documents;

c.     grant the DIP Agent, for the benefit of itself and the other DIP Secured Parties, allowed superpriority administrative expense claim status in each of the Cases, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "<u>Successor Cases</u>"), in respect of the DIP Facility and all obligations owing thereunder and under, or secured by, the DIP Loan Documents to the DIP Agent and the DIP Lenders (collectively, and including all obligations as described in the DIP Credit Agreement, the "<u>DIP Obligations</u>");

d.      grant to the DIP Agent, for the benefit of itself and the other DIP Secured Parties under the applicable DIP Loan Documents valid, enforceable, nonavoidable, automatically and fully perfected first priority priming security interests in and liens on all of the DIP Collateral (as defined herein), including all property constituting "cash collateral" as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral"), which liens shall be subject to the priorities set forth in the Interim Order;

e.      authorize the Debtors to pay the principal, interest, fees, expenses, and other amounts payable, whether or not such amounts arose before or after the Petition Date, under the DIP Loan Documents as such become earned, due and payable, including letter of credit fees (including issuance and other related charges), continuing commitment fees, closing fees, audit fees, appraisal fees, valuation fees, liquidator fees, structuring fees, administrative agent's fees, and the reasonable fees and disbursements of the DIP Agents' and DIP Lenders' attorneys, advisors, accountants, and other consultants, all to the extent provided in, and in accordance with, the DIP Loan Documents;

f.      authorize the Debtors to use the Prepetition First Lien Collateral, including the Cash Collateral of the Prepetition First Lien Secured Parties under the Prepetition First Lien Credit Agreement, and providing adequate protection to the DIP Lenders and Prepetition First Lien Secured Parties for any diminution in value of their respective interests in Prepetition First Lien Collateral, including the Cash Collateral, resulting from the imposition of the automatic stay, the Debtors' use, sale, or lease of Prepetition First Lien Collateral, including Cash Collateral and/or the priming of their respective interests in Prepetition First Lien Collateral, including the Cash Collateral (including by the Carve Out (as defined in the Interim Order));

g.      vacate and modify the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and the Interim Order;

h.      schedule a final hearing (the "Final Hearing") with regard to the relief requested herein and approving the form of notice with respect to the Final Hearing approximately thirty days from the Petition Date; and

i.      grant related relief.

## Concise Statement Pursuant to Bankruptcy Rule 4001(b) and Local Rule 4001-2

### I.    Concise Statement Regarding the DIP Facility.

12.    The below chart contains a summary of the material terms of the proposed DIP Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2.[4]

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Borrower** Bankruptcy Rule 4001(c)(1)(B) | Acosta, Inc. ("Acosta")<br><br>*See* DIP Credit Agreement, Recitals |
| **Guarantors** Bankruptcy Rule 4001(c)(1)(B) | Anna Acquisition Company, Inc. and all direct and indirect subsidiaries of the DIP Borrower that are Debtors.<br><br>*See* DIP Credit Agreement, Schedule 1. |
| **DIP Agent** Bankruptcy Rule 4001(c)(1)(B) | Ankura Trust Company, LLC<br><br>*See* DIP Credit Agreement, Recitals |
| **DIP Lenders** Bankruptcy Rule 4001(c)(1)(B) | (i) Elliott Associates, L.P., Manningtree Investments Limited, Oaktree Opportunities Fund X Holdings (Delaware), L.P., Oaktree Opportunities Fund Xb Holdings (Delaware), L.P., Oaktree Opps Xb Holdco Ltd., Oaktree Value Opportunities Fund Holdings, L.P., Midtown Acquisitions L.P., Database Coinvest, LP, (ii) any of the other Prepetition First Lien Lenders who choose to participate, and/or (iii) any subsidiaries or affiliates or any funds and/or accounts managed, advised or controlled by any of the foregoing.<br><br>*See* DIP Credit Agreement, Recitals |
| **Reporting Information** Bankruptcy Rule 4001(c)(1)(B) | The DIP Facility includes standard and customary covenants that require the DIP Borrower to provide periodic reports to the DIP Lenders regarding the Approved Budget, the status of the Cases, and certain other matters.  The failure of the DIP Borrower to comply with such reporting obligations will cause an Event of Default (subject to any applicable cure periods, if any) that may permit the DIP Agent, on behalf of the DIP Lenders, to exercise remedies against the DIP Borrower, including accelerating the Initial DIP Loan and other obligations pursuant to the DIP Facility.<br><br>*See* DIP Credit Agreement, Article VI |
| **Term** Bankruptcy Rule | The earliest to occur of (a) the date that is six (6) months after the Petition Date ("Stated Maturity Date"), (b) sixty (60) calendar days after the Petition Date (or such later date as agreed to by the DIP Lenders), unless the Final Order has been entered by the Court, |

---

[4]    The summaries contained in this motion are qualified in their entirety by the provisions of the documents referenced.  To the extent anything in this motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in the following summary chart but not otherwise defined have the meanings ascribed to them in the DIP Loan Documents or the Interim Order, as applicable.

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| 4001(b)(l)(B)(iii), 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | (c) the effective date of any chapter 11 plan for the reorganization of the DIP Borrower or any other Debtor (the "Effective Date"), (d) the consummation of a sale or other disposition of all or substantially all assets of the Debtors or equity interests of the DIP Borrower under section 363 of the Bankruptcy Code, (e) the date of termination of the Restructuring Support Agreement, and (f) the date of acceleration of the DIP Loans or termination of the DIP commitments in accordance with the terms of the DIP Loan Documents, including as a result of an Event of Default (such earliest date, the "Maturity Date").<br><br>*See* DIP Credit Agreement § 1.01; Interim Order ¶ 17(a) |
| **Commitment**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | Subject to the terms and conditions set forth in the DIP Credit Agreement and in the DIP Orders, each DIP Lender agrees, severally and not jointly, to make a single term loan denominated in Dollars (the "Initial DIP Loan") to the DIP Borrower on the Closing Date in an amount not to exceed such DIP Lender's Initial Commitment. Once funded, the Initial DIP Loan shall be a "Loan" for all purposes under the DIP Credit Agreement and the other DIP Loan Documents. The Initial DIP Loan shall be made simultaneously by the DIP Lenders in accordance with their respective DIP Commitments (as defined below). Amounts borrowed under Section 2.01 of the DIP Credit Agreement and subsequently repaid or prepaid may not be reborrowed. Loans may be Base Rate Loans or Eurocurrency Rate Loans as further provided herein.<br><br>The aggregate amount of the DIP Lenders' Initial Commitments on the Closing Date is $150,000,000 (the "DIP Commitments").<br><br>*See* DIP Credit Agreement § 2.01, Schedule 2.01 |
| **Conditions of Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | *Conditions to Closing.* The DIP Loan Documents include conditions to closing that are customary and appropriate for similar debtor-in-possession financings of this type.<br><br>*See* DIP Credit Agreement § 4.01 |
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | DIP Loans shall bear interest at the sum of one-month LIBOR Rate (subject to a 1.50% floor) *plus* 9.50%.<br><br>Default Rate: 2.00% per annum in excess of the otherwise applicable rate.<br><br>*See* DIP Credit Agreement § 2.07 |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Use of DIP Facility and Cash Collateral**<br>**Bankruptcy Rule** 4001(b)(l)(B)(ii)<br><br>Local Rule 4001-2(a)(ii) | All Cash Collateral, all proceeds of the Prepetition First Lien Collateral and the DIP Collateral, including proceeds realized from a sale or disposition thereof, or from payment thereon, and all proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses payable under the Interim Order or the Final Order) shall be used and/or applied by the Debtors, in accordance with the Interim Order and the other DIP Loan Documents:  (a) for payment of costs, fees, expenses and other amounts related to the Cases; (b) to make adequate protection payments; (c) to pay fees, interest, payments, and expenses associated with the DIP Facility, including fees, costs and expenses of the DIP Agent and/or the DIP Lenders (including, without limitation, the reasonable fees and expenses of their legal counsel and financial and other advisors and consultants as provided herein); (d) to fund working capital needs, capital improvements and other general corporate purposes of the Debtors during the Cases, in each case, in accordance with the Approved Budget (subject to the Budget Variance); and (e) to repay the Prepetition A/R Facility (as defined below) in full.<br><br>The Debtors may also, in accordance with the Interim Order and the other DIP Loan Documents, use and/or apply Cash Collateral, proceeds of the Prepetition First Lien Collateral and the DIP Collateral, including proceeds realized from a sale or disposition thereof, or from payment thereon, and proceeds of the DIP Facility to cash collateralize outstanding and undrawn Letters of Credit issued under (and as defined in) the Prepetition First Lien Credit Agreement.<br><br>*See* DIP Credit Agreement § 5.07, Interim Order ¶¶ I, 2(a) |
| **Adequate Protection**<br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | *Adequate Protection of Prepetition First Lien Secured Parties.*  As adequate protection for the interests of the Prepetition First Lien Secured Parties in the Prepetition First Lien Collateral (including Cash Collateral), the Prepetition First Lien Agent, for the benefit of itself and the other Prepetition First Lien Secured Parties, shall, subject to any timely and successful Challenge (as defined below) that results in the avoidance of any of the Prepetition First Liens pursuant to an order of the Court that is final and not subject to further appeal, from and after the Petition Date, receive adequate protection as follows:<br><br>    *Adequate Protection Liens.*  To the extent of, and in an amount equal to the aggregate diminution in value of the Prepetition First Lien Secured Parties' interests in the Prepetition First Lien Collateral (including the Cash Collateral), from and after the Petition Date, for any reason provided for under the Bankruptcy Code, including, without limitation, any such decrease resulting from the use, sale or lease by the Debtors of the Prepetition First Lien Collateral (including the use of Cash Collateral), the granting of the DIP Liens, the subordination of the Prepetition First Liens to the DIP Liens and to the Carve-Out, and the imposition or enforcement of the automatic stay pursuant to section 362(a) of the Bankruptcy Code (collectively, "<u>Diminution in Value</u>"), the Prepetition First Lien Agent, for the benefit of itself and the other Prepetition First Lien Secured Parties, is hereby granted, pursuant to sections 361, 362, 363(e) and 364(d) of the Bankruptcy Code, valid, perfected replacement security interests in and liens upon (the "<u>Adequate Protection Liens</u>") all of the DIP Collateral, including, without limitation, the Unencumbered Property.  The Adequate Protection Liens of the Prepetition First Lien Secured Parties shall be junior and subject only to the DIP Liens, any Senior Third Party Liens, and the Carve-Out.<br><br>    *Prepetition Adequate Protection Superpriority Claims.* To the extent of the aggregate Diminution in Value, the Prepetition First Lien Secured Parties are hereby granted allowed superpriority administrative expense claims (the "<u>Adequate Protection Superpriority Claims</u>") as provided for in section 507(b) of |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | the Bankruptcy Code, immediately junior and subject only to the DIP Superpriority Claims and the Carve-Out, and payable from and having recourse to all of the DIP Collateral; *provided* that the Prepetition First Lien Secured Parties shall not receive or retain any payments, property, distribution or other amounts in respect of the Adequate Protection Superpriority Claims unless and until the DIP Obligations and (without duplication) the DIP Superpriority Claims have indefeasibly been paid in full in cash. |
| | *Adequate Protection Payments, etc.* Without duplication of amounts required to be paid pursuant to paragraph 20(b) of the Interim Order, the Debtors shall pay in cash all reasonable and documented prepetition and postpetition out-of-pocket professional and advisory fees, costs and expenses of the Prepetition First Lien Secured Parties incurred in connection with the negotiation, documentation, administration and monitoring of the Prepetition First Lien Documents and/or the DIP Facility and in connection with the Cases (including, without limitation, the reasonable documented fees and expenses of legal, financial and other advisory, tax, investment banking and other professionals (including, without limitation, Davis Polk & Wardell LLP, White & Case LLP, Sullivan & Cromwell LLP, Freshfields Bruckhaus Deringer LLP,  Chilmark Partners, Centerview Partners LLC, Arnold & Porter Kaye Scholer LLP, FTI Consulting, Inc., and any local counsel retained by any of the Prepetition First Lien Secured Parties (collectively, the "<u>Prepetition Lender Professionals</u>")) as follows: (x) on the Closing Date, immediate cash payment of all accrued and unpaid fees and disbursements owing to the Prepetition First Lien Secured Parties (including, without limitation, with respect to the Prepetition Lender Professionals), incurred prior to the Petition Date, and (y) thereafter, within five (5) Business Days of the presentment of any invoices, subject to the notice and documentation provisions set forth in paragraph 20(b) of the Interim Order. |
| | *See* Interim Order ¶¶ 4(a)-(c) |
| **Budget** Bankruptcy Rule 4001 (c)(1)(B) Local Rule 4001-2(a)(ii) **Variance Covenant** Bankruptcy Rule 4001(c)(l)(B) Local Rule 4001-2(a)(ii) | The DIP Borrower shall deliver to the DIP Agent for further distribution to each DIP Lender no later than 11:59 p.m. (New York City time) on the Wednesday of every week (commencing with the first Wednesday following the Closing Date) or, to the extent such Wednesday is not a Business Day, the next Business Day thereafter, a Budget Variance Report.  Each such report shall be certified by a Responsible Officer of the Borrower as being prepared in good faith and fairly presenting in all material respects the information set forth therein.  At the request of the Administrative Agent or the Required Lenders, the Borrower shall make its chief financial officer, its financial advisor or both available via teleconference to provide a reasonably detailed explanation to the Administrative Agent and the Lenders of any material variance. *See* DIP Credit Agreement § 6.01(e) The DIP Borrower shall deliver to the DIP Agent for further distribution to each DIP Lender no later than 11:59 p.m. (New York City time) on the Wednesday following the last Business Day of each fiscal month of the Borrower (commencing with the fiscal month of the Borrower in which the Closing Date occurs) or, to the extent such Wednesday is not a Business Day, the next Business Day thereafter, an updated DIP Budget.  Any such updated DIP Budget must be reasonably acceptable to the Required Lenders and, to the extent any such updated DIP Budget is reasonably acceptable to the Required Lenders within five (5) Business Days after delivery thereof, the line item amounts set forth therein shall only be used to calculate the projected line items commencing with the week in which such updated DIP Budget was presented to the |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | Required Lenders and for subsequent weeks set forth therein, and any prior periods tested shall be calculated using the projected line items set forth in the applicable previously Approved Budget. Upon delivery on the Closing Date, in the case of the Initial DIP Budget, and upon such approval by the Required Lenders pursuant to Section 6.01(e) of the DIP Credit Agreement, such DIP Budget shall constitute, together with the Initial DIP Budget, the "<u>Approved Budget</u>."<br><br>*See* DIP Credit Agreement § 6.01(f)<br><br>Beginning with the last Business Day of the second full week following the Petition Date, as of the last Business Day of each week, the Borrower shall not, in each case for the cumulative period from the Petition Date to the last Business Day of each week, (i) permit the unfavorable Budget Variance with respect to aggregate receipts of the Debtors to exceed (x) with respect to the first three full weeks following the Petition Date, 15%, and (y) thereafter, 10% and (ii) permit the unfavorable Budget Variance with respect to aggregate operating disbursements of the Debtors (excluding disbursements with respect to professional fees and expenses for the Debtors and adequate protection payments in accordance with the Orders) to exceed 10%.<br><br>*See* DIP Credit Agreement § 7.09<br><br>The Borrower shall not permit Domestic Unrestricted Liquidity to be less than (i) during the period from the Petition Date through and including the eight week anniversary of the Petition Date, $50,000,000 and (ii) thereafter, $25,000,000, in each case, measured as of the closing weekly balance.<br><br>*See* DIP Credit Agreement § 7.10 |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-2(a)(ii) | Usual and customary for financings of this type, including failure to obtain entry of the Interim Order.<br><br>*See* DIP Credit Agreement § 8.01 |
| **Indemnification**<br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The DIP Loan Documents and Interim Order contain indemnification provisions ordinary and customary for DIP financings of this type by the DIP Borrower and each Guarantor in favor of the DIP Agent, each of the DIP Lenders, and each of their respective affiliates and the respective officers, directors, employees, agents, advisors, attorneys and representatives of each of them subject to customary carve-outs.<br><br>*See* DIP Credit Agreement § 10.05; Interim Order ¶ F(ii) |
| **Entities with Interests in Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(i) | As of the Petition Date, the following secured parties have an interest in Cash Collateral (subject to the priorities set forth in the DIP Orders):<br><br>• DIP Secured Parties<br><br>• Prepetition First Lien Secured Parties<br><br>*See* DIP Credit Agreement § 1.01; Interim Order ¶ (vi) |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Carve-Out**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(i)(F) | The Interim Order provides a "Carve-Out" of certain statutory fees, allowed professional fees of the Debtors, and any official committee of unsecured creditors appointed under section 1102 of the Bankruptcy Code appointed in the Cases pursuant to section 1103 of the Bankruptcy Code, including a Post-Carve Out Trigger Notice Cap, all as detailed in the Interim Order.<br><br>*See* Interim Order ¶ 10 |
| **Fees**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | The DIP Borrower agrees to pay to each DIP Lender with a DIP Commitment on the Closing Date a nonrefundable fee in an amount equal to 3.00% of all DIP Commitments of such Lender on the Closing Date, which fee shall be earned on the Closing Date and shall be payable in cash on the Closing Date, it being understood that such fee may be deducted from the proceeds of the Initial Loan on the Closing Date.<br><br>In the event all or any portion of the DIP Loans of a DIP Lender are repaid, prepaid, refinanced or replaced at any time (whether voluntary or mandatory, including as a result of acceleration or at the Maturity Date) or any DIP Commitment of a DIP Lender is terminated or reduced (except pursuant to Section 2.05 of the DIP Credit Agreement, by the aggregate principal amount of the Initial Loan made by such DIP Lender pursuant to Section 2.01 of the DIP Credit Agreement), such repayment, prepayment, refinancing, replacement, termination or reduction will be made together with a yield enhancement payment to such DIP Lender in an amount equal to 4.50% of the aggregate principal amount of DIP Loans or DIP Commitments of such DIP Lender so repaid, prepaid, refinanced, replaced, terminated or reduced; *provided*, that the DIP Yield Enhancement Payment shall be automatically waived in the event, and upon the occurrence of, of the earlier of (i) the effective date of an Acceptable Plan and (ii) the Stated Maturity Date.<br><br>*See* DIP Credit Agreement § 2.08 |
| **506(c) Waiver**<br>Bankruptcy Rule 4001(c)(l)(B)(x)<br><br>Local Rule 4001-2(a)(i)(C)<br><br><br>**Section 552(b)**<br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-2(a)(i)(H) | *Section 506(c) Claims.*  Subject to the entry of the Final Order, as a further condition of the DIP Facility, any obligation of the DIP Secured Parties to make DIP Loans, and the Debtors' authorization to use the Cash Collateral, the Debtors (and any successors thereto or any representatives thereof, including any trustees appointed in the Cases or any Successor Case) shall be deemed to have waived any rights, benefits or causes of action under section 506(c) of the Bankruptcy Code as they may relate to or be asserted against the DIP Secured Parties, the DIP Liens, the DIP Collateral, the Prepetition First Lien Secured Parties, the Adequate Protection Liens, the Prepetition First Liens or the Prepetition First Lien Collateral.  Except for the Carve-Out, nothing contained in the Interim Order, in the Final Order or in the other DIP Loan Documents shall be deemed a consent by the Prepetition First Lien Secured Parties or the DIP Secured Parties to any charge, lien, assessment or claim against, or in respect of, the DIP Collateral or the Prepetition First Lien Collateral under section 506(c) of the Bankruptcy Code or otherwise.<br><br>*Section 552(b).*  Subject to the entry of the Final Order, the DIP Secured Parties and the Prepetition First Lien Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Secured Parties or the Prepetition First Lien Secured Parties with respect to proceeds, product, offspring, or profits of any DIP Collateral, including Prepetition First Lien Collateral<br><br>*See* Interim Order ¶¶ 20(c), (g) |
| **Liens on Avoidance Actions** | The DIP Collateral shall not include causes of action for preferences, fraudulent conveyances, and other avoidance power claims under sections 502(d), 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code or any avoidance actions or applicable |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| Local Rule 4001-2(a)(i)(D) | non-bankruptcy law (collectively, the "Avoidance Actions"), but shall, upon entry of the Final DIP Order, include the proceeds of Avoidance Actions.<br><br>*See* Interim Order ¶ 2(d) |
| **Stipulations to Prepetition Liens and Claims**<br>Bankruptcy Rule 4001(c)(1)(B)(iii)<br><br>Local Rule 4001-2(a)(i)(B) | After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties-in-interest, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree immediately upon entry of the Interim Order, to certain stipulations regarding the validity and extent of the Prepetition First Lien Lenders' claims and liens.<br><br>*See* Interim Order § F |
| **Liens and Priorities**<br><br>Bankruptcy Rule 4001(c)(1)(B)(i)<br><br>Local Rule 4001-2(a)(i)(D) and (G), 4001-2(a)(4) | As security for the DIP Obligations, effective immediately and automatically and properly perfected upon the date of the Interim Order and without the necessity of the execution, recordation or filing by the DIP Loan Parties of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, any notation of certificates of title for a titled good or the possession or control by the DIP Agent of, or over, any DIP Collateral, valid, binding, continuing, enforceable, and non-avoidable security interests and liens are granted by the Interim DIP Order (with priority as set forth on Exhibit A to the Interim Order) to the DIP Agent for the benefit of itself and the other DIP Secured Parties.<br><br>*See* Interim Order ¶¶ 2(d)-(e), 8 |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | The DIP Borrower shall comply with the following milestones in connection with the Cases:<br><br>• on the Petition Date, filing of (i) the Acceptable Plan; (ii) the Acceptable Disclosure Statement; and (iii) the motion, in form and substance acceptable to the Required DIP Lenders, seeking entry of the Interim Order, including approval of the DIP Credit Agreement and the other DIP Loan Documents.<br><br>• no later than five (5) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Interim Order;<br><br>• no later than sixty (60) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final Order;<br><br>• no later than seventy-five (75) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Acceptable Confirmation Order and an order approving the Acceptable Disclosure Statement; and<br><br>• no later than ninety (90) calendar days after the Petition Date, the Effective Date shall have occurred;<br><br>*provided* that if any milestone in the Restructuring Support Agreement that is also a milestone under the DIP Credit Agreement is extended pursuant to the terms of the Restructuring Support Agreement, the corresponding milestone under the DIP Credit Agreement shall be deemed to be extended to the same date.<br><br>The failure to comply with any Milestone shall constitute an Event of Default in accordance with the terms of the DIP Credit Agreement (unless waived or extended with |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | the consent of the Required DIP Lenders or the DIP Agent (with the consent of the Required DIP Lenders)).<br><br>*See* DIP Credit Agreement § 6.17 |
| **Challenge Period**<br><br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-2(a)(i)(B) | *Challenge Period.*  (i) with respect to any party in interest other than the Committee,  the earlier of (x) seventy-five (75) calendar days after entry of the Final Order and (y) the date on which objections to confirmation of an Acceptable Plan are due (if the Acceptable Plan is confirmed and becomes effective), and (ii) with respect to any Committee, if one has been formed, the earlier of (x) sixty (60) calendar days following the formation of such Committee and (y) the date on which objections to confirmation of an Acceptable Plan are due (if an Acceptable Plan is confirmed and becomes effective) (in each case, or such longer period as the Court orders for cause shown before the expiration of such period).<br><br>*See* Interim Order ¶ 9(a) |
| **Waiver/Modification of the Automatic Stay**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iv) | Any automatic stay otherwise applicable to the DIP Secured Parties, the Prepetition First Lien Agent and the Prepetition First Lien Secured Parties is hereby modified so that, upon and after the occurrence of the Termination Date, the DIP Agent and the Prepetition First Lien Agent shall be, subject to paragraph 17(b), immediately entitled to exercise all of their rights and remedies in respect of the DIP Collateral and the Prepetition First Lien Collateral, in accordance with the Interim DIP Order, the other DIP Loan Documents and/or the Prepetition First Lien Documents, as applicable.<br><br>Notwithstanding the foregoing, immediately following the giving of the Notice of Default, during the Default Notice Period (each as defined below): (i) all DIP Commitments of the DIP Lenders to provide any DIP Loans shall immediately be suspended; and (ii) the DIP Loan Parties shall be permitted to continue to use Cash Collateral and proceeds of DIP Loans solely (x) in the ordinary course of business to pay payroll and other expenses critical to keeping the business of the Debtors operating, in each case in accordance with the Approved Budget and the other DIP Loan Documents and (y) to fund the Carve-Out Reserves.  The Debtors and any Committee shall be entitled to an emergency hearing before this Court, with proper notice to the DIP Agent and DIP Lenders, within five (5) Business Days after the giving of written notice (the "<u>Notice of Default</u>") by the DIP Agent (or, if the DIP Obligations have been indefeasibly paid in full, the Prepetition First Lien Agent) to the Debtors, counsel to the Debtors, counsel for the Committee (if any), and the U.S. Trustee of the occurrence of an Event of Default (such 5-Business Day period, the "<u>Default Notice Period</u>").  The Default Notice Period shall run concurrently with any notice required to be provided under the DIP Loan Documents.  If the Debtors, any Committee or any other party in interest, does not contest the occurrence of the Event of Default within the Default Notice Period, or if there is a timely contest of the occurrence of an Event of Default and the Court after notice and a hearing declines to stay the enforcement thereof, the Termination Date shall be deemed to have occurred for all purposes and the automatic stay, as to the DIP Agent and the Prepetition First Lien Agent, shall automatically terminate in all respects.<br><br>Upon the occurrence of the Termination Date (but subject, only in the case of the occurrence of the Termination Date resulting from an Event of Default, to the provisions of paragraph 17(b) of the Interim Order), the DIP Agent and the Prepetition First Lien Agent are authorized to exercise all remedies and proceed under or pursuant to the applicable DIP Loan Documents and the Prepetition First Lien Documents. |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | *See* Interim Order ¶ 17 |
| | Subject to entry of the Final Order, neither the DIP Secured Parties nor the Prepetition First Lien Secured Parties shall be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or Prepetition First Lien Collateral, as applicable. |
| | *See* Interim Order ¶ 20(e) |
| | Further, subject to entry of the Final Order, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the secured claims of the Prepetition First Lien Secured Parties. |
| | *See* Interim Order ¶¶ K, 20(g) |
| | The Debtors shall waive their right to surcharge pursuant to section 506(c) of the Bankruptcy Code the DIP Collateral and, upon entry of the Final Order, the Prepetition First Lien Collateral. |
| | *See* Interim Order ¶ (ix) |

### The Debtors' Prepetition Capital Structure

13.     As of the Petition Date, the Debtors have approximately $3 billion of funded debt obligations.  The following table depicts the Debtors' prepetition capital structure as of the Petition Date:

| Type of Debt | Description | Maturity | Amount Outstanding |
|---|---|---|---|
| **Prepetition A/R Facility** | $150 million accounts receivable facility with term loan and revolving component, secured by certain Debtors' U.S. accounts receivable | June 2021 | $118.1 million |
| **Revolving Credit Facility** | Revolving credit facility, secured by a first lien on substantially all assets, *pari passu* with Term Loan Facility | June 2021 | $149.2 million[5] |
| **Term Loan Facility** | Secured term loan facility, originally issued in the amount of $2,065.0 million, amortizing 0.25% quarterly, *pari passu* with the Revolving Credit Facility | Sept. 2021 | $1,991.6 million |
| **Senior Notes** | Unsecured notes guaranteed by each of the Company's subsidiaries that is a borrower or guarantor under the First Lien Facility | Oct. 2022 | $841.4 million |

---

[5]     Exclusive of approximately $30.7 million of outstanding letters of credit.

I.    **The Prepetition A/R Facility.**

14.    On May 10, 2019, the Company entered into that certain credit and security agreement (the "Prepetition A/R Facility Agreement"), among Acosta ARC II, LLC ("ARC II"), as borrower, Acosta, Inc., as master servicer, the lenders from time to time party thereto, and Wells Fargo Bank, N.A., as administrative agent.  ARC II is a wholly-owned subsidiary of Acosta ARC Holdings, LLC ("ARC Holdings"), each of which was created as an Unrestricted Subsidiary (as defined in the Prepetition First Lien Credit Agreement) in connection with the Company's entry into the Prepetition A/R Facility.  ARC Holdings is proportionately owned by each of the Originators (as defined below), and such ownership is subject to refinement based on the receivable contributions made to secure the Prepetition A/R Facility.  The Debtors, therefore, maintain the Prepetition A/R Facility through ARC and ARC Holdings, which are bankruptcy remote, non-Debtor special-purpose entities.  Sound Point Capital Management LP (through a lending vehicle) holds 100 percent of the outstanding commitments under the Prepetition A/R Facility.  As of the Petition Date, there is no availability under the Prepetition A/R Facility.

15.    In an effort to provide the Company and its debtholders runway to drive consensus toward a comprehensive restructuring transaction, the Debtors engaged with the Prepetition A/R Facility Lenders to waive certain reporting requirements and events of default (as described below) under the Prepetition A/R Facility through November 8, 2019 and have agreed for this waiver to extend through December 15, 2019 or termination of the Restructuring Support Agreement.

16.    Under the Prepetition A/R Facility Agreement and ancillary agreements related thereto, certain of the Debtors (the "Originators") contribute their U.S. billed and commission accounts receivables (the "Receivables") to ARC II and ARC Holdings, which secure the obligations under the Prepetition A/R Facility, and in exchange, the Originators proportionally own the membership interests in ARC Holdings.  Pursuant to the terms and conditions of the

Prepetition A/R Facility Agreement and ancillary agreements related thereto, each Originator contributes, from time to time, such Originator's Receivables to ARC Holdings, which, in turn, contributes, from time to time, such Receivables to ARC II.  The Receivables are ultimately sent to a lock-box or deposited into a collection account in the name of, and maintained by, ARC II (the "ARC Facility Accounts").  Each Originator or Acosta causes all available outstanding balances in the applicable collection account or lock-box account to be swept daily into the ARC Facility Accounts.

17.    As collateral for the payment in full and performance of its obligations under the Prepetition A/R Facility Agreement, ARC II grants, assigns, and pledges to the Prepetition A/R Facility Agent, for the benefit of the Prepetition A/R Facility Lenders, a continuing security interest in all of its property, including all Receivables, the ARC Facility Accounts and certain other lock-box and collection accounts, the rights of ARC II under the Prepetition A/R Facility Agreement, and all proceeds of the foregoing.

18.    The Prepetition A/R Facility is supported by a borrowing base calculated weekly for billed Receivables and monthly for commission Receivables.  Availability under the Prepetition A/R Facility is determined by advances made by the Originators against such eligible Receivables.  For a period from zero to ten days, as applicable, following the weekly report of the borrowing base calculation, the Debtors are unable to access much-needed cash in an amount up to $30 million under the Prepetition A/R Facility.  Accordingly, in the ordinary course, the Debtors have materially less liquidity due to cash that is locked in the Prepetition A/R Facility.

19.    Importantly, the filing of a voluntary chapter 11 petition by any Originator causes a termination event under the Prepetition A/R Facility, which would enable the Prepetition A/R Facility Agent to assert control over the ARC Facility Accounts and related lock-box, collections,

and depository accounts.  All subsequent collections of Receivables under the Prepetition A/R Facility would therefore be allocated to satisfy then-outstanding and subsequently accrued obligations thereunder.  The Prepetition A/R Facility Agent's right to assert such control would eliminate the Debtors' access to Receivables and would have a material, negative impact on liquidity.  Faced with the prospect of further-dwindling liquidity and increased creditor demands, the Debtors and their advisors determined that it would therefore be necessary to refinance the Prepetition A/R Facility.

20.    Accordingly, the refinancing of the Prepetition A/R Facility under the proposed DIP Facility will:  (a) grant the Debtors access to additional incremental liquidity, including cash proceeds from the Receivables; (b) further enhance the Debtors' go-forward liquidity position by removing the negative impact on liquidity imposed by the weekly noticing requirements related to the Prepetition A/R Facility borrowing base calculation; (c) avoid the associated risks of a termination event under the Prepetition A/R Facility; (d) avoid potentially having to provide the Prepetition A/R Facility Lenders with a comprehensive and onerous adequate protection package; and (e) provide additional collateral for the DIP Facility as Receivables will no longer be contributed to the non-Debtor bankruptcy remote vehicles.

## II.    The First Lien Credit Facility.

21.    On September 26, 2014, in connection with the 2014 Acquisition, the Debtors entered into that certain credit agreement (as amended, restated, or otherwise modified from time to time, the "Prepetition First Lien Credit Agreement") by and among Acosta, Inc. as borrower, Anna Acquisition Company, Inc., certain subsidiaries of Acosta, Inc., the lenders party thereto, and JPMorgan Chase Bank, N.A. ("JPM") as administrative agent and collateral agent.[6]  The

---

[6]    At the time of the 2014 Acquisition, the Prepetition First Lien Credit Agreement was entered into by Anna Merger Sub, Inc. as Initial Borrower and Acosta Holdco, Inc. as Surviving Borrower.  On the date of the 2014 Acquisition,

Prepetition First Lien Credit Agreement governs both a senior secured term loan facility (the "Term Loan Facility") and a multicurrency revolving credit facility (the "Revolving Credit Facility", and together with the Term Loan Facility, the "Prepetition First Lien Facility").  The Term Loan Facility and the Revolving Credit Facility are *pari passu*, and are guaranteed by each of the Debtors.  The Prepetition First Lien Credit Agreement was amended twice, most recently on January 29, 2019 (the "2019 Amendment").

### A.    The Revolving Credit Facility.

22.    At the time of the 2014 Acquisition, the Revolving Credit Facility was issued in the amount of $225 million.  The Revolving Credit Facility was set to mature on September 26, 2019. Pursuant to the 2019 Amendment, certain participating lenders (the "Extending Revolver Lenders") agreed to extend the maturity date of the Revolving Credit Facility to March 26, 2020, with the possibility to be extended further to June 25, 2021, upon satisfaction of certain requirements.  Thereafter, the requirements were satisfied.  Accordingly, the maturity date of the Revolving Credit Facility with respect to the Extending Revolver Lenders is June 25, 2021 (the "Extended Revolver").  In connection with this extension, the commitments of the Extending Revolver Lenders were reduced to $181.8 million from $225.0 million.  Following the closing of the Prepetition A/R Facility, the commitments of the Extending Revolving Lenders were further reduced to $143.4 million.

23.    On August 19, 2019 and August 27, 2019, following discussions and the recommendation of their advisors, the Company borrowed the majority of the remaining approximately $78 million availability under the Revolving Credit Facility.  Access to this

---

Anna Merger Sub, Inc. was merged with and into Acosta Holdco, Inc. (with Acosta Holdco, Inc. surviving), then Acosta Holdco, Inc. was merged with and into its wholly owned subsidiary, Acosta Intermediate Holdings, Inc. (with Acosta Intermediate Holdings, Inc. surviving), and then Acosta Intermediate Holdings, Inc. was merged with and into its wholly owned subsidiary, Acosta, Inc. (with Acosta, Inc. surviving).

additional liquidity, which in the Debtors' view was the least expensive funded source of liquidity available, proved critical to the Debtors' ability to fund operations during negotiations with all major creditor constituencies regarding the terms of a consensual balance sheet restructuring. Following these borrowings, the Revolving Credit Facility was fully drawn in the amount of $176.7 million (including approximately $31 million of outstanding letters of credit).

24.     Lenders under the Revolving Credit Facility holding approximately $33.5 million of commitments did not consent to an extension of the maturity of the Revolving Credit Facility (the "Non-Extending Revolver Lenders," and such commitments, the "Non Extended Revolver"). Commitments under the Non Extended Revolver matured September 26, 2019.  Following collaborative discussions with key stakeholders, the Company and the majority of lenders under the Prepetition First Lien Credit Agreement agreed that the Company should defer payment under the Non Extended Revolver, causing  default under the Prepetition First Lien Credit Agreement, and that the lenders would forbear from exercising their rights in connection therewith (the "First Lien Forbearance"), while the parties continued their discussions with the common objective of strengthening the Company's financial position.

**B.      The Term Loan Facility.**

25.     At the time of the 2014 Acquisition, the Term Loan Facility was issued in the amount of $2.065 billion, amortizing at 0.25 percent quarterly.   As of the Petition Date, approximately $1.967 billion principal amount remains outstanding on the Term Loan Facility. Interest on the Term Loan Facility originally accrued at LIBOR plus 3.25%, but currently accrues at PRIME plus 2.25 percent as a result of the default under the Prepetition First Lien Credit Agreement.  The Term Loan Facility matures on September 26, 2021.

III.    **The Senior Notes.**

26.    At the time of the 2014 Acquisition, the Debtors entered into that certain indenture by and among Acosta, Inc., as issuer, and Wilmington Trust, National Association, as indenture trustee, governing $800.0 million of aggregate principal amount of 7.750 percent senior notes due 2022 (the "Senior Notes").  The Senior Notes mature on October 1, 2022 and bear interest at 7.75 percent.  The obligations under the Senior Notes are guaranteed by each of the Debtor subsidiaries that is a borrower or guarantor under the Prepetition First Lien Facility.

27.    In addition to the debt service payment due under the Non Extended Revolver, the Debtors faced a $31.0 million interest payment under the Senior Notes on October 1, 2019.  As discussed further in the First Day Declaration, the Debtors determined to defer this payment to preserve liquidity during ongoing restructuring negotiations.  Accordingly, holders of over seventy percent of Senior Notes agreed to forbear from exercise of their rights in connection with the deferral of Senior Notes interest (the "Notes Forbearance").  Each of the First Lien Forbearance and Notes Forbearance were extended several times on a short-term basis and ultimately have been extended to be co-terminus with the Restructuring Support Agreement.

IV.    **The Junior Notes Obligations.**

28.    In addition to their funded debt obligations, certain Debtor and non-Debtor affiliates are obligors on approximately $23.1 million of other unsecured note obligations (collectively, the "Other Unsecured Notes").  Approximately $22.7 million of Other Unsecured Notes are obligations associated with long-term service contracts and other related agreements associated with acquired businesses (the "Acquisition Notes").  In addition, Anna Holdings, Inc. is an obligor on approximately $0.4 million of unsecured obligations related to certain stock repurchase promissory notes (the "Stock Repurchase Notes").

## **The Proposed DIP Facility**

I.    **The Debtors' Need for Access to Financing and Use of Cash Collateral.**

29.    To continue operating in the ordinary course and to effectuate an efficient and expeditious restructuring, the Debtors require immediate access to liquidity.  As described in greater detail below, in the First Day Declaration, and in the Sheaffer Declaration, the Debtors, with the assistance of their advisors, analyzed their cash needs in order to determine the liquidity levels necessary to maintain the Debtors' operations during the pendency of the Cases.

30.    Related to the sizing of the DIP Facility, the Debtors and their advisors thoroughly analyzed the decision whether to refinance the Prepetition A/R Facility.  *See* Sheaffer Decl. ¶ 11. Absent being refinanced by the DIP Facility, the Prepetition A/R Facility (which is provided by a third-party financial institution that is not a DIP Lender) would be in default as a result of the chapter 11 filing, shutting off the Debtors' access to the cash proceeds of their accounts receivable. Moreover, the Prepetition A/R Facility Agent would be allowed to assert control over all Receivable collections, and allocate such funds to satisfy outstanding and subsequently accrued obligations under the Prepetition A/R Facility.  This would materially impact the Debtors' liquidity.  *See* Sheaffer Decl. ¶¶ 11-12.

31.    Accordingly, by refinancing the Prepetition A/R Facility, the Debtors would avoid such attendant risks in addition to avoid having to provide the Prepetition A/R Facility Lenders with a comprehensive and onerous adequate protection package.  Additionally, refinancing the Prepetition A/R Facility will remove the weekly liquidity crunch that results from the weekly noticing requirements related to the borrowing base calculation.  The Debtors will be able to access cash that would otherwise be tied up in the Prepetition A/R Facility absent such refinancing, further enhancing the Debtors' go-forward liquidity condition.  *See* Sheaffer Decl. ¶ 12.  In consideration

of the foregoing, the Debtors made the business decision to refinance the Prepetition A/R Facility. *See* Sheaffer Decl. ¶ 12.

32.     Based on this analysis and these discussions, the Debtors determined that they would need incremental liquidity of approximately $150 million to satisfy all outstanding obligations under the Prepetition A/R Facility, operate smoothly postpetition, satisfy all administrative costs and expenses, and remain adequately capitalized upon emergence. *See* Sheaffer Decl. ¶ 13. Additionally, with the consent of the Prepetition First Lien Secured Parties, the Debtors will use Cash Collateral to fund working capital expenditures and other general corporate purposes. Cash Collateral, however, will be insufficient to provide working capital for the Debtors' business and satisfy the costs associated with completing the Debtors' restructuring. *See* Sheaffer Decl. ¶ 8. Therefore, the Debtors believe the DIP Facility is essential to preserve and maximize the value of their estates and responsibly administer these Cases.

## II.    Alternative Sources of Financing Are Not Available on Better Terms.

33.     As described in the First Day Declaration, beginning in August 2019, the Debtors entered into restructuring negotiations with the Backstop Group, which represented approximately 70 percent of the Prepetition First Lien Facility claims and approximately 80 percent of holders of Senior Notes, to achieve the best possible terms for the DIP Facility. *See* Sheaffer Decl. ¶ 9. Following significant engagement with the Backstop Group through in person and telephonic meetings, the Backstop Group indicated that it would be willing to provide the Company with access to a postpetition term loan financing facility on a senior secured basis. *See* Sheaffer Decl. ¶ 9. Nevertheless, the Debtors and their advisors surveyed various sources of potential debtor-in-possession financing to fund the Debtors' ongoing business operations and the chapter 11 process.

34.     The Debtors, with the assistance of their advisors, solicited interest for a third-party debtor-in-possession financing facility proposal that would meet the Debtors' liquidity needs.  In November 2019, PJT Partners ("PJT") solicited interest from ten third-party financial institutions to determine the extent to which third-parties would be willing to provide postpetition financing to the Debtors.  *See* Sheaffer Decl. ¶ 14.  No party that the Debtors' advisors communicated with as part of the marketing process, and no other party that the Debtors or their advisors are aware of, was interested in providing, or willing to provide, postpetition financing to the Debtors on an unsecured basis.  *See* Sheaffer Decl. ¶ 16.  Indeed, no party was willing to provide postpetition financing on anything other than a "priming" basis with respect to substantially all of the Debtors' assets, which "priming" liens likely would not have been consented to by the Prepetition First Lien Secured Parties and would have subjected the Debtors to a protracted and expensive priming dispute.  *See* Sheaffer Decl. ¶ 16.

35.     After extensive, arm's-length negotiations with the Backstop Group, the Debtors were able to secure the proposed $150 million DIP Facility.  Additionally, in November 2019, the Debtors engaged in negotiations with the Minority First Lien Group to open participation in the DIP Facility to all Prepetition First Lien Lenders.  The DIP Facility allows the Debtors to draw $150 million upon entry of the Interim Order.  The proceeds of the DIP Facility will be used for: (a) satisfying all outstanding obligations under the Prepetition A/R Facility; (b) working capital needs; and (c) funding of DIP Facility fees and expenses.  *See* Sheaffer Decl. ¶ 18.

36.     The DIP Facility is critical to the Debtors' ability to pay the administrative costs of the Cases, and provides the Debtors with sufficient liquidity to operate their business without creating a value destructive "priming" or valuation dispute at the outset of the Cases.  In tandem with the Debtors' Restructuring Support Agreement, the DIP Facility provides a speedy path to

emergence that is important to reassure clients, protect operations, and maximize value for all stakeholders.

**Basis for Relief**

I.     **The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Loan Documents.**

    A.     **Entry into the DIP Loan Documents Is an Exercise of the Debtors' Sound Business Judgment.**

37.     The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Loan Documents, obtain access to the DIP Facility, and continue using Cash Collateral.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below.  Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See, e.g.*, *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest.").

38.     Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under

similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of the debtor's authority under the [Bankruptcy] Code").

39.    Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) (while many of the terms favored the DIP lenders, "taken in context, and considering the relative circumstances of the parties," the court found them to be reasonable); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization). The Court may also appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility. For example, in *In re ION Media Networks, Inc.*, the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms. ***Relevant features of the financing must be evaluated, including non economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.*** This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

40.     The Debtors' determination to move forward with the DIP Facility is an exercise of their sound business judgment following an arm's length process and careful evaluation of available alternatives.  Specifically, the Debtors and their advisors determined that the Debtors would require postpetition financing to support their operational and chapter 11 activities.  The DIP Facility will allow the Debtors to:  (a) serve their clients in the ordinary course and to reassure other stakeholders; (b) fund payroll obligations; (c) fund the administrative cost of the Cases; (d) maintain access to the Debtors' accounts receivable by refinancing the Prepetition A/R Facility, and (e) provide a path to emergence by allowing the Debtors to implement the restructuring contemplated by the RSA and the Plan.  The Debtors negotiated the DIP Facility and other DIP Loan Documents with the DIP Lenders in good faith, at arm's length, and with the assistance of their respective advisors, and the Debtors believe that they have obtained the best financing available under the circumstances.  Accordingly, the Court should authorize the Debtors' entry into the DIP Credit Agreement, as it is a reasonable exercise of the Debtors' business judgment.

**B.      The Debtors Should Be Authorized to Grant Liens and Superpriority Claims.**

41.     The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth in the DIP Loan Documents pursuant to section 364(c) of the Bankruptcy Code.  Specifically, the Debtors propose to provide to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, a postpetition security interest in and liens on the DIP Collateral and Prepetition First Lien Collateral that are valid, perfected, allowed, enforceable, non-avoidable, and not subject to challenge, dispute or subordination immediately upon entry of the Interim Order.

42.     The above-described liens on encumbered and unencumbered assets are common features of postpetition financing facilities, and as set forth in greater detail in the Sheaffer Declaration, were a necessary feature here to provide security for the proposed financings.  *See*

Sheaffer Decl. ¶ 24.  Indeed, postpetition financing facilities approved in this Circuit and elsewhere routinely are secured by the proceeds of a debtor's unencumbered assets such as leaseholds that are subject to leases that prohibit the impositions of liens thereon.  *See, e.g.*, *In re PES Holdings, LLC*, No. 19-11626 (KG) (Bankr. D. Del. July 23, 2019) (approving DIP liens on collateral including any leasehold interests or the proceeds thereof as permitted by applicable law); *In re Blackhawk Mining LLC*, No. 19-11595 (LSS) (Bankr. D. Del. July 22, 2019) (same); *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019) (same); *In re ATD Corporation*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 26, 2018) (same); *In re Am. Apparel, LLC*, No. 16-12551 (Bankr. D. Del. Dec. 12, 2016) (same).

43.    The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]."  11 U.S.C. § 364(c).  *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).  Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

a.    the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

b.    the credit transaction is necessary to preserve the assets of the estate; and

c.    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Los Angeles Dodgers LLC*, 457 B.R. 308 (Bankr. D. Del. 2011); *See In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

28

44.     As described above and as set forth in the Sheaffer Declaration, each third-party lender indicated it would be unwilling to provide postpetition DIP financing on an unsecured, *pari passu*, or junior-lien basis to the Prepetition First Lien Secured Parties.  *See* Sheaffer Decl. ¶ 16. Therefore, the Debtors, in consultation with their advisors, concluded that any workable financing likely would require the support of, or be provided by, the Debtors' existing lenders.  The Debtors, however, also negotiated with their creditors and surveyed certain potential lending sources for actionable alternative proposals—but determined that the DIP Facility provided the best collective opportunity available to the Debtors under the circumstances to fund the Cases.  *See* Sheaffer Decl. ¶¶ 9-17.

45.     Absent the DIP Facility, which will provide assurances that the Debtors will have sufficient liquidity to administer the Cases, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders.  *See* Sheaffer Decl. ¶ 28.  Without postpetition financing, the Debtors may lack sufficient funds to operate their enterprise, continue paying their debts as they come due, and cover the projected costs of the Cases.  *See* Sheaffer Decl. ¶ 8.  The DIP Facility provides the Debtors and their stakeholders with the financing necessary to consummate the restructuring transactions contemplated by the Restructuring Support Agreement and the Plan.  Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the DIP Loan Documents, are reasonable as more fully set forth above and in the Sheaffer Declaration.  For all these reasons, the Debtors submit that they have met the standard for obtaining postpetition financing.

46.     In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) of the Bankruptcy Code provides that a court "may authorize the obtaining of credit or the incurring of

debt (a) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the [Bankruptcy Code]; (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is subject to a lien." As described above, the Debtors are unable to obtain unsecured credit. Therefore, approving a superpriority claim in favor of the DIP Lenders is reasonable and appropriate.

47.     Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1). The Debtors may incur "priming" liens under the DIP Facilities if either (a) the Prepetition Lenders have consented or (b) Prepetition Lenders' interest in collateral are adequately protected. *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected."). Accordingly, the Debtors may incur "priming" liens under the DIP Facilities if either their (a) Prepetition First Lien Secured Parties have consented or (b) Prepetition First Lien Secured Parties' interests in collateral are adequately protected.

48.     Here, a substantial majority of the Prepetition First Lien Secured Parties have affirmatively consented to the DIP Facility and actively participated in facilitating the proposed DIP Facility. Moreover, as set forth more fully in the Interim Order, the Debtors propose to provide a variety of adequate protection to protect the interests of the Prepetition First Lien Secured Parties. Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

C. **No Comparable Alternative to the DIP Facility Is Reasonably Available on More Favorable Overall Terms.**

49.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

50.     As noted above, the Debtors do not believe that a more favorable alternative DIP financing is reasonably available given the realities imposed by the Debtors' existing capital structure and the Debtors' solicitation of alternative financing proposals. Additionally, the DIP Facility helps facilitate the Debtors' overall restructuring. Thus, the Debtors have determined that the DIP Facility offers the most efficient transaction costs while reducing execution risks, and is an integral piece of the debt reduction contemplated by these Cases and is provided on reasonable terms under the circumstances. Simply put, the DIP Facility provides the Debtors with the liquidity they need at the lowest cost available while simultaneously placing the Debtors on an optimal path

for a successful restructuring.  Therefore, the Debtors submit that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

## II.    The Debtors Should Be Authorized to Use the Cash Collateral.

51.     Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) of the Bankruptcy Code permits a debtor in possession to use Cash Collateral with the consent of the secured party.  Here, the DIP Lenders and the Prepetition First Lien Secured Parties consent or are deemed to consent to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim Order.

52.     Section 363(e) of the Bankruptcy Code provides for adequate protection of interests in property when a debtor uses Cash Collateral.  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *See, e.g.*, *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (explaining that the "determination of whether there is adequate protection is made on a case by case basis"); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012) (same); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) ("the circumstances of the case will dictate the necessary relief to be given"); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) ("what interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis"); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy

¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding")).

53.     As set forth in the Interim Order, the Debtors propose to provide the Prepetition First Lien Secured Parties with a variety of adequate protection to protect against the postpetition diminution in value of their collateral, including as result of the use, sale, or lease of Cash Collateral by the Debtors and the imposition of the automatic stay (collectively, the "Adequate Protection Obligations"), including:

    a.     payment of the reasonable and documented prepetition and postpetition professional fees and expenses of the Prepetition First Lien Secured Parties (including, without limitation, the Prepetition Lender Professionals);

    b.     allowed, superpriority administrative claims under sections 503(b) and 507(b) of the Bankruptcy Code (subject to the Carve-Out and the priorities set out in the Interim Order)

    c.     the Adequate Protection Liens (subject to the Carve-Out and the priorities set out in the Interim Order);

    d.     financial reporting and other reports and notices delivered by the Debtors to the DIP Agent, for the benefit of itself and the other DIP Secured Parties, and the Prepetition First Lien Agent, for the benefit of itself and the other Prepetition First Lien Secured Parties; and

    e.     compliance with the Milestones.

54.     The Debtors submit that the proposed Adequate Protection Obligations are sufficient to protect the Prepetition First Lien Secured Parties from any potential diminution in value to the Cash Collateral.  In light of the foregoing, the Debtors further submit, and the Prepetition First Lien Secured Parties agree, that the proposed Adequate Protection Obligations to be provided for the benefit of the Prepetition Secured Parties are appropriate.  Thus, the Debtors' provision of the Adequate Protection Obligations is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of the Cases to ensure the

Debtors are able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and their estates.

### III.    The Debtors Should Be Authorized to Pay the Fees Required by the DIP Lenders Under the DIP Loan Documents.

55.    Under the DIP Loan Documents, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Agent and the DIP Lenders.  In particular, as noted above, the Debtors have agreed to pay the following fees:

> a.    to the DIP Agent for the benefit of the DIP Lenders:
>
>> (i).    a DIP Agent Fee in an amount equal to $75,000 to be paid in full on the Closing Date pursuant to the DIP Agent fee letter, substantially in the form attached hereto as **Exhibit C**.
>
> b.    to the DIP Lenders:
>
>> (i).    a commitment fee in an amount equal to 3.00% of the aggregate principal amount of each DIP Lender's DIP Commitment as of the Closing Date; and
>>
>> (ii).    the DIP Yield Enhancement Payment in an amount equal to 4.50% of the aggregate principal amount of DIP Loans or DIP Commitments of each DIP Lender repaid, prepaid, refinanced, replaced, terminated, or reduced, as applicable and as set forth in the DIP Credit Agreement (whether voluntary or mandatory, including as a result of acceleration or at the Stated Maturity Date, but other than as a result of the borrowing of DIP Loans); *provided* that the DIP Yield Enhancement Payment shall be automatically waived in the event, and upon the occurrence of, the earlier of (i) the effective date of an Acceptable Plan and (ii) the Stated Maturity Date.

56.    Courts in this district and others have approved similar aggregates in fees in large chapter 11 cases. *See, e.g, In re ATD Corporation*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 26, 2018) (approving a cash fee approximately 2.0 percent of the overall DIP facility); *In re PES Holdings LLC*, No. 18-10122 (KG) (Bankr. D. Del. Jan. 22, 2018) (same); *In re Toys "R" US, Inc.,* No. 17-34665 (KLP) (Bankr. E.D.Va. Sept. 19, 2017) (approving aggregate fees that were just less than 3.0 percent of the overall DIP facility);  *In re Exide Techs.*, No. 13-11482 (KJC)

(Bankr. D. Del. Jul. 25, 2013) (approving approximately 4.7% of aggregate fees to underwriters, arrangers, and lenders); *In re Cooper-Standard Holdings Inc.*, No. 09-12743 (Bankr. D. Del. Sept. 2, 2009) (approving 2.5 percent upfront fee and 2.5 percent exit fee); *In re Hayes Lemmerz Int'l, Inc.*, No. 09-11655 (Bankr. D. Del. June 15, 2009) (approving 3 percent exit fee); *In re Aleris Int'l. Inc.*, No. 09-10478 (Bankr. D. Del. Mar. 18, 2009) (approving 3.5-percent exit fee and 3.5% front-end net adjustment against each lender's initial commitment); *In re Lear Corp.*, No. 09-14326 (Bankr. S.D.N.Y. Aug. 4, 2009) (approving 5.0-percent upfront fee and a 1.0-percent exit/conversion fee).

57.     It is understood and agreed by all parties that these fees are an integral component of the overall terms of the DIP Facility and were required by the DIP Lenders as consideration for the extension of postpetition financing.  *See* Sheaffer Decl. ¶ 20.  Accordingly, the Court should authorize the Debtors to pay the fees provided under the DIP Loan Documents in connection with entering into those agreements.

## IV.     The DIP Lenders Should Be Deemed Good-Faith Lenders Under Section 364(e).

58.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

59.    As explained herein and in the Sheaffer Declaration, the DIP Loan Documents are the result of:  (a) the Debtors' reasonable and informed determination that the DIP Lenders provided the best postpetition financing alternative available under the circumstances; and (b) extended arm's length, good-faith negotiations between the Debtors and the DIP Lenders.  *See* Sheaffer Decl. ¶ 27.  The Debtors submit that the terms and conditions of the DIP Loan Documents are reasonable under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Loan Documents other than as described herein.  Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

**V.    The Automatic Stay Should Be Modified on a Limited Basis.**

60.    The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lenders to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the Interim Order.  The proposed Interim Order further provides that the automatic stay is modified as necessary to permit the Debtors to grant liens to the DIP Lenders and to incur all liabilities and obligations set forth in the Interim Order.  Finally, the proposed Interim Order provides that, following the occurrence of an Event of Default and an appropriate opportunity for the Debtors to obtain appropriate relief from the Court, the automatic stay shall be vacated and modified to the extent necessary to permit the DIP Agent to exercise all rights and remedies in accordance with the DIP Loan Documents, or applicable law.

61.     Stay modifications of this kind are ordinary and standard features of debtor in possession financing arrangements and, in the Debtors' business judgment, are reasonable and fair under the circumstances of the Cases.  *See, e.g.*, *In re Blackhawk Mining LLC*, No. 19-11595 (LSS) (Bankr. D. Del. July 22, 2019) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Z Gallerie, LLC*, No. 19-10488 (LSS) (Bankr. D. Del. Apr. 9, 2019) (same); *ATD Corporation*, No. 18-12221 (KJC) (Bankr. D. Del. Oct. 26, 2018) (same); *In re In re Charming Charlie, LLC*, No. 17-12906 (CSS) (Bankr. D. Del. Dec. 12, 2017) (same); *In re Magnum Hunter Res. Corp.*, No. 15-12533 (KG) (Bankr. D. Del. Dec. 15, 2015) (terminating automatic stay after event of default).

## VI.     Failure to Obtain Immediate Interim Access to the DIP Facilities and Cash Collateral Would Cause Immediate and Irreparable Harm.

62.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use Cash Collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than fourteen days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

63.     For the reasons noted above, the Debtors have an immediate postpetition need to use Cash Collateral, access the liquidity provided by the DIP Facility, and refinance the Prepetition A/R Facility.  The Debtors cannot maintain the value of their estates during the pendency of the Cases without access to cash.  The Debtors will use cash, among other things, to fund the operation of their business, including to ensure that vendors continue to manufacture and ship inventory, and to fund the administration of the Cases.  Substantially all of the Debtors' available cash constitutes the Cash Collateral of the Prepetition First Lien Secured Parties.  The Debtors will therefore be

unable to operate their business or otherwise fund the Cases without access to Cash Collateral, and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest.  *See* First Day Declaration ¶ 65.  In short, the Debtors' ability to administer the Cases through the use of Cash Collateral is vital to preserve and maximize the value of the Debtors' estates.

64.     The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final Hearing, to receive funding under the DIP Facility.  The Debtors require the funding under the DIP Facility prior to the Final Hearing and entry of the Final Order to continue operating, pay their administrative expenses, and to implement the relief requested in the Debtors' other "first day" motions.  This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

## Request for Final Hearing

65.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and in no event after twenty-five days after the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to this motion.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

66.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## **Reservation of Rights**

67.     Nothing contained herein is intended or shall be construed as:  (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law.

## **Notice**

68.     The Debtors will provide notice of this motion to the following parties:  (a) the United States Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the Ad Hoc Group; (d) counsel to the Consenting Creditors; (e) counsel to the A/R Facility Lenders; (f) counsel to the First Lien Agent; (g) counsel to the Indenture Trustee; (h) counsel to the Receivables Facility Agent; (i) counsel to the Sponsor; (j) counsel to the Minority First Lien Group; (k) the United States Attorney's Office for the District of Delaware; (l) the Internal Revenue Service; (m) the attorneys general for the states in which the Debtors operate; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002.[7]  As this motion is seeking "first day" relief, within two

---

[7]     Capitalized terms used in this paragraph have the meanings given to them the Plan.

business days of the hearing on this motion, the Debtors will serve copies of this motion and any order entered in respect to this motion as required by Local Rule 9013-1(m).

## **No Prior Request**

69.     No prior request for the relief sought in this motion has been made to this or any other court.

*[Remainder of page intentionally blank]*

WHEREFORE, the Debtors respectfully request that the Court enter interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated:  December 1, 2019  
Wilmington, Delaware

/s/ *Domenic E. Pacitti*

Domenic E. Pacitti (DE Bar No. 3989)  
Michael W. Yurkewicz (DE Bar No. 4165)  
Sally E. Veghte (DE Bar No. 4762)  
**KLEHR HARRISON HARVEY BRANZBURG LLP**  
919 N. Market Street, Suite 1000  
Wilmington, Delaware 19801  
Telephone:    (302) 426-1189

- and -

Edward O. Sassower, P.C.  
Joshua A. Sussberg, P.C. (*pro hac vice* pending)  
Christopher T. Greco, P.C.  (*pro hac vice* pending)  
**KIRKLAND & ELLIS LLP**  
**KIRKLAND & ELLIS INTERNATIONAL LLP**  
601 Lexington Ave  
New York, New York 10022  
Telephone:    (212) 446-4800  
Facsimile:    (212) 446-4900

- and -

Spencer Winters (*pro hac vice* pending)  
**KIRKLAND & ELLIS LLP**  
**KIRKLAND & ELLIS INTERNATIONAL LLP**  
300 North LaSalle  
Chicago, Illinois 60654  
Telephone:    (312) 862-2000  
Facsimile:    (312) 862-2200

*Proposed Co-Counsel to the Debtors and Debtors in Possession*