1                 UNITED STATES BANKRUPTCY COURT
                   DISTRICT OF DELAWARE
2

                          .   Chapter 11
3  IN RE:                    .
                          .   Case No. 19-12551 (CSS)
4  ANNA HOLDINGS, INC., *et al.,*   .
                          .
5                          .   Courtroom No. 6
                          .   824 Market Street
6                          .   Wilmington, Delaware 19801
7                          .
                Debtors.     .   December 3, 2019
8  . . . . . . . . . . . . . . . . .   1:00 P.M.

9              TRANSCRIPT OF FIRST DAY HEARING
       BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
10            UNITED STATES BANKRUPTCY JUDGE

11  APPEARANCES:

12  For the Debtors:       Domenic E. Pacitti, Esquire
13                    Michael W. Yurkewicz, Esquire
                   Sally E. Veghte, Esquire
14                    KLEHR HARRISON HARVEY BRANZBURG LLP
                   919 N. Market Street Suite 1000
15                    Wilmington, Delaware 19801

16  Audio Operator:        Electronically Recorded
17                    by Leslie Murin, ECRO

18  Transcription Company:   Reliable
                   1007 N. Orange Street
19                    Wilmington, Delaware 19801
                   (302)654-8080
20                    Email:  gmatthews@reliable-co.com

21  Proceedings recorded by electronic sound recording,
22  transcript produced by transcription service.

23

24

25

```
 1   APPEARANCES (Continued):

 2   For the Debtors:         Edward O. Sassower, Esquire
                              Joshua A. Sussberg, Esquire
 3                            Christopher T. Grecco, Esquire
                              Ameneh Bordi, Esquire
 4                            KIRKLAND & ELLIS LLP
                              KIRKLAND & ELLIS INTERNATIONAL LLP
 5                            601 Lexington Avenue
                              New York, New York 10022
 6
 7                            - and -

 8                            Spencer A. Winters, Esquire
                              Annie Dreisbach, Esquire
 9                            KIRKLAND & ELLIS LLP
                              KIRKLAND & ELLIS INTERNATIONAL LLP
10                            300 North LaSalle
                              Chicago, Illinois
11
12   For Elliot Management    Michael Shepherd, Esquire
     Corporation & Oaktree    WHITE & CASE LLP
13   Capital Management:      Southeast Financial Center
                              200 South Biscayne Blvd., Suite 4900
14                            Miami, Florida 33131

15   For JP Morgan:           Scott Talmadge, Esquire
                              FRESHFIELDS BRUCKAUS DERINGER
16                            601 Lexington Avenue, 31st Floor
                              New York, New York 10022
17
18   For Waste Management:     Rachel Mersky, Esquire
                              MONZACK, MERSKY, MCLAUGHLIN & BOWDER
19                            1201 N. Orange Street, Suite 400
                              Wilmington, Delaware 19801
20
     For the U.S. Trustee:    Richard Schepacarter, Esquire
21                            UNITED STATES DEPARTMENT OF JUSTICE
                              OFFICE OF THE UNITED STATES TRUSTEE
22                            844 King Street, Suite 2207
                              Lockbox 35
23                            Wilmington, Delaware 19801

24

25
```

INDEX

**Joint Administration Motion.** Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief [Docket No. 3]

**Ruling:  Order Signed**

**DIP Financing Motion.** Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Obtain Postpetition Financing and (II) Utilize Cash Collateral, (B) Granting Liens and Superpriority Administrative Expense Claims, (C) Granting Adequate Protection, (D) Modifying the Automatic Stay, (E) Scheduling a Final Hearing, and (F) Granting Related Relief [Docket No. 9]

**Ruling:  Order Signed**

**Prime Clerk 156(c) Retention Application.** Debtors' Application for Appointment of Prime Clerk LLC as Claims and Noticing Agent [Docket No. 12]

**Ruling:  Order Signed**

**Cash Management Motion.** Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Continue to Operate Their Cash Management System, (II) Maintain Existing Business Forms and Books and Records, and (III) Perform Intercompany Transactions and Granting Administrative Expense Status to Intercompany Payments and (B) Granting Related Relief [Docket No. 13]

**Ruling:  Order Signed**

**Wages Motion.** Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Pay Prepetition Wages, Compensation, and Benefit Obligations and (II) Continue Employee Compensation and Benefit Programs and (B) Granting Related Relief [Docket No. 14]

**Ruling:  Order Signed**

**Customer Programs Motion.** Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Honor Certain Prepetition Obligations to Customers and (II) Otherwise Continue Certain Customer Programs in the Ordinary Course of Business and (B) Granting Related Relief [Docket No. 15]

**Ruling:  Order Signed**

**All Trade Motion**. Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Pay Accounts Payable Claims

in the Ordinary Course of Business and (B) Granting Related Relief [Docket No. 16]

**Ruling:  Order Signed**

**Utilities Motion.** Debtors' Motion for Entry of Interim and Final Orders (A) (I) Approving the Debtors' Proposed Adequate Assurance Payment for Future Utility Services, (II) Approving the Debtors Proposed Procedures for Resolving Additional Adequate Assurance Requests, (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Services, and (IV) Authorizing Fee Payments to the Debtors Third-Party Utility Service Vendor and (B) Granting Related Relief [Docket No. 17]

**Ruling:  Order Signed**

**Insurance Motion.** Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to (I) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto and (II) Renew, Supplement or Purchase Insurance Policies and (B) Granting Related Relief [Docket No. 18]

**Ruling:  Order Signed**

**Taxes Motion.** Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Payment of Certain Prepetition Taxes and Fees and (B) Granting Related Relief [Docket No. 19]

**Ruling:  Order Signed**

**NOL Motion.** Debtors' Motion for Entry of Interim and Final Orders (A) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness With Respect to Common Stock and (B) Granting Related Relief [Docket No. 20]

**Ruling:  Order Signed**

**Creditor Matrix Motion.** Debtors' Motion for Entry of an Order (A) Authorizing the Debtors to (I) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (II) File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, (III) Redact Certain Personally Identifiable Information for Individual Creditors, (B) Approving the Form and Manner of Notifying Creditors of Commencement, and (C) Granting Related Relief [[Docket No. 21]

**Ruling:  Order Signed**

1  MATTERS GOING FORWARD FOR SCHEDULING PURPOSES:

2  **Chapter 11 Plan.** Debtors' First Amended Joint Prepackaged Chapter
   11 Plan of Reorganization [Docket No. 4]
3
   **Disclosure Statement.** Disclosure Statement for the Debtors' First
4  Amended Joint Prepackaged Chapter 11 Plan of Reorganization [Docket
   No. 5]
5
   **Notice Regarding Amended Chapter 11 Plan.** Notice of Filing of the
6  Debtors' First Amended Joint Prepackaged Chapter 11 Plan of
   Reorganization [Docket No. 6]
7
   **Notice Regarding Disclosure Statement.** Notice of Filing of the
8  Disclosure Statement for the Debtors' First Amended Joint
   Prepackaged Chapter 11 Plan of Reorganization [Docket No. 7]
9
   **Combined Disclosure Statement and Plan Confirmation Motion.**
10 Debtors' Motion for Entry of an Order (I) Scheduling a Combined
   Disclosure Statement Approval and Plan Confirmation Hearing, (II)
11 Approving the Solicitation Procedures and Dates, Deadlines, and
   Notices Related Thereto, (III) Approving the Equity Rights Offering
12 Procedures and Related Materials, (IV) Directing that a Meeting of
   Creditors Not Be Convened, (V) Waiving the Requirement of Filing
13 Statements of Financial Affairs and Schedules of Assets and
   Liabilities, and (VI) Granting Related Relief [Docket No. 11]
14

15 EXHIBITS:                         I.D.    REC'D

16 Declaration of Matt Laurie                  22

17 Declaration of Paul Sheaffer                22

18 Declaration of James Daloia                 22

19

20

21

22

23

24

25

1          (Proceedings commenced at 1:06 p.m.)

2          (Call to order of the court)

3                THE COURT:  Please be seated.  Good afternoon.

4                MR. YURKEWICZ:  Good afternoon, Your Honor.

5                THE COURT:  I can't hear you.

6                MR. YURKEWICZ:  Good afternoon, Your Honor.  Is

7    that any better?

8                THE COURT:  Yes.  Thank you.

9                MR. YURKEWICZ:  For the record Michael Yurkewicz

10   of Klehr Harrison Harvey Branzburg on behalf of Anna Holdings

11   debtors, here with the Kirkland & Ellis team of Mr. Sussberg,

12   Mr. Winters, Ms. Bordi, Ms. Dreisbach and Mr. French.  I

13   believe you're acquainted with most of them.

14                Thank you for taking the time to hear us today.

15   We filed *pro hac's* for all of these people.  And I believe

16   Mr. Sussberg would like to address the court if that's okay

17   with you.

18                THE COURT:  Fine with me.

19                MR. YURKEWICZ:  Thank you, Your Honor.

20                THE COURT:  You're welcome.

21                Mr. Sussberg, good afternoon.

22                MR. SUSSBERG:  Good afternoon, Your Honor.  Good

23   to see you.  Hope you had a nice holiday.

24                THE COURT:  I did.  I didn't get any thinner.

25          (Laughter)

1          MR. SUSSBERG:  It's a tough time of year to get

2   thin.

3          For the record Joshua Sussberg from Kirkland &

4   Ellis on behalf of Anna Holdings, the lead debtor, and the

5   Acosta related entities.  And if it's okay with Your Honor I

6   would like to provide just a few minutes of background.

7          This is, frankly, the most parties I've seen in a

8   consensual case in a long time, but maybe I will be able to

9   speak for most all of them and we can short-line --

10   streamline this hearing today.

11          THE COURT:  Okay.

12          MR. SUSSBERG:  A couple introductions before we

13   start.  In the courtroom, today, we have our first-day

14   declarant Mr. Matthew Laurie, the interim chief financial

15   officer of the company in the first row.

16          THE COURT:  Welcome, sir.

17          MR. SUSSBERG:  Next to him is Todd Johnson, the

18   chief legal officer of Acosta.

19          THE COURT:  Good afternoon.

20          MR. SUSSBERG:  In addition, we have the company's

21   proposed investment bank from PJT, Mr. Steve Zelin, who you

22   are familiar with, and Mr. Paul Sheaffer who is a declarant

23   with respect to the DIP financing.

24          THE COURT:  Very good.

25          MR. SUSSBERG:  Then, finally, on the company side

1  from Alvarez & Marsal, the company's restructuring advisor,

2  we have Brian Cejka and Chris Kelly.

3          THE COURT:  Welcome all of you.

4          MR. SUSSBERG:  Your Honor, interestingly enough,

5  on Thanksgiving I was delinquent in purchasing a turkey and

6  my wife had purchased a different turkey, but we were going

7  to fry a turkey for the first time, and I had the opportunity

8  to get to the grocery store, and as we were working on the

9  first-day affidavit Ms. Bordi, who was taking the laboring

10 ore, was answering lots of my questions.  And as you will see

11 throughout Mr. Laurie's first-day declaration there's

12 references to center aisle, and the outside aisles, and the

13 perimeter, and fresh shopping, and consumer preferences

14 changing.  So, I took the opportunity, as I was purchasing

15 the bird, to walk around the grocery store a bit.  And I

16 hadn't been to a grocery store in a while --

17          THE COURT:  And, and you got to bill your

18 Thanksgiving shopping.

19      (Laughter)

20          MR. SUSSBERG:  Thanksgiving was *pro bono,* Your

21 Honor.

22      (Laughter)

23          MR. SUSSBERG:  And as I went through I kept in

24 mind, and I really thought a lot about what this company

25 does, and the services that they provide.  And for a moment

1  you step around, and you realize, and a lot of the things

2  that we work on whether its retail or oil and gas, which is a

3  commodity, but a lot of things that we've been working on

4  relate to technological disruption.  And technology certainly

5  served as a disruption to this company which started back in

6  1927 as a single family grocery store marketing company.  And

7  it has, over time, grown into a massive marketing enterprise

8  and a behemoth that serves over 1,200 different blue-chip and

9  mid-size clients.

10       As you see, as times change, it's all about

11  adapting.  So, I think, Your Honor, as you will hear today

12  and in this introductory presentation this company from a

13  business standpoint, from a financial standpoint and from a

14  go-forward standpoint is looking to adapt and move fairly

15  quickly through a restructuring process to move forward in a

16  day in age that has changed.

17       On the first slide you will note, Your Honor, just

18  very quickly, and I think the most important piece here,

19  30,000 employees across the United States, in the United

20  Kingdom -- and that was a focus of ours from the very

21  beginning, maintaining this business and all of its assets

22  for the benefit of those employees and, obviously, its

23  stakeholders.

24       It is a company that, as I noted, started in 1927

25  back in Jacksonville, Florida where it still remains located

1  and has grown into a powerhouse that represents the brands

2  that you see here, many of which on this slide, from Campbell

3  Soup, Kellogg's, to Coca-Cola, and many others.  It's a

4  company, as noted on the bottom, that has really evolved over

5  time from originally providing services to grocery stores, it

6  is now dealing with consumer marketing, retailing, retail

7  services, it's got Acosta solutions business as we talk about

8  in Mr. Laurie's declaration, e-commerce which is the fastest

9  changing business around and boxes loading up on people's

10  driveway's more so then garbage bags.  It is a company that

11  has sales and marketing expertise in all of these arenas.  It

12  provides these services, as noted on this slide, through an

13  entire spectrum of retail operations.

14          In addition to the food service and the grocery,

15  as you see, there's drugstores, there's mass merchandisers

16  from Walmart, to Target, and everything in between.  There is

17  natural and specialty goods, and there is a preference now

18  for people to provide and to consume fresh marketing goods as

19  opposed to those center aisle goods, the Bumblebee Tuna's of

20  the world who, themselves, are going through a restructuring,

21  Clorox, Kleenex; those brands as well.

22          And what this company has dealt with, Your Honor,

23  as I referenced earlier, is a macro-economic trend and shift

24  in the way that people consume and the way that people shop.

25  I think it's interesting, and its reality, that as you look

1   at this slide and the evolution of the slide, and this is a

2   shopping mall just as an instance, but you see the change in

3   course and the way in which people are consuming their goods

4   and adapting to the changing marketplace and the

5   technological disruption.

6           Just like consumer package good manufacturers who

7   are having to adapt to this very trend and reduce marketing

8   spends, and revenue, and their bottom line so too are the

9   marketing and sales providers that help those very companies,

10  very logical.  And as traditional shopping is becoming

11  different and moving away from the grocery store, so too are

12  traditional marketing companies like Acosta.  And that shift

13  has dedicated and necessitated resources, and capital in

14  order to be able to capitalize on opportunities.

15          In addition, Your Honor, as noted on this slide,

16  people are moving away from the branded goods, the Clorox on

17  the bottom, to the store-bought goods, the blank label.  And

18  their cost conscience, consumer spending is down and as a

19  result people aren't focused on the brands that necessarily

20  have been the center-piece of Acosta's business.  And, again,

21  as we talked about, there's a complete change in the way that

22  people shop not only for fresh goods with Whole Foods and the

23  way Amazon delivers, but Fresh Direct and everything in

24  between.  And that has changed the landscape drastically.

25          In addition, Your Honor, and these are important

 1  facts to note because I think it serves to set the stage and

 2  the landscape for what we were able to accomplish coming in

 3  and what we hope to accomplish going forward.  This is a

 4  fragile business and clients have an ability to utilize

 5  competitors to help them weather the storm.  And as a result,

 6  if there are cracks in the fabric, if there are concerns

 7  about the capital structure, if there are noises around

 8  upcoming interest payments or maturity dates that leads long-

 9  time customers with long-standing relationships the ability

10  to look and potentially maximize opportunities with others.

11          And notwithstanding the fact that we have long-

12  standing many, many decade relationships with some of these

13  biggest brands the big concern, as noted on this slide, is a

14  lot of those contracts with this company are short-term in

15  nature, and there are statements of work, and contracts,

16  generally, that potentially expire during the course of a

17  short period of time whether it be 60 to 90 days.  As a

18  result, with that backdrop and the possibility of having

19  business disruption associated with the restructuring, it was

20  our job and the company's focus to conduct as much of its

21  restructuring outside of Your Honor's courtroom and outside

22  of any courtroom.  That starts with a couple of different

23  pieces that I want to talk about on the next couple of

24  slides.

25          First and foremost, just briefly, Your Honor,

1  there was an operational and strategic shift.  And this

2  company over the course of the last couple of years has

3  reduced management redundancy, corrected under-utilized

4  activities, right-sized its head count and is projecting to

5  save close to $265 million dollars over the course of the

6  next couple of years.

7            There was a new management team that was put in

8  place in July of 2019 led by Darian Pickett, a 28 year

9  veteran of Acosta and somebody who has helped turn things

10  around from an overall management perspective.  There has

11  also been a change, Your Honor, in the way that employees are

12  managed and compensated, and it's a movement to a performance

13  base system.  And if the consumers win and purchase products,

14  and by default the consumer product goods manufacturers win,

15  so do the employees.  This was a commission based business

16  for a long period  of time, not necessarily predicated upon

17  purchases, and being able to shift to this model has

18  incentives and, frankly, rejuvenated the workforce.

19            All of that is a backdrop to the balance sheet.

20  And in order to be able to invest in operations and to make

21  demands with respect to the technological changes that are in

22  existence the company has to have access to capital.  And as

23  a result of a 2014 buyout the company has an over-levered

24  balance sheet as we stand here today.  So, our mission with

25  respect to this balance sheet and close to $3 billion dollars

1  of indebtedness was to take all the good work that the

2  company had done from an operational perspective and attack

3  this balance sheet in a concerted way outside of the public

4  eye and in a way in which that would put this company in the

5  best position possible to succeed in an ever-changing

6  consumer dynamic and landscape.

7          So, Your Honor, beginning, frankly, in August of

8  2019 PJT had been engaged by the company a year prior.

9  Alvarez & Marsal came in, in July.  Kirkland was hired in

10 August.  The company's operational shifts and change had been

11 put in place.  Our task was to attack that balance sheet.

12         One of the first things we did at the end of

13 August was drew down the company's remaining revolver balance

14 of approximately $78 million dollars.  That, of course, led

15 to discussions and conversations.  The first group that we

16 engaged with was the term loan lenders.  This was a term loan

17 lender group that was represented by Davis Polk and

18 Centerview.  And at the time the group represented

19 approximately 40 percent of the outstanding term loan.

20         Now one of the first things the company suggested

21 to this term loan lender group was to include, in the

22 discussions, what we coin the cross-over group.  Now this

23 cross-over group was led by two holders; Elliott and Oaktree.

24 And Elliott and Oaktree, between the two of them, held

25 approximately 30 percent of the outstanding term loan which

1  led to 70 percent overall term loan holdings between the two

2  and then more than 60 percent of the outstanding unsecured

3  bonds that were in place.  And I am going to come back in a

4  moment to why that became important because the unsecured

5  bonds were a very important centerpiece in the overall

6  discussions.

7          And over the course of the next month we engaged

8  in diligence with this group of holders; 70 percent of the

9  term loan and approximately 60 percent of the unsecured's.

10 There was a series of meetings with management.  Obviously,

11 very much deep negotiations with advisors.  And it became

12 clear during the course of those discussions that there was a

13 push from the cross-over group, who was weighted to the

14 bonds, to make an argument with respect to the collateral and

15 the unencumbered versus encumbered nature of the prepetition

16 collateral.

17         Specifically, Your Honor, as I mentioned, the

18 short-term duration of the contracts, there was a suggestion

19 that any long drawn out potential bankruptcy concerning

20 valuation or the propriety of a prepetition security interest

21 with respect to 506 and 552 could result in contracts burning

22 off by their very terms and then potentially being entered

23 into a new post-petition.  That, in and of itself, under 552

24 could serve as a basis for bondholders to argue that all the

25 collateral was post-petition after acquired collateral and

1 | all creditors should share equally in the recovery.

2 | We spent a tremendous amount of time, Your Honor,

3 | debating, analyzing, understanding the arguments, looking at

4 | case law, figuring out the specifics on both sides, and while

5 | academically interesting and very much something that has not

6 | been adjudicated specifically in a court of law, from the

7 | company's perspective that dispute was not something that

8 | would have benefited the entirety of this capital structure

9 | and it was not something that was value maximizing.

10 | So, over the course of September and October, Your

11 | Honor, we started negotiating with a subset of the group that

12 | you see here.  That group, which we call the backstop

13 | parties, came together.  That group includes Davidson

14 | Kempner, Nexus, Oaktree and Elliott.  Davidson Kempner and

15 | Nexus are represented by Sullivan Cromwell and Potter

16 | Anderson, and Elliott and Oaktree are represented by White &

17 | Case and Whiteford Taylor.

18 | What we were able to accomplish with this group

19 | was convincing both sides that the litigation over 552 would

20 | not be worth the pain that the company would suffer.  As a

21 | result we negotiated a split of the reorganized equity

22 | amongst the term loan lenders on the one hand and the

23 | bondholders on the other, and that was an 85/15 split.  And

24 | then the backstop parties agreed to backstop the entirety of

25 | the restructuring including the proposed DIP financing that

1 Mr. Winters will explain, as well as the preferred equity

2 offering that will help capitalize this business on the path

3 forward, and that is an amount of $325 million dollars.

4 So, with 70 percent of the backstop parties on

5 sides at that point in time, vis-à-vis the term loan, and

6 approximately 80 percent of bond holdings -- and the reason

7 for that shift, Your Honor, is because those four holders

8 increased their term loan and bond holdings over the course

9 of the negotiation period trading amongst parties that were

10 all subject to the same NDA's and discussions.  And with that

11 70 percent and 80 percent, respectively, of holdings we

12 launched our solicitation process on a pre-packaged Chapter

13 11 plan.

14 From the company's standpoint, and in an effort to

15 keep this case outside of the public domain as long as

16 possible and to build as much consensus, we anticipated that

17 there may be disputes, concerns, even objections from

18 minority term loan lenders as well as the revolving credit

19 facility.  And so we purposely set the deadline for voting

20 ahead of the Chapter 11 filing as reflected in the

21 restructuring support agreement.  And as that deadline

22 approached we realized that there was a potential issue with

23 a minority group of term loan lenders that it formed.  That

24 group, represented by Arnold & Porter, FTI Consulting and

25 Pepper Hamilton, engaged with the company as well as the

 1  backstop parties, and we were able to surgically make

 2  modifications to the proposed plan and adjust that plan,

 3  extend out the voting deadline and build consensus along the

 4  lines of the minority lenders to get to a place where, I'll

 5  show in the next slide in a few moments, we had unanimous

 6  consent from the lender community to this Chapter 11 plan.

 7          The plan also enjoys, as reflected in the top box,

 8  the support from the equity sponsor, Carlyle, represented by

 9  Latham & Watkins.  And I'm happy to report that we also have

10  the support of the RCF lenders as well as the remaining

11  amounts of bonds; although, the voting deadline remains open

12  with respect to remaining bonds because of the notice periods

13  required under applicable law and regulation.

14          So, where that puts us, Your Honor, as reflected

15  in the next slide, is unanimous consent to date with respect

16  to this plan.  We have 100 percent of voting creditors voting

17  in favor in Class 3, that is the term loan, and so far we

18  have 100 percent consent with respect to Class 4.  That

19  voting deadline, again, is open until December 9th and at

20  this point in time 707 million of the 800 outstanding have

21  voted in favor reflecting the 88 percent amount on that

22  slide.  We do not expect and we have not heard from any

23  dissident bondholders, and there have been no reach-outs from

24  anybody that holds bond holdings with questions or otherwise.

25          So, in total, Your Honor, what we have before you

1  is a fully consensual prepackaged Chapter 11 plan.  There is

2  one issue today that we want to address.  We have worked very

3  hard, as we always do, with Mr. Schepacarter and we

4  appreciate all his help in proposing and getting before Your

5  Honor consensual first day's, say for one issue with respect

6  to the credit matrix.  We will address that in due course.

7         We have a business that is going to be able to

8  emerge, hopefully subject to Your Honor's approval, from

9  Chapter 11 in just two short weeks.  We're going to eliminate

10 $3 billion dollars of indebtedness.  We're going to preserve

11 30,000 jobs.  We're going to recapitalize this business with

12 $325 million dollars of new money backstopped by our backstop

13 parties, participated in by the minority lenders and the rest

14 of the group, with $150 million dollar DIP facility that Mr.

15 Winters will walk through and explain its uses.  And

16 importantly, Your Honor, we want to be in Chapter 11 as short

17 as possible.  No offense to the court, we always appreciate

18 being here, but it is important for this business to be able

19 to get in front of its customers, and meet the ever changing

20 demand, and move forward as quickly as possible.

21        With that I'm happy to answer any questions Your

22 Honor may have; otherwise, we'd move through the agenda.  I

23 will cede the podium to Mr. Winters.

24        THE COURT:  Thank you.  That was very helpful and

25 very thorough.  I do appreciate it.  Whoever knows how to do

1  those block things with the power point needs to come and

2  teach me.

3          MR. SUSSBERG:  Ms. Bordi all night.

4          THE COURT:  Pretty cool.

5          MR. SUSSBERG:  Thank you.

6          THE COURT:  I have looked through the binders and

7  certainly tell me whatever you think I need to know, but they

8  all seem really quite routine.  So, I don't want to rob

9  anybody of their moment in the spotlight, but we can work

10 through it pretty quickly I hope.

11         MR. WINTERS:  Good afternoon, Your Honor; Spencer

12 Winters Kirkland & Ellis LLP on behalf of the debtors.

13         We will plan to move quickly, Your Honor.  And Ms.

14 Bordi has a stack of orders here if she could bring those up.

15         As Mr. Sussberg mentioned, we're happy to be here

16 today at what we believe is a fully consensual confirmation

17 hearing with the exception of the one small issue on the

18 schedules and statements with the U.S. Trustee.  Pleadings

19 were shared well in advance of the filing with various

20 constituencies including counsel to the backstop parties,

21 counsel to the first lien agent, counsel to the minority term

22 loan group and the U.S. Trustee.  We incorporated their

23 feedback in advance, so there are only limited changes to the

24 proposed orders that were filed with the pleadings on Sunday.

25         I plan to handle the first several items on the

1  agenda including the DIP and the scheduling motion before

2  handing it over to my colleagues, Ms. Bordi and Ms.

3  Dreisbach.

4          Do those orders make sense, Your Honor?

5          THE COURT:  Yeah, that's fine.  I'm sorry, I

6  didn't know you were waiting for me.

7          MR. WINTERS:  No.

8          THE COURT:  The only -- let's get the declarations

9  in evidence.

10          MR. WINTERS:  Yes.  So, we filed the following

11  declarations and affidavits in support of first-day relief.

12  The declaration of Matt Laurie, the CFO, at Docket Number 8;

13  the declaration of Paul Sheaffer of PJT at Docket Number 10;

14  and Prime Clerk's voting declaration and service affidavits

15  at Docket Numbers 31, 32 and 33.  Mr. Laurie, and Mr.

16  Sheaffer and Mr. Daloia are in the courtroom today and

17  available for cross examination.

18          THE COURT:  Is there any objection to the

19  admission of the declarations in support of the motions?

20      (No verbal response)

21          THE COURT:  I hear none.  They're admitted without

22  objection.

23      (Declaration of Matt Laurie, admitted)

24      (Declaration of Paul Sheaffer, admitted)

25      (Declaration of James Daloia, admitted)

1        THE COURT:  Does anyone wish to cross-examine any

2  of the witnesses?

3      (No verbal response)

4        THE COURT:  Again, I hear none.  I have no

5  questions.

6        MR. WINTERS:  Thank you, Your Honor.

7        I will turn first to the joint administration

8  motion which is at Docket Item 3 and Agenda Item 3.  This is

9  a customary motion for joint administration of the 20 Chapter

10  11 cases of these affiliated debtors.  Unless the court has

11  any questions we would respectfully request that the court

12  enter the proposed order.

13        THE COURT:  Does anyone wish to be heard?

14      (No verbal response)

15        THE COURT:  All right.  Just give me a moment.

16  Sorry, I'm just getting organized.  I apologize.

17        MR. WINTERS:  No problem, Your Honor.

18        THE COURT:  All right.  I've signed the order.

19        MR. WINTERS:  Thank you, Your Honor.

20        I'd turn now to the DIP motion which is at Docket

21  Number 9 and Agenda Item 4.  The motion requests approval of

22  $150 million dollar DIP financing facility and authority to

23  use cash collateral.  It also requests authority to grant DIP

24  and adequate protection liens, approval of adequate

25  protection payments and various other customary relief.  An

1  opportunity to participate in a DIP facility was opened to

2  all first lien lenders, approximately 84 percent by amount of

3  which chose to participate.  And the DIP facility has the

4  express support of more than 95 percent by amount of secured

5  lenders and more than 85 percent by amount of unsecured

6  bondholders who are party to the RSA.

7          The proceeds of the DIP will be used to fund these

8  Chapter 11 cases, to fund working capital needs and to

9  refinance the debtor's prepetition accounts recievable

10 facility.  The AR facility is a $150 million dollar facility

11 with about $118 million dollars outstanding.

12         As of the petition date substantially all of the

13 debtors' accounts receivables, approximately 245 million face

14 value, sit at the AR facility entity.  And in the ordinary

15 course accounts receivables convert to cash and the AR

16 receivable facility actually distributes that cash up to the

17 debtors, and the debtors contribute new AR back down to that

18 entity.

19         The filing, however, triggered a termination event

20 for that entity which allows the lender to freeze that AR and

21 not distribute the proceeds to the debtor.  So, this cuts off

22 our access to revenue which we receive and those accounts

23 recievable convert to cash.  So, absent the funding of the

24 $150 million dollar DIP facility and the refinancing of the

25 AR facility the debtors would go cash-flow negative in week

1  three of these Chapter 11 cases and would miss payroll.

2         As set forth in Mr. Sheaffer's declaration, entry

3  into the DIP facility is a sound exercise of the debtors'

4  business judgment and the debtors were unable to obtain

5  credit on an unsecured basis or a non-priming basis.

6         Immediate access to the DIP facility is critical

7  to fund these Chapter 11 cases and fund ongoing operations.

8  Moreover, the DIP financing is an integral term of this $3

9  billion dollar restructuring.  The 506(c) waiver, equities of

10 the case waiver and like provisions are for the final order

11 only.

12         Unless the court has any questions I'm happy to

13 walk the court through the changes to the proposed order that

14 we sent over earlier today.

15         THE COURT:  Okay.

16         MR. WINTERS:  So, on Page 6 of the redline, Your

17 Honor, just some clean-up changes.

18         On Page 14 some changes at the request of the

19 agent to clarify the scope of the indemnity and clarify that

20 there is no third-party claims being released by this order.

21         Page 32 of the redline is a continuation of those

22 changes.  And the second change on 9(a) there is a

23 clarification requested by the U.S. Trustee.

24         Page 34 of the redline that deletion is another

25 clarification requested by the U.S. Trustee.

1          Page 50 of the redline, these are additional

2 changes and clarifications requested by the U.S. Trustee to

3 just decline -- to just not restate the meaning of 364(e) and

4 let it speak for itself.  The same on Page 51.

5          Your Honor, on Pages 58 through 59 there are

6 blanks for the final hearing and the objection deadline.

7          If the court has availability we were thinking the

8 week of January 6th for that final hearing with the objection

9 deadline the week before.  And I would just note, Your Honor,

10 that the idea behind that is that, you know, if we emerge

11 before then these final orders would likely be moot.

12          THE COURT:  I'm just looking for a time on my

13 calendar.  What page was that?

14          MR. WINTERS:  58 and 59 of the clean, it's

15 Paragraph 21.

16          THE COURT:  All right.  So, let's do 1/7 at one

17 p.m.

18          MR. WINTERS:  Thank you, Your Honor.

19          THE COURT:  Then that would make the objections

20 due New Year's Eve.  So, we're not going to do that.  So --

21          MR. WINTERS:  Yeah.  A little later is fine,

22 you're Honor.

23          THE COURT:  Yeah.  Let's do objections due the

24 30th at four p.m.  Okay.

25          Before I get there I do have two questions.

1        MR. WINTERS:  Yes, Your Honor.

2        THE COURT:  Then I will ask if anyone else wishes

3   to be heard.  Okay.  This is a very minor change, but

4   Paragraph 8 --

5        MR. WINTERS:  Got it.

6        THE COURT:  Let me see if I can find the language

7   I'm looking for.  I think it's actually on Page 31 -- yeah,

8   there we go.

9        One, two, three, four, five, six, seven, eight,

10  nine, tenth line down there's a direction that recording

11  officers accept these documents as sufficient and I'm not

12  going to do that.  I will authorize the debtors to do it, but

13  I'm not going to direct the county clerk in Jacksonville,

14  Florida, to do anything.

15       MR. WINTER:  Understood.  Thank you, Your Honor.

16       THE COURT:  You're welcome.

17       And that is literally it.

18       Does anyone wish to be heard?

19       MR. SHEPHERD:  Yes.  Your Honor, Michael Shepherd

20  of the law firm of White & Case on behalf of Elliott and

21  Oaktree.

22       THE COURT:  Yes.

23       MR. SHEPHERD:  We just want to build on something

24  Mr. Winter said.  In the event that the Court sees this case

25  being confirmed in advance of that hearing, that final DIP

1  hearing, as the largest DIP lender -- and I believe maybe the

2  second- or third-largest DIP lender -- we would anticipate

3  seeking provisions in the confirmation order that address the

4  DIP on a final basis so that we have comfort that it's not

5  going to be revisited.  So, it's going to be, Your Honor,

6  then the company, depending on the schedule, may actually

7  emerge before that hearing.

8          THE COURT:  Okay.  Understood.

9          MR. SHEPHERD:  Thank you.

10         THE COURT:  You're welcome.

11         Anyone else?

12     (No verbal response)

13         THE COURT:  I've signed the order.

14         MR. WINTER:  Thank you, Your Honor.

15         I'll turn next to the scheduling motion, which is

16 at Docket Number 11 and Agenda Item 19 -- we'll take this one

17 out of order if that's acceptable to the Court?

18         THE COURT:  That's fine.

19         MR. WINTER:  Through this motion, the debtors are

20 requesting that the Court schedule a combined confirmation

21 and disclosure statement hearing approximately two weeks

22 after the petition date; approve corresponding dates and

23 deadlines, solicitation procedures, rights and offering

24 procedures, and forms of notices; waive the requirements that

25 the U.S. Trustee can be in a creditors meeting and that the

1  debtors file schedules and statements, unless the plan is not

2  confirmed within 75 days.

3          The two-week timeline that we're asking the Court

4  to establish today is necessary and appropriate for several

5  reasons.  The first is that, as set forth in Mr. Laurie's

6  declaration, this debtors' business has been and continues to

7  be severely impaired by publicity surrounding financial

8  distress.  The debtors are a marketing-services company with

9  large, sophisticated customers on short-term contracts.

10  Customers can and will go to the debtors' competitors, out of

11  fear as to the debtors' credit worthiness and commercial

12  viability.  The company has lost clients and is at risk of

13  losing my clients, due to a leverage and financial distress.

14  The company is also not winning new clients due to financial

15  distress.  These instances are directly traceable to the

16  debtors' financial situation.  Customers tell the debtors

17  that the debtors' financial situation is the problem.

18          Similarly, competitors are telling the debtors'

19  customers that Acosta has too much leverage and isn't

20  reliable.  Every day that passes without the restructuring

21  being approved and closing risks potential customer losses.

22  It also puts a strain on the debtors' ability to retain their

23  approximate 30,000 employees.

24          Second, as set forth in the three Prime Clerk

25  declarations and affidavits, the debtors carried out a robust

1  prepetition noticing campaign.  On November 8th, 2019, the

2  debtors sent notices of the proposed combined hearing and

3  objection deadline to over 75,000 parties in interest,

4  including all known creditors and interest holders.  These

5  letters were circulated more than 28 days before the proposed

6  objection deadline and 35 days before the proposed hearing

7  date, consistent with Bankruptcy Code, Bankruptcy Rules, and

8  Local Rules.  The debtors also published notice in *The Wall*

9  *Street Journal* and *The Florida Times-Union*.  All voting

10  parties received the plan and disclosure statement and non-

11  voting parties were directed to the debtors' website where

12  the plan and disclosure statement were accessible and free of

13  charge.

14          Third, as set forth in Mr. Laurie's declaration

15  and the Prime Clerk declarations, the plan as an incredible

16  level of support.  The first lien voting deadline expired

17  before the petition date and 100 percent of voting first lien

18  creditors accepted the plan.  The vast majority of first lien

19  lenders voted; no first lien lender voted against the plan.

20  And although the bond voting deadline won't expire until next

21  week, 88 percent, by principal amount of bondholders signed

22  the RSA, and the debtors are unaware of any objecting

23  bondholder.  General unsecured claims are unimpaired and will

24  be paid in full in cash or reinstated.  Additionally, the

25  debtors' equity sponsor signed the RSA and supports the plan.

1          Courts in this district and others have approved

2    similar timelines where full notice was provided prepetition.

3    In this district, the Court approved a nine-day confirmation

4    timeline in Arsenal and in other districts, courts have

5    approved similar timelines, including a 16-day timeline in

6    Southcross and one-day timelines in each of Fullbeauty and

7    Sungard in New York.

8          For the foregoing reasons, the debtors believe

9    that the timeline set forth in the motion is appropriate.  We

10   do understand that the Court did not have availability on the

11   13th.  We have handed up an order that fills in an objection

12   deadline on the 12th at 10:00 a.m., a reply deadline on the

13   15th at 5:00 p.m., and a hearing on the 16th at 1:00 p.m.

14         Unless the Court has any questions, I'm happy to

15   walk through the other changes to the order.

16         THE COURT:  I don't have -- well, does anyone wish

17   to be heard?

18         MR. TALMADGE:  Your Honor?

19         THE COURT:  Yes?

20         MR. TALMADGE:  Very briefly.

21         THE COURT:  Mr. Talmadge, how are you?

22         MR. TALMADGE:  Good afternoon, Your Honor.  Scott

23   Talmadge from Freshfields Bruckhaus & Deringer, on behalf of

24   JPMorgan & Chase.  JPMorgan is the agent under the revolving

25   in term credit facility, as well as an LCU issuer.

1            Until last night, Your Honor, we had some issues

2   with the way the letters of credit were being treated under

3   the plan.  We've reached agreement with the debtors on

4   changes to the plan.  Signature pages to the amended RSA are

5   being circulated and we believe that a second amended plan

6   will be filed, which addresses those issues.

7            So, with that in mind, we have no objection to the

8   relief sought in the scheduling motion.

9            THE COURT:  Okay.  I understand.

10           MR. TALMADGE:  Thank you, Your Honor.

11           THE COURT:  Thank you.

12           Anyone else?

13       (No verbal response)

14           THE COURT:  All right.  Well, this is my first

15  experience with what's obviously a new trend in a certain

16  number of pre-packaged cases.  I think the critical aspect

17  here, though, is that the notices went out prepetition and

18  that all creditors are receiving full notice -- even though

19  the case, itself, won't include the entirety of that notice

20  period -- everything they're entitled to.

21           Also, it's highly significant that it is

22  apparently going to be a consensual case.  Usually when I get

23  a pre-pack, I'm looking for the person who's got the

24  shortened of the stick.  They're not very hard to find at the

25  first day hearing; they come -- they usually show up and let

1  me know that, but this is not that kind of case and that's

2  certainly good.  So, I am willing to schedule it on rather

3  short order, to say the least.

4          I am out of the state of Delaware the week that

5  includes the 13th, so I can't hear it then, but I will

6  schedule it for the date that I previously gave or my clerk

7  previously gave to the debtors of the 16th at 1:00 p.m., I

8  think.

9          MR. WINTER:  Yes, Your Honor.

10         THE COURT:  And the objection deadlines are --

11  just so the record is clear -- the hearing will be December

12  16th at 1:00 p.m.  Objections are due the 12th at 10:00 a.m.

13  It's kind of an odd time.  I wanted to give people that extra

14  night of no sleep rather than having them due on the 9th, but

15  I want them all done before the agenda is due, which is at

16  noon, so that's why I picked that time.

17         And the replies are due the 15th at 5:00 p.m. --

18  sorry about the lost weekend -- but --

19         MR. WINTER:  No problem, Your Honor.

20         THE COURT:  -- it's part of the game we play.  And

21  I think my clerk gave you instructions on how to make sure

22  that I get copies of that.

23         UNIDENTIFIED:  Yes, Your Honor.

24         THE COURT:  So, hopefully, you won't have any

25  hiccups papering the deal that was just cut; of course, if

1   issues arise, you can always contact the Court.

2           MR. WINTER:  Will do, Your Honor -- we appreciate

3   it.  We did also add --

4           THE COURT:  I am -- I can be contacted.  I'm not

5   going to the North Pole --

6       (Laughter)

7           THE COURT:  -- to help out Santa; I'm available,

8   but I won't be in the state.

9           MR. WINTER:  We will try not to bother you.

10          THE COURT:  That's --

11          MR. WINTER:  We did also add, Your Honor -- it's

12  reflected in the redline at the request of the U.S.

13  Trustee -- Paragraph 10, which just says that we'll serve the

14  combined notice on certain additional parties, substantially

15  all of whom already received it, but some additional comfort

16  language.

17          THE COURT:  All right.  I've signed the order.

18          MR. WINTER:  Thank you, Your Honor.

19          That takes me, Your Honor, to the Prime Clerk

20  application, which is at Docket Number 12 and Agenda Item 5.

21  This is a customary application to employ Prime Clerk as

22  claims and noticing agent, consistent with the protocol in

23  this district.

24          Also consistent with the protocol, the debtors

25  solicited protocols from three parties.  The debtors will

1  file a separate application under Section 327 to retain Prime

2  Clerk in its capacity as administrative agent.

3          There have been no changes to the order from the

4  version that was filed.  Unless the Court has any questions,

5  we would respectfully request that the Court enter the

6  proposed order.

7          THE COURT:  Does anyone wish to be heard?

8      (No verbal response)

9          THE COURT:  I'll sign the order.

10          MR. WINTER:  Thank you, Your Honor.

11          With that, I'll turn the podium over to Ms. Bordi

12  to take us through the rest of the agenda.

13          THE COURT:  Very good.

14          MS. BORDI:  Good afternoon, Your Honor.  Ameneh

15  Bordi of Kirkland & Ellis, on behalf of the debtors.

16          So, I'll take us through some of these operational

17  motions rather quickly.  The first on the -- next on the

18  agenda is the cash management motion, which was filed at

19  Docket Number 13.

20          You have a redline which reflects one change that

21  you've already mentioned, which is that you're not going to

22  direct the banks to do anything, so we just made that change

23  to the order.  And then we noticed that in previous hearings,

24  you prefer that each order stand on its own, so we have

25  removed the reference to this order being controlled by the

 1   DIP order.

 2              THE COURT:  Very good.

 3              MS. BORDI:  Unless Your Honor has any questions,

 4   we would ask that you enter the order approving the

 5   continuation of the cash management system.

 6              THE COURT:  Does anyone wish to be heard?

 7         (No verbal response)

 8              THE COURT:  All right.  This -- I guess the final

 9   hearing for this will also be the 7th --

10              MS. BORDI:  Yes, Your Honor.

11              THE COURT:  -- is that what we're doing?

12              I'll just fill that in.

13              MS. BORDI:  The next item --

14              THE COURT:  Hang on -- I'm sorry -- I'm not ready.

15              MS. BORDI:  I'm so sorry.

16              THE COURT:  I said one o'clock, right?

17              MS. BORDI:  Yes, Your Honor.

18              THE COURT:  Sorry.  I didn't write that down on my

19   notes.  Okay.  I've signed the order.

20              MS. BORDI:  Okay.  Thank you, Your Honor.

21              Next on the agenda is the wages motion, which was

22   filed at Docket Number 14.  As Your Honor has heard several

23   times, the employees are the lifeblood of this company, so

24   this one is a really important one to the debtors.

25              And the only changes in the order, again, reflect

1  what we understand to be Your Honor's preference, so in

2  Paragraphs 5 and 6, the reference to cashing checks is cross-

3  referenced to the cash management order --

4              THE COURT:  Uh-huh.

5              MS. BORDI:  -- and then Paragraph 9, relating to

6  the DIP facility -- DIP order overriding had been struck.

7              So, unless Your Honor has any questions, we would

8  respectfully request entry of the wages motion order.

9              THE COURT:  Does anyone wish to be heard?

10        (No verbal response)

11             THE COURT:  All right.  Let me just fill in the

12  dates here.

13             MS. BORDI:  Thank you.

14             THE COURT:  Okay.  I've signed the order.

15             MS. BORDI:  Thank you, Your Honor.

16             The next item on the agenda is the customer

17  programs motion.  This was filed at Docket Number 15.

18             This motion covers various programs that are

19  designed to maintain the goodwill and business of all the

20  debtors' clients and customers.  Again, the only changes to

21  this order are to cross-reference against the cash management

22  order and remove the reference to the DIP facility.

23             Unless Your Honor has any questions, we would

24  respectfully request entry of the order.

25             THE COURT:  Customers, right?

1        MS. BORDI:  Yes, Your Honor.

2        THE COURT:  I've signed the order.

3        MS. BORDI:  Thank you, Your Honor.

4        Next on the agenda is the -- what we're calling

5 the "all trade motion," which was filed at Docket Number 16.

6 This motion seeks authority to pay, basically, all trade

7 payables that are on the debtors' open AP system.  Given the

8 pre-packaged nature of these Chapter 11 cases and that the

9 plan provides that all general unsecured claims would be paid

10 in full, we request authority to continue to operate this the

11 ordinary course.

12        None of the payments would be accelerated, of

13 course, and we did confer with the Office of the United

14 States Trustee and provided information on these claims, as

15 well.

16        Unless Your Honor -- again, same changes I should

17 mention, to the order removing that paragraph and reference

18 in cash management order.  Unless there are any questions, we

19 would respectfully request entry of the order.

20        THE COURT:  Okay.  Does anybody wish to be heard?

21     (No verbal response)

22        THE COURT:  Okay.  I have signed the order.

23        MS. BORDI:  Next on the agenda is the utilities

24 motion.  This was filed at Docket Number 17.

25        The utilities motion seeks to put into place an

1  adequate assurance deposit for utilities.  We don't believe

2  that the debtors are in arrears of any utilities, but in the

3  short period of this case, we will put an adequate assurance

4  deposit.  If any utility would like to draw on that, there

5  are procedures that are set forth in the order that are

6  customary in this district and others.

7          I -- we did have one informal request from one of

8  the utilities -- Waste Management -- so, if it's all right

9  with Your Honor, we would just read in an agreement that

10 we've reached with that utility.

11         THE COURT:  Yes, that's fine.

12         MS. BORDI:  "Prior to terminating any waste-

13 management services with the debtors, the debtors shall

14 provide notice of such termination in writing, including by

15 email, to counsel of record for Waste Management, attention

16 Brian J. McLaughlin, Esquire, and Rachel B. Mersky, Esquire,

17 1201 North Orange Street, suite 400, Wilmington, Delaware

18 19801."

19         And their emails are:  BMcLaughlin@monlaw.com,

20 Rmersky@monlaw.com, and Waste Management, attention,

21 Jacqueline E. Hatfield Mills, Waste Management, 1001 Fannin,

22 suite 4000, Houston, Texas, Jmills@wm.com.

23         The notice of termination shall include the date

24 of termination and the location at which services are being

25 terminated.  As defined in the agreement or invoice between

1   Waste Management and the debtors, if the debtors fail to

2   provide notice, as provided, the debtors shall remain

3   administratively obligated for the costs and expense of

4   services provided by Waste Management to such location until

5   Waste Management receives actual notice that waste-management

6   services at a particular location is terminated.

7           Again, we don't anticipate needing to use this

8   provision, but we wanted to give comfort to Waste Management

9   that we would give them notice.

10          THE COURT:  Thank you.

11          MS. BORDI:  Unless there are any objections, we

12  request that the Court enter the order.

13          THE COURT:  Does anybody wish to be heard, other

14  than -- Ms. Mersky, yes?  She read your language.

15      (Laughter)

16          MS. MERSKY:  Your Honor, I just wanted to thank

17  the debtor for quickly responding to us.  In this case, it is

18  probably unnecessary, but the unknown is something that's

19  necessary to protect against.  But we do appreciate the

20  debtors' quick response.

21          THE COURT:  Okay.  Thank you.

22          All right.  I've signed the order.

23          MS. BORDI:  Thank you, Your Honor.

24          The next item on the agenda is the insurance

25  motion, Docket Number 18.  Again, this is somewhat of a

1  protective motion, as the debtors have already renewed their

2  insurance for this cycle and don't believe that any

3  prepetition amounts remain outstanding; however, unless there

4  are any questions, we would request entry of the insurance

5  motion authorizing the debtors to continue their prepetition

6  insurance and pay any undisputed prepetition insurance

7  obligations if any are out there, which we don't believe

8  there are.  Again, the same changes to the order cross-

9  referencing cash management and taking out the DIP.

10              THE COURT:  Does anybody wish to be heard?

11          (No verbal response)

12              THE COURT:  Okay.  Just give me a minute.

13              Okay.  I've signed the order.

14          MS. BORDI:  Thank you, Your Honor.

15              And I'll turn it over to my colleague,

16  Ms. Dreisbach, to take us through the balance of the agenda

17  today.

18              THE COURT:  Okay.  Thank you.

19              Ms. Dreisbach, good afternoon.

20          MS. DREISBACH:  Good afternoon, Your Honor.  Annie

21  Dreisbach for the debtors.

22              Next on today's agenda is Item Number 12, the

23  debtors' taxes motion, filed at Docket Number 19.  By this

24  motion, the debtors seek entry of an order authorizing them

25  to remit and pay prepetition business taxes and fees that

1    will become payable during these Chapter 11 cases, up to $1.2

2    million.

3         The debtors share the proposed order with the U.S.

4    Trustee's Office before filing, so the filed version reflects

5    their comments.  Additionally, we have made the one change

6    that Ms. Bordi addressed, which is reflected in Your Honor's

7    copy.  Unless Your Honor has any questions, we would

8    respectfully ask the Court to enter the order as modified.

9         THE COURT:  Does anybody wish to be heard?

10        (No verbal response)

11        THE COURT:  So, I was trying to decide whether

12   Footnote 4 was an approving footnote of my decision --

13   affirmative -- or a disapproving footnote.

14        MR. SUSSBERG:  I want to look for it, but it's

15   approving.

16        (Laughter)

17        THE COURT:  So, the official Kirkland position is

18   I got it right.  All right.

19        MR. SUSSBERG:  That's the party line.

20        (Laughter)

21        THE COURT:  Well, all that matters is whether

22   Judge Andrews, who I believe has the appeal, whether he

23   agrees with it or not.

24        MS. BORDI:  Oh, the straddle pack?

25        THE COURT:  Yes.

1          MR. SUSSBERG:  Yes.

2          MS. BORDI:  Well, would --

3          MR. SUSSBERG:  It's approving.

4          THE COURT:  Okay.  I've signed the order.

5          MS. DREISBACH:  Thank you, Your Honor.

6          Turning to Item Number 13 on the agenda, it's the

7   debtors' equity trading motion, filed at Docket Number 20.

8   This motion seeks authority to establish notification

9   requirements regarding Anna Holding common stock and

10  establishing restrictions on certain transfers of the stock.

11         Your Honor, unless you have any questions, we

12  respectfully request the Court to enter the order.

13         THE COURT:  Does anybody wish to be heard?

14      (No verbal response)

15         THE COURT:  Okay.  Let's see.

16      (Pause)

17         THE COURT:  Make sure you look at these orders

18  when they're posted to make sure I didn't mess up any of the

19  dates.  I think I'm getting them right.  If there are, just

20  let us -- if there are mess-ups just let us know and we'll do

21  a revised order.

22         MS. DREISBACH:  Yes, Your Honor.

23         THE COURT:  I've signed the order.

24         MS. DREISBACH:  Thank you, Your Honor.

25         That brings us to the last item on today's agenda,

1   which is the debtors' motion to file a consolidated creditor

2   matrix, and this is filed at Docket Number 21.  By this

3   motion, the debtors seek authority to file a consolidated

4   creditor matrix and a top-30 list and redact certain

5   personally identifiable information.

6           We have had conversations with Mr. Schepacarter

7   regarding the redaction points and we understand the Office

8   of the United States Trustee has an institutional objection

9   to the redaction of information.  We'd like to take this time

10  to briefly set forth why we believe cause exists to do so.

11          THE COURT:  Okay.

12          MS. DREISBACH:  Courts in this jurisdiction have

13  authorized the debtors to redact this personally identifiable

14  information for individual creditors because they recognize

15  that such information would render these individuals more

16  susceptible to identity theft and could jeopardize the safety

17  of these individuals who, unbeknownst to the debtors, may be

18  survivors of domestic violence or stalking, by publicize

19  their home addresses without any advanced notice.

20          In fact, we know in our firm's experience that

21  this risk is not merely speculative.  In Charming Charlie,

22  closing argument case Your Honor presided over, we posted the

23  address of a person who is hiding from an abuser.  The

24  abusive former partner exploited the publicly accessible

25  creditor information to track this employee to her new home

1  address.

2           While we acknowledge that the policy interests and

3  the public's access to court records is of special

4  importance, we respectfully submit that the public's

5  interests in the home addresses of employees is far

6  outweighed by the dangers we might inflict on these people

7  who are identified on a broad creditor matrix without any

8  notice.

9           The debtors propose an unredacted version of this

10 information will be made available to the Court, to the U.S.

11 Trustee, and to other parties in interest upon reasonable

12 request, but it will not be made easily available to the word

13 through a simple Google search.  The relief requested herein

14 is especially appropriate in light of the pre-package nature

15 of these Chapter 11 cases where unsecured creditors are being

16 paid in full and their interests are riding through

17 unimpaired.

18           As such, the debtors respectfully submit that our

19 proposed solution appropriately balances the potential harm

20 that would come with publishing this information with the

21 public's access to the court records.

22           Unless Your Honor has any questions, I will turn

23 the podium over to Mr. Schepacarter for the U.S. Trustee's

24 view.

25           THE COURT:  Thank you.

1          Mr. Schepacarter?

2          MR. SCHEPACARTER:   Thank you, Your Honor.

3          Thank you, Ms. Dreisbach.

4          For the record, Richard Schepacarter for the

5  United States Trustee.   I'm not sure it's like an

6  institutional objection --

7     (Laughter)

8          MR. SCHEPACARTER:   -- but I think it's more of a

9  statutory read in the objection based on the Code,

10 Section 107, and what flows from that, with respect to this

11 type of information having been redacted from the schedules

12 or any other paper that's filed in this case.

13         I think we started the bedrock principle of

14 transparency and disclosure.   I know that when I first

15 started practicing bankruptcy law back in 1980-something,

16 that they always used to say, Oh, it's the fish bowl of

17 bankruptcy, so once you file a bankruptcy petition, whether

18 it be Chapter 11, 7, 13, 12, I guess even 9, that for the

19 public, all the information is available to the public.

20         THE COURT:   But the problem is that it's a fish

21 bowl for the debtor.   It's not a fish bowl for the debtors'

22 employees and they're being put in a situation where they're

23 not debtors, but their information --

24         MR. SCHEPACARTER:   Right.

25         THE COURT:   -- and the world is very different

1  from when you and I started practice with the problems of

2  identity theft.

3            MR. SCHEPACARTER:  Understood.  I understand that

4  argument very well.

5            THE COURT:  If you wanted to look at the schedules

6  in 1994 when I started practicing bankruptcy, you had to go

7  to the Clerk's Office to look at the, you know -- now, you're

8  two clicks away -- one click away.

9            MR. SCHEPACARTER:  Understood.

10            THE COURT:  But keep arguing.  I'm just --

11        (Laughter)

12            THE COURT:  -- we're just having a conversation.

13        (Laughter)

14            MR. SCHEPACARTER:  I understand.  And, basically,

15  the Code has, I think, provided a little bit for that.  In

16  Section 107 it talks about that the Court can protect

17  somebody from the undue risk of identity theft.

18            Here, we have speculation, we have the

19  anticipation that there's the possibility that something

20  could be -- have their name uncovered; although, it may be

21  somewhere else in the web, which, again, didn't exist in

22  1980-something -- maybe it did and we just didn't know about

23  it.

24            But having said that, the Code provides for that

25  protection and the information in it boils down to where you

1  get to the identity theft in Title 18, and absent from that

2  is those protected -- that protected information, some of

3  which is like biomedical and stuff like that, things of that

4  nature of.  Absent from that is the home addresses of a

5  person.

6          Now, I understand that they want to protect,

7  basically, the employees in the case and I think that,

8  perhaps, what has happened, unless you were in the first

9  Charming Charlie, but I think in one of the Judge Walrath

10  cases that she ruled the other way, which is basically to say

11  that the information had to be published, but then had it

12  redacted for anyone who was a minor, basically, somebody

13  who's under the age of 18.

14          THE COURT:  All right.

15          MR. SCHEPACARTER:  Thank you, Your Honor.

16          THE COURT:  I appreciate the concern, in

17  particular, the statutory concern, involved here with fealty

18  to the Code, of course, is important.  But I really think --

19  and my mind is completely changed on this, so please ignore

20  all previous rulings on this --

21      (Laughter)

22          THE COURT:  -- frankly, I don't think I was aware

23  as a citizen, as much about the dangers associated with this

24  kind of information becoming public.  Now, it's a balancing

25  act, of course, and you have to disclose what you have to

1  disclose; however, the reality is that the employees are

2  really creditors in name only.  I mean, they're being paid --

3  virtually all of them are being paid in the interim order up

4  to the statutory cap.  Those that are above the statutory cap

5  will have to -- for those about the statutory cap, they have

6  to wait until the final order; of course, there might be

7  other employee-related obligations of the debtor that would

8  technically make them a creditor, but appropriately, we very

9  quickly turn employees not into creditors, but into persons

10  who are incentivized to promote the reorganization of the

11  business.  Every business enterprise relies on its employees

12  for value, creation, and protection.

13         So -- and, again, here with a case where it's a

14  pre-packaged case that may or may not, but appears it's

15  headed to confirmation in two weeks, I think we can always

16  revisit this issue if it turns out that there's a reason that

17  these addresses need to be put in the public sphere -- if the

18  case doesn't go well, if there's some issue with regard to

19  employee-related claims -- we can revisit it.

20         But I think it's just plain common sense in

21  2019 -- soon-to-be 2020 -- to put as little information out

22  as possible about people's personal lives to present scams.

23         I had a member of my family who had an identity-

24  theft problem.  I have an elderly member of my family who

25  every time she answers the phone, I'm afraid she's going to

1  sell the house to somebody on the other end.

2      (Laughter)

3          THE COURT:  So, you know, it's a real-life issue,

4  and, of course, the issue of domestic violence is extremely

5  important.  So, I'm going to perhaps skirt the line of fealty

6  to the Bankruptcy Code, being that I think it just makes

7  common sense.  I'm going to approve the order and overrule

8  the objection.

9          MS. DREISBACH:  Great.  Thank you, Your Honor.

10         That concludes our agenda for today.

11         THE COURT:  I'm sorry it's so warm in here.  I --

12  we've been having trouble -- usually it's like an icebox, but

13  we've been having trouble.

14         MR. SUSSBERG:  Judge, thank you and your chambers,

15  for accommodating us today on short notice.  We very much

16  appreciate it.

17         And we expect to be here on the 16th with as much

18  consensus as we have today --

19         THE COURT:  Okay.

20         MR. SUSSBERG:  -- and just extend this two-week

21  period of time for the company to stay in bankruptcy.  Thank

22  you.

23         THE COURT:  Thank you very much.

24         We're adjourned.

25         COUNSEL:  Thank you, Your Honor.

1          (Proceedings concluded at 2:10 p.m.)

2

3                           CERTIFICATE

4

5    I certify that the foregoing is a correct transcript from the

6    electronic sound recording of the proceedings in the above-

7    entitled matter.

8
     /s/Mary Zajaczkowski_____          December 3, 2019
9    Mary Zajaczkowski, CET**D-531

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25